UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COALITION FOR COMPETITIVE ELECTRICITY,
DYNEGY INC.,
EASTERN GENERATION, LLC,
ELECTRIC POWER SUPPLY ASSOCIATION,
NRG ENERGY, INC.,
ROSETON GENERATING LLC, and
SELKIRK COGEN PARTNERS, L.P.,                    No. _____

      Plaintiffs,

      v.

AUDREY ZIBELMAN, in her official
capacity as Chair of the New York Public
Service Commission; and PATRICIA L.
ACAMPORA, GREGG C. SAYRE, and
DIANE X. BURMAN, in their official
capacities as Commissioners of the New York
Public Service Commission,

      Defendants.

                                        /

## COMPLAINT

    1.    This case arises from unlawful New York Public Service Commission

("PSC") regulations that intrude on the exclusive authority of the Federal Energy

Regulatory Commission ("FERC") over "the sale of electric energy at wholesale in

interstate commerce" pursuant to the Federal Power Act ("FPA"), 16 U.S.C.

§ 824(b)(1).  FERC has determined that competitive market forces best set

wholesale energy prices and thus has mandated and approved auction-based

1

markets for wholesale electric energy in the New York region and other regions nationwide. Under FERC's system, as the PSC has acknowledged the forces of competition "have benefited consumers but have impaired the financial viability of upstate nuclear plants, to the point where plant owners have announced the intention to close plants that are otherwise fully licensed and operational." Order Adopting a Clean Energy Standard, Aug. 1, 2016 (the "ZEC Order"), at 45.[1]

2.    Seeking to change the results of FERC's market-based auction system, the PSC issued the ZEC Order to bail out four uneconomic upstate nuclear power plants and keep them in the market for at least twelve more years, via so-called Zero Emissions Credits ("ZECs"). Unless enjoined or eliminated, these credits will result in New York's captive ratepayers paying the owners an estimated $7.6 billion over twelve years to the owners of these plants. Indeed, it appears that 100% of the ratepayer subsidies will go to a single company, which will own all of the subsidized plants. The actual dollar amount of the ZECs is tethered to the price of electricity in the FERC-regulated wholesale market. That is, particular nuclear generators are entitled to ZECs when the PSC finds that the wholesale market price is "insufficient to provide adequate compensation" to them,

---

[1]    The ZEC Order is available at http://documents.dps.ny.gov/public/Common/ ViewDoc.aspx?DocRefId={44C5D5B8-14C3-4F32-8399-F5487D6D8FE8}. Although the Order covers several matters and includes several ordering clauses, this case concerns only the "Tier 3" subsidies to upstate nuclear generators, as set forth therein. ZEC Order at 19-20, 45-61, 119-150. The pertinent pages are attached hereto as Exhibit A. Plaintiffs are not challenging the Tier 1 and Tier 2 portions of the Order.

and the amount of the subsidies is reduced or increased as wholesale prices fluctuate.  There is no entitlement to any ZECs if wholesale market prices established under FERC's auspices rise above a specified level.

3.     If the ZECs go into effect, as they are scheduled to do in April 2017, they will profoundly disrupt the FERC-approved energy-market auction structure and result in the transfer of more than $600 million a year of ratepayer funds to Exelon.  At current wholesale prices, for every megawatt hour ("MWh") of energy the upstate nuclear plants sell into the FERC-jurisdictional market, the nuclear units will receive a more than 80 percent premium from the ZECs.  That is, for each MWh sold, they will receive the current locational price of energy ($19.71 per MWh for Ginna, for example, and $20.63 per MWh for FitzPatrick and Nine Mile[2]) plus a $17.48 ZEC payment subsidy, funded entirely by New York consumers.  In other words, the FitzPatrick and Nine Mile plants will both receive $38.11 per MWh of energy produced, while a competing energy generator, located next door, would receive just $20.63 per MWh.  If the wholesale price of electricity decreases over the next two years, the bonus payments to the subsidized nuclear plants will increase above the current $17.48 per MWh level.  The bonus

---

[2]     Prices based on around-the-clock average day-ahead market prices for October 1, 2015 – September 30, 2016, and published at:  http://www.nyiso.com/public/markets_operations/ market_data/ custom_report/ index.jsp?report=dam_lbmp_zonal.

would decrease, in turn, if wholesale market prices increase to specified levels equated with the cost of operating the nuclear plants.

     4.    The ZEC payments threaten to disrupt the economically efficient function of the FERC-approved monthly capacity market auctions administered by the NYISO. In anticipation of significant disruption to the April 2017 and subsequent monthly capacity market results, financial over-the-counter capacity markets that trade in advance of the FERC-sponsored auctions have already shown dramatic price declines as a result of the ZEC Order. These declines reflect that nuclear plants that were scheduled to leave the market are now likely to remain in operation. The artificial retention of the nuclear units in the market has a significant effect on wholesale capacity market prices subject to FERC's exclusive jurisdiction.[3]

     5.    The prospect of these out-of-market payments has already caused three of the four affected nuclear plants to reverse their decisions to close, preventing the New York energy markets from reaching the efficient market equilibrium that the FERC-approved wholesale prices would have otherwise produced.

---

[3]    *See* The Brattle Group, *New York's Upstate Nuclear Power Plants' Contribution to the State Economy* (*hereinafter* "The Brattle Group 2015"), which estimates an approximately $15 billion impact on wholesale energy prices over 12 years.

6.    If the ZECs go into effect, New York's *retail* ratepayers will be forced to fund an effort by the PSC to artificially depress *wholesale* market prices, which disrupts the FERC-approved auctions and market processes.  The nuclear plants will not retire as scheduled, but will continue to bid into the wholesale market auctions, with the incentive and ability to offer their supply into the auctions at artificially lower prices (*i.e.*, at prices that do not fully cover their costs).  The result of these below-cost bids will be below market prices.  This would harm other generators, including the Plaintiffs, because the lower auction prices will result in lower revenues.  In the long term, with non-subsidized generators forced to exit the market, lower prices will deter potential new generators – including generators of renewable sources of energy – from entering the market.  The result will be reduced supply and increased prices for local utilities, and thus for the homeowners and businesses that they serve.

7.    The ZEC program is unlawful because it operates in the area of FERC's exclusive jurisdiction, and federal law thus preempts it.  Such preemption invalidated similar measures that Maryland had adopted, under the U.S. Supreme Court's decision earlier this year in *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. __ (2016).  As a further and independent basis for federal preemption, moreover, the ZEC program will frustrate the long-term functioning of the FERC-jurisdictional markets.  The program results in a mix of energy resources that will

5

be far less economically efficient than if the markets were allowed to work as designed.

8.    The ZEC program is also invalid under the dormant Commerce Clause.  The ZECs solely benefit certain wholesale producers of nuclear energy in New York, to the disadvantage of out-of-state producers who compete in the wholesale market.  New York has thus failed to regulate evenhandedly to effectuate a legitimate local public interest, and the effects of its regulation on interstate commerce are more than incidental.  For all of these reasons, the Court should enter appropriate declaratory and injunctive relief.

## PARTIES

9.    Plaintiff Coalition for Competitive Electricity ("CCE") is a non-profit trade organization, chartered in Delaware, formed by certain electric power suppliers whose businesses will be harmed if the ZEC Order goes into effect.

10.    Plaintiff Dynegy Inc. ("Dynegy") owns and operates nearly 26,000 MW of power-generating capacity throughout the Midwest and Northeast and two retail electric companies serving businesses and residents in Illinois, Ohio, and Pennsylvania.  Dynegy's indirect subsidiary Sithe/Independence Power Partners, LP ("SIPP") owns and operates the Independence Energy Facility in Oswego, New York, a gas-fueled generator with a capacity of 1,060 MW.  Through an affiliated

power marketer, SIPP actively participates in the New York-area FERC-regulated wholesale electricity auctions.

11.     Plaintiff Eastern Generation, LLC ("Eastern") owns and operates, through its subsidiaries, 72 generating units at seven facilities with a total average capacity of 4,961 MW. The facilities are located in New York, Illinois, Michigan, and Ohio. Eastern units provide over 18 percent of electricity capacity for the City of New York. Eastern actively participates in the New York-area FERC-regulated wholesale electricity auctions.

12.     Electric Power Supply Association ("EPSA") is the national trade association representing leading competitive electric power suppliers, and is incorporated under the laws of the District of Columbia. EPSA's members include companies that are involved in competitive wholesale and retail electricity markets, with significant financial investments in electric generation and electricity marketing operations in New York and throughout the United States. EPSA seeks to bring the benefits of competition to all power customers. Many EPSA members actively participate in the New York-area FERC-regulated wholesale electricity auctions.[4]

13.     Plaintiff NRG Energy, Inc. ("NRG") is the largest independent power producer in the United States with over 50,000MW of diverse resources – powered

---

[4]     The views expressed in this filing represent the position of EPSA as an organization, but not necessarily the views of any particular member with respect to any issue.

by solar, wind, nuclear, gas, coal, oil, and cogeneration – and is one of the nation's largest competitive retail energy suppliers, with roughly three million retail customers. In New York, NRG owns four power plants in Staten Island, Queens, Haverstraw, and Oswego, totaling approximately 4,000 MW of generation. NRG affiliates also offer demand response services in New York, which are also highly influenced by prices in the FERC-jurisdictional markets, as well as selling power to New York customers at retail through a variety of affiliates. Through its ownership of these resources, NRG actively participates in the New York-area FERC-regulated wholesale electricity auctions.

14.     Plaintiff Roseton Generating LLC ("Roseton") is the owner and operator of the Roseton electricity generation facility, a 1,242MW natural gas- and fuel-oil-fired generation facility in Newburgh, New York. Roseton actively participates in the New York-area FERC-regulated wholesale electricity auctions.

15.     Plaintiff Selkirk Cogen Partners L.P. ("Selkirk Cogen") is the owner of a 432-MW natural-gas-fired combined-cycle cogeneration facility in Bethlehem, New York. Selkirk Cogen actively participates in the New York-area FERC-regulated wholesale electricity auctions.

16.     Defendant Audrey Zibelman is Chair of the PSC and is sued here only in her official capacity.

17.    Defendant Patricia L. Acampora is a Commissioner of the PSC and is sued here only in her official capacity.

18.    Defendant Gregg C. Sayre is a Commissioner of the PSC and is sued here only in his official capacity.

19.    Defendant Diane X. Burman is a Commissioner of the PSC and is sued here only in her official capacity.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over the subject matter of this case, under 28 U.S.C. § 1331, because the claims arise under federal law, specifically the Supremacy Clause and the Commerce Clause of the U.S. Constitution, and under 28 U.S.C. § 1983.

21.    This Court has the authority to grant the requested declaratory relief under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, and authority to grant the requested injunctive relief under 28 U.S.C. § 1651(a) and Federal Rules of Civil Procedure 2202 and 65.

22.    This Court has jurisdiction to order prospective relief in the form of a declaratory judgment or an injunction against Defendants in their official capacities as officers of an agency of the State of New York. *Ex parte Young*, 209 U.S. 123, 129 (1908).

23.     Venue is properly in this district pursuant to 28 U.S.C. § 1391, because at least one defendant resides in this district, as the PSC has a major office in this district.

## FACTS

### Exclusive Federal Jurisdiction Over the Wholesale Electricity Market

24.     Under the FPA, FERC has exclusive regulatory authority, to the exclusion of state and local governments, over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1); *see also id.* § 824(d) (defining a "wholesale" sale as a sale of electric energy to a buyer "for resale" to another buyer).

25.     The scope of interstate regulation has grown over the years, as technological developments made it increasingly possible to transmit energy over long distances.  Local delivery networks gave way to the modern "grid" network, with electricity constantly moving in interstate commerce throughout the United States.

26.     FERC is exclusively empowered to regulate the interstate wholesale market to ensure, *inter alia*, that rates are "just and reasonable." 16 U.S.C. § 824d(a).  In determining whether a state regulation interferes with this authority, courts consider "the *target* at which the state law *aims*," and "measures aimed directly at interstate purchasers and wholesales for resale" are preempted. *Oneok,*

10

*Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015).  State actions that "*directly affect the wholesale rate*" are likewise invalid.  *FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760, 772 (2016) (quotation omitted).  The Supremacy Clause preempts any state regulation that effectively sets the wholesale rate a generator will receive.  *Hughes*, 578 U.S. __.

## The FERC Regulatory Regime and the NYISO

27.    Instead of directly setting wholesale rates, FERC has opted to regulate by using market-based auctions that are administered to establish the "just and reasonable rates" the FPA requires.  FERC has explained that it relies on market processes "to bring more efficient, lower cost power to the Nation's electricity consumers."  *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.*, FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996).

28.    FERC authorizes and regulates "independent system operators" ("ISOs") and "regional transmission organizations" ("RTOs") to oversee the interstate auctions that are part of such market processes.  The state of New York is in a region where wholesale electricity is bought and sold via auctions conducted by an ISO called the New York Independent System Operator, Inc. ("NYISO").  Some of the buyers in NYISO's wholesale auctions are entities located outside of New York, although most buyers are in-state utilities and competitive energy

providers that resell to New York customers and businesses.  The energy suppliers in NYISO's wholesale auctions include generators and demand-response entities located inside and outside of New York.  NYISO's auctions are considered interstate wholesale markets, and FERC regulates them.

29.    NYISO operates two distinct types of wholesale auctions: energy and capacity (among others, which have less direct bearing on this Complaint).  There are two types of energy auctions – "day-ahead" and "real-time."

### Energy Markets

30.    With respect to the energy market, the goal of both the day-ahead and real-time auctions is to ensure that the NYISO "dispatches" (that is, turns on and regulates the output level of) sufficient generation resources to meet the actual amount of power used by consumers – or "load" in energy parlance – at any given moment.  Unlike most other commodities that can be bought and sold in markets, electricity cannot be economically stored in appreciable quantities.  If the amount of generation on the system falls short of demand levels, the grid operator will take a series of FERC-mandated steps to limit the negative consequences, starting with voltage reductions or "brownouts" and ending, in more severe cases, with load shedding or "rotating blackouts" to restore balance.  If these measures to reduce load to meet available supply are not successful, uncontrolled widespread blackouts may result.

31.    NYISO aims to prevent a supply/demand mismatch by running sophisticated day-ahead and real-time energy markets that take into account physical limitations on the transmission lines, generator availability, predicted energy usage, and many other factors.  Because the transmission system has various physical limitations, the price of power varies by location, with electricity costing more in some parts of New York than in others.

32.    In the day-ahead energy market, generators bid the price at which they are willing to generate a particular quantity of electricity for next-day delivery.  In the real-time energy markets, the NYISO price increases or decreases, signaling the need for participating generators to produce more or less electricity as real-time conditions change.

33.    The economic theory behind the energy markets is simple:  the NYISO accepts bids from generators, beginning with the lowest and moving up until all demand bids are satisfied.  (The reality is more complicated, as the NYISO determines separate energy prices, every five minutes, for hundreds of individual locations across New York.)  The price of the final bid that satisfies all demand for a given location is known as the "market clearing price" or "locational based marginal price" and is paid uniformly to all successful supply-side bidders in that location.  The wholesale price of electricity in both the day-ahead and real-time energy markets can rise very steeply at times of peak demand.  Markets naturally

13

deploy the most efficient and cheapest generators first; additional quantity must be provided by less efficient generators that cost more to run.

34.     Unlike other types of generators, which can be turned on and off, or adjusted quickly to produce more or less energy, as conditions warrant, nuclear generators are typically dispatched in the day-ahead market and run continuously at maximum output.  Because they have no alternative to selling their output in the NYISO energy auctions, they typically bid into these markets as "price takers," meaning that they will sell their entire output at whatever clearing price the market determines, even if the price is negative (in which case the generators would actually pay money for the right to download their output to the grid).  A large price-taking unit significantly decreases energy-market prices paid to competitors, as it injects large quantities of energy into the grid, which lowers market-clearing prices.  As long as energy-market prices, on average, are higher than the nuclear unit's marginal operating costs, this may be financially sustainable for a nuclear unit, since the total revenues earned will exceed the unit's costs of production. Recent decreases in energy-production costs, however, largely driven by access of

cheap shale gas, have decreased energy prices below the level necessary to keep some nuclear units operating.[5]

*Capacity Markets*

35.   In order to ensure that the NYISO has the electricity-producing resources (the generating capacity) it needs to operate the grid reliably, the NYISO operates a capacity auction. On a seasonal basis, NYISO calculates how much generating capacity is needed to allow the electric grid to run reliably under forecasted peak demand and in the presence of significant losses of generating and transmission facilities. NYISO establishes the amount of electricity-generation capacity that New York retail electric suppliers ("load serving entities" or "LSEs") are required to purchase in order to meet customer demand under peak conditions. New York LSEs can meet their capacity obligations either through bilateral contracts with generation-owners (or with generation that they own), or through the NYISO-administered auction markets for reliability products known as capacity (the "Installed Capacity" or "ICAP" auctions), which FERC established.

36.   In contrast to the energy auctions, where *electricity itself* is bought and sold, capacity auctions are for the purchase and sale of *options* to produce

---

[5]   The owner of the Nine Mile and Ginna facility states that it "realizes a facility cost of $50.00 per megawatt hour."  Docket No. 16-E-0270, "Petition of Constellation Energy Nuclear Group LLC; R.E. Ginna Nuclear Power Plant, LLC; and Nine Mile Point Nuclear Station, LLC to Initiate a Proceeding to Establish the Facility Costs for the R.E. Ginna and Nine Mile Point Nuclear Power Plants," at 2.

electricity.  The NYISO, as buyer of a capacity-market option, receives the right, at its sole discretion, to call upon the seller of the option (a power generator) to produce a specified amount of energy if and when needed.  Each generator that sells capacity in the NYISO capacity market is required to participate in the day-ahead energy market, and to respond in real-time, if conditions warrant.  While the buyer of an option – in this case, the NYISO – need not exercise its option to require the seller to produce energy, the capacity market ensures that the grid will have the *ability* to furnish the amount of energy needed by consumers at any given moment in time.

37.    The amount of capacity that the New York LSEs are required to purchase in the NYISO capacity markets is determined through a rigorous reliability planning process conducted by the New York State Reliability Council and overseen by FERC.  Under FERC oversight, NYISO determines the required amount of capacity, and then it administers FERC-approved monthly capacity auctions, which are conducted separately for each of four sub-zones within the NYISO region.  FERC also approves key parameters of the capacity-market auction, in particular, the shape of the administratively determined "downward sloping" demand curve that establishes the price LSEs are required to pay for capacity in various reliability scenarios and in various locations across New York.

38.     As supplies of capacity are reduced (signaling a heightened risk to
reliability), capacity prices increase to induce additional infrastructure investments.
As supplies of capacity become more abundant (signaling a potential over-supply),
capacity prices decrease, leading to the potential closure of inefficient generating
units.  Under FERC's auspices, NYISO has carefully calibrated its "downward
sloping" demand curve to ensure that consumers receive the desired level of
electrical-system reliability at the lowest possible price.  Over time, the FERC-
approved market design is self-correcting and leads to efficient economic
equilibrium.  The costs of capacity purchased in the NYISO capacity auctions are
apportioned to LSEs on a volumetric-share basis.

39.     In the capacity auction, generators offer to sell a certain amount of
capacity at a certain price at a certain location.  As with the energy auctions, the
capacity offers in each of New York's four constrained capacity zones are
"stacked" from lowest to highest, and bids are accepted until the requisite total
demand has been met.  The last and highest offer price needed to meet the demand
in each zone establishes the market-clearing price for that zone.  Any generator
that offered at or below this price "clears" in the market and is paid the clearing
price.  Such a generator in turn is generally obligated to deliver, if called upon in
the day-ahead or real-time energy markets, the amount of electricity to match the
capacity that had cleared the auction in that generator's accepted offer.  The

generators whose offers are above the clearing price receive no payment and have no delivery obligation.

40.     NYISO has explained that the auction's stacking mechanism "creates [an] incentive for capacity providers to be efficient and cost effective in order to be selected.  Further, it creates price signals for new capacity to enter the market if it can supply capacity at prices below the clearing price.  At the same time, the market provides price signals for existing suppliers to exit the market if they are unable to beat the clearing price." *NYISO Markets: New York's Marketplace for Wholesale Electricity* at 5.[6]

### *Total Market Compensation*

41.     The total compensation a generator receives in the market is the sum of its energy-market and capacity-market revenues (as well as ancillary services market revenues, which accounts for only a small part of a generator's total earning potential).

42.     An uneconomic generator can be artificially encouraged to remain in the market by subsidizing the generator's capacity-market earnings, or by subsidizing the generator's earnings in the wholesale energy markets.  Because FERC determines both wholesale electricity market prices through NYISO's

---

[6]     Available at: http://www.nyiso.com/public/webdocs/ media_room/ publications_presentations/Other_Reports/Other_Reports/NYISO%20Markets%20-%20New%20Yorks%20Marketplace%20for%20Wholesale%20Electricity.pdf.

auction processes, there is no meaningful difference between whether the State elects to replace the FERC-jurisdictional auction-derived capacity rate or energy rate. In both cases, because subsidized generators would be uneconomic in the absence of the subsidy, the subsidy distorts wholesale market price signals and directly interferes with the way in which FERC intends wholesale markets to function.

### How Zero Emission Credits Distort the Wholesale Market

43.    The ZECs distort the functioning of the FERC-regulated energy and capacity markets, in the NYISO region and nationwide.

44.    Under the ZEC subsidy program, an uneconomic nuclear generator receives a higher price per MWh of energy it sells into the wholesale energy market than the rate established pursuant to FERC-approved market rules. Retail ratepayers in New York are the ones required to fund the difference between the wholesale energy rate authorized by FERC and the higher, subsidized rate, established by the state. This state-determined "revised" price contradicts FERC's determination that the NYISO-determined single clearing price is the just and reasonable rate for resources participating in the energy markets. Under the stacking mechanism used to set prices in the NYISO markets, moreover, the artificial retention of the uneconomic nuclear generators in the wholesale markets adds additional (uneconomic) supply in the energy market, which harms

19

competitors (and economic efficiency) by artificially reducing wholesale energy prices and forcing otherwise economic generation (*i.e.*, non-subsidized generation that is more efficient than the nuclear units at issue) to inefficiently leave the market. In addition, the ZEC subsidies will deter the entry of new efficient suppliers, including suppliers of renewable energy, and the end result is higher prices to consumers and businesses in the long term.

45.   Forced subsidization of the nuclear generators by retail customers equally distorts wholesale *capacity* market auction outcomes. Under the stacking mechanism, the retention of otherwise uneconomic producers artificially increases the supply of capacity, which directly leads to lower prices. This harm is more than hypothetical: three of the covered nuclear generators had announced that they would shut down some or all of their generating units, only to reverse their decisions once the ZEC program was announced. Artificially retaining generators in the capacity market that should have retired contravenes the economically efficient market structure that NYISO designed and FERC approved.

46.   In addition, FERC has previously acted to prevent the exercise of buyer-side, or monopsony, market power from infecting the capacity market. Buyer-side market power occurs when a state entity or other large buyer of capacity provides for retail customers to provide subsidies to select generating units in order to induce them to enter into, or remain in, the marketplace, even

though market revenues are insufficient to warrant attracting the investment. These uneconomic units, in turn, lower capacity prices in the FERC-jurisdictional market by suppressing the clearing price in the auction, which decreases the amount the buyer pays for all remaining capacity purchases and thereby reduces its total cost for capacity. Because capacity-market prices are sensitive to even small shifts in the supply/demand balance, the decrease in total capacity market costs can be large. In some cases, the reduction in total capacity market costs can exceed the artificial subsidy needed to cause the distortion in prices. To prevent this economically inefficient outcome, FERC has been extremely vigilant in protecting its capacity markets against state-subsidized resources undercutting its investment price signals.

47.     In this case, by artificially retaining the otherwise uneconomic nuclear units, the PSC is using the ZEC subsidy to exert a large depressive effect on energy and capacity prices, which one group of experts estimated at $15 billion over 12 years.[7] While artificially depressed (below-market) energy and capacity prices may save New York ratepayers money in the short run, these savings will be offset by both the increased costs of the ZECs themselves and by the enormous forgone benefits of competition and more efficient generation over the long run. Regardless of the short-run or long-run effect, New York – like Maryland in

---

[7]     *See supra n. 3.*

*Hughes* – has taken action to alter what the state views as unsatisfactory consequences of the prices set by the wholesale markets under FERC's exclusive jurisdiction.

48.     Artificially suppressed prices threaten the viability of more efficient generators, including Plaintiffs, and discourage investment in efficient new, flexible generators better suited to integrate weather-dependent, zero-carbon renewable generating resources like wind and solar.  Accordingly, not only will the ZEC program ultimately lead to higher wholesale prices, but it will also stifle the unquestionable environmental benefits derived from competitive electric markets.

49.     The ZEC program, which is called "Tier 3" in the ZEC Order, is easily distinguishable from the Renewable Energy Credit ("REC") program, the "Tier 1" and "Tier 2" programs in the ZEC Order.[8]  Under the Tier 1 and Tier 2 programs, qualified renewable generators (such as solar, wind, and biomass) earn RECs for each MWh of electricity they generate.  New York LSEs are required to acquire a certain number of RECs each year or make an Alternative Compliance Payment.

---

[8]     New York has had an REC program for over a decade prior to the ZEC Order. *See* Order Regarding Retail Renewable Portfolio Standard, Case no. 03-E-0188 (9/24/04) (available at http://www3.dps.ny.gov/pscweb/WebFileRoom.nsf/Web/85D8CCC6A42DB86F85256F1900533 518/$File/301.03e0188.RPS.pdf).  The ZEC Order reconstitutes New York's REC program, and now refers to RECs as Tier 1 or Tier 2, with ZECs constituting Tier 3.

50.    Federal law authorizes States to provide a different level of compensation to certain types of renewable generators, but makes no such allowance for States to set the level of compensation for nuclear generators. *See* 16 U.S.C. § 796 (authorizing states to set prices for Qualified Facilities, defined as renewable facilities with output less than 80 MW or gas-fired facilities that meet specified efficiency requirements). In addition, Congress has provided renewable generators with tax incentives, in the form of Production Tax Credits and Energy Investment Tax Credits, 20 U.S.C. §§ 45 & 48.

51.    RECs also differ from ZECs in several other important respects. Similar to the REC programs established in many other states and regions, under the PSC's REC program, RECs are created by all qualified renewable generators, without regard to economic need. The price of RECs is not tethered in any way to wholesale electricity prices. Rather, RECs are publicly traded, so that their value varies based on supply and demand, including the competitive interactions among alternative qualified suppliers of renewable generation (based on the overall economics of their respective technologies, their specific generating units, and their own operational efficiencies).

### The New York ZEC Program

52.    Several New York's older nuclear generators have become uneconomic in recent years, in particular the Robert Emmett Ginna plant ("Ginna")

in Ontario and the James A. FitzPatrick ("FitzPatrick") and Nine Mile Point 1

plants, also in Scriba.  The newer, more efficient Nine Mile 2 plant in Scriba is

operating without any financial issues.

53.     These nuclear plants are Exempt Wholesale Generators ("EWGs")

under the Public Utility Holding Company Act, 42 U.S.C. § 16451 *et seq*.  An

EWG is a person engaged "exclusively in the business of owning or operating, or

both owning and operating, all or part of one or more eligible facilities and selling

electric energy at wholesale."  Id. § 79z–5a.  These nuclear facilities thus can only

produce energy and sell it at wholesale.

54.     Exelon owns the Ginna plant, as well as the Nine Mile Point plaint.  In

2014, after millions of dollars in losses, Exelon threatened to retire the Ginna plant,

as the expected revenues from the sale of capacity and energy into the NYISO

markets were insufficient to cover its costs of continued operation.  Citing its status

as a large taxpayer and employer, Ginna pleaded for state aid to keep the facility

open.

55.     As a temporary measure to ensure system reliability, FERC approved

a Reliability Support Service Agreement ("RSSA") between Ginna and a local

utility, under which retail customers pay a minimum $2.20 monthly surcharge

through March 2017 to prop up Ginna while the reliability problems on the grid

associated with Ginna's retirement are corrected by way of a $144,855,000

transmission-system upgrade, scheduled for completion in March 2017.[9]  Once the

planned upgrades are completed, Ginna will no longer be needed for reliability,

and it would be expected to close (absent the ZEC bailout).[10]

56.    Entergy owns the FitzPatrick plant, which has suffered from similar

economic problems.  In 2015, Entergy announced the plant would close at the end

of its current fuel cycle, expected to be in January 2017.  FitzPatrick looked to the

state to provide incentives to keep the plant open to save local jobs and tax

revenues.  Exelon agreed to buy FitzPatrick from Entergy if, but only if, the state

provided a bailout subsidy.[11]

57.    In January 2016, Exelon similarly announced that, in view of

continued losses, Nine Mile 1 would be closed in the absence of price support from

the state.  Unlike Ginna and FitzPatrick, Nine Mile Point has two nuclear facilities.

Although Nine Mile 1 is losing money, the newer Nine Mile 2 plant is profitable

without subsidies.

58.    The PSC adopted the ZEC program in response to the financial

problems at these three plants.  Ostensibly to avoid "losing the carbon-free

attributes of this generation before the development of new renewable resources

---

[9]      Http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={59B4ADCD-E7B2-40FF-B3F0-2755F0C12A00}.
[10]     Http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={151A78E9-8112-4169-AE7F-114516908853}.
[11]     *See* Joint Application under FPA Section 203 of Entergy Nuclear FitzPatrick, LLC and Exelon Generation Company, LLC, Ex. I, § 5.06(e) available at http://elibrary.ferc.gov/idmws/file_list.asp?document_id=14487740.

between now and 2030," the PSC established a mechanism to provide out-of-market funding to Ginna, Fitzpatrick, and Nine Mile Point, purportedly for the "zero-emissions attributes of nuclear zero-carbon electric generating facilities where public necessity to encourage the continued creation of the attributes is demonstrated." ZEC Order at 19.

59.    Only nuclear plants specifically selected by the PSC are eligible to receive the ZEC subsidy.  Other zero-carbon resources in New York receive no compensation for their zero-carbon attributes.  Once the ZEC subsidy is taken into account, the uneconomic nuclear resources expect to receive a higher level of wholesale market compensation than nuclear generators operating in New York that are still profitable and that do not qualify for ZEC payments.  Thus, the ZEC Order simply serves to keep the uneconomic capacity and energy from these specific units in the FERC-regulated wholesale markets, notwithstanding the fact that wholesale market price signals are indicating that these units should be retired.

60.    In June 2015, the PSC opened a proceeding entitled "In the Matter of the Implementation of a Large-Scale Renewable Program and a Clean Energy Standard," case no. 15-E-0302 (the "LSR proceeding").  There was no mention of the upstate nuclear plants or any type of ZEC program in the initial notice of the LSR proceeding or in the accompanying paper entitled "Large Scale Renewable Energy Development in New York: Options and Assessment," which was prepared

26

jointly by the PSC's staff, the New York State Energy Research and Development

Authority ("NYSERDA"), and outside consultants.  Shortly thereafter, in July

2015, the State Energy Planning Board promulgated a State Energy Plan ("SEP")

with a goal that 50 percent of all electricity used in the state should by 2030 be

generated from renewable energy sources.  The SEP does not mention the upstate

nuclear plants or any type of ZEC program.

61.     After the announcements of the closing of Ginna and FitzPatrick, the

PSC in January 2016 expanded the scope of the LSR proceeding and ordered its

staff to develop a white paper with recommendations to keep the upstate nuclear

generators open.[12]

62.     Four days later, the staff issued its white paper which proposed, *inter

alia*, that the PSC adopt a ZEC program to save New York nuclear generators

facing "financial difficulties."  The white paper proposed that ZECs be issued

"based upon the difference between the anticipated operating costs of the units and

forecasted wholesale prices."[13]  The proposed ZEC program was said to be

"similar to the Ginna RSSA" and was designed "to provide qualifying nuclear

plants with support payments, reflective of their going forward costs of operation,

---

[12] *See* Order Expanding Scope of Proceeding and Seeking Comments (1/21/16), available at
http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={C29C66EA-CE42-
4FD2-B679-19A39E0F1C4F}.
[13]     Staff White Paper on Clean Energy Standard (1/25/16) at 32, available at
http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7B930CE8E2-F2D8-
404C-9E36-71A72123A89D%7D.

to ensure they continue to operate." Unlike the Ginna RSSA, however, the ZEC program would be implemented without FERC approval and without a determination that any of the plants are needed for reliability.

63. In April 2016, the U.S. Supreme Court rendered its decision in *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. __ (2016), which held that state subsidies to electricity generators are unconstitutional if "tethered" to FERC-regulated wholesale electricity prices. Apparently recognizing that its original proposal was plainly unconstitutional under *Hughes*, the PSC staff hastily revised its recommendation in July 2016 and changed the formula for determining the amount of the ZEC subsidies. Although the new formula was ostensibly based upon a federal interagency working group's estimated "social cost of carbon,"[14] this was window dressing, changing the name but not the intent to replace the FERC-determined energy price with a state-determined energy price, with respect to Ginna, FitzPatrick, and Nine Mile Point. Indian Point, a fourth New York nuclear generating station, located in Westchester County, was not recommended for inclusion in the ZEC program.

64. The PSC adopted the revised recommendation on August 1, 2016 and claimed that the ZEC program was not preempted because it "closely ties the

---

[14] Staff's Responsive Proposal for Preserving Zero Emissions Attributes (7/8/16) at 2, available at http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7BBBBFA4008-FD27-4209-B8E1-AD037578101E%7D.

pricing mechanism for ZECs to the environmental attribute" and is "untethered to a generator's wholesale market participation." ZEC Order at 134, 151. The PSC acknowledged, however, that "federal law on what measures are or are not untethered is currently unclear, creating an element of risk for any kind of program." *Id*. at 121. The PSC also ignored the fact that the revised version of the program is contingent on the nuclear units' participation in the FERC-jurisdictional wholesale markets, because the payment of ZEC subsidies occurs if, and only if, the nuclear generator "produces" electricity. All electricity produced by these nuclear generators must be sold directly or indirectly in the NYISO auctions, as there are no alternative markets.

65.     The ZEC program thus establishes a new state-created energy price "adder" granted only to the designated nuclear generators. The adder would not occur unless the nuclear generators sell their energy into the wholesale market and thus is directly tethered to the wholesale price of electricity. The PSC disqualified Indian Point from the ZEC program specifically because it "has a much higher level of market revenues" (ZEC Order at 130), which further indicates how tightly the adder is tethered to the wholesale electricity markets.

66.     The price-suppressive effects of the ZECs on the FERC-regulated wholesale markets also impermissibly discriminate against other non-carbon emitting technologies. Under the ZEC program, a small hydroelectric dam

producing zero-emission energy would receive the FERC-determined energy price, but would not qualify for ZECs. Other generators of renewable energy and out-of-state entities are similarly disadvantaged, substantially burdening interstate (as well as international) commerce.

67.     Under the ZEC Order, a New York nuclear generator that makes a showing of "public necessity" is entitled to a long-term subsidy contract with NYSERDA. To find the triggering "public necessity" for a particular facility, the PSC must find, *inter alia*, that the facility's revenues "are at a level that is insufficient to provide adequate compensation to preserve the zero-emission environmental values or attributes historically provided by the facility." *Id.* at 124. In other words, the nuclear generator's entitlement to ZECs depends upon the PSC's determination that the generator's compensation from the FERC-regulated auctions is "inadequate." Accordingly, at the threshold, the entire ZEC program is tethered to PSC findings that necessarily contradict FERC's determination that the wholesale price is "just and reasonable."

68.     Inadequate compensation is the second of five factors the PSC must consider before finding the requisite "public necessity" for the issuance of ZECs to a nuclear facility. The five prong test in its entirety is:

> (a)     the verifiable historic contribution the facility has made to the clean energy resource mix consumed by retail consumers in New York State regardless of the location of the facility;

(b)     the degree to which energy, capacity and ancillary services revenues projected to be received by the facility are at a level that is insufficient to provide adequate compensation to preserve the zero-emission environmental values or attributes historically provided by the facility;

(c)     the costs and benefits of such a payment for zero-emissions attributes for the facility in relation to other clean energy alternatives for the benefit of the electric system, its customers and the environment;

(d)     the impacts of such costs on ratepayers; and

(e)     the public interest.

*Id.* at 124.  The PSC has already found that the requisite "public necessity" exists for the Ginna, FitzPatrick, and the Nine Mile Point 1 and 2 nuclear facilities.  *Id.* at 128.  If the planned sale of FitzPatrick to Exelon is completed, then all of the $7.6 billion in subsidies will go to a single company, Exelon.  (There has not been a finding of public necessity regarding Indian Point, which is owned by Entergy.)

69.     Once the PSC finds a "public necessity" with respect to a particular nuclear facility, the generator will then, under a contract with NYSERDA, sell its ZECs to NYSERDA at a price determined administratively by the PSC.  As noted, a nuclear facility is only entitled to ZECs to the extent it "produces" electricity, and the designated facilities have no choice but to sell their production in the NYISO wholesale auctions.  In addition, the value of each ZEC is tethered to wholesale electricity prices in the manner set forth below.

31

70.     For the first two years, from April 1, 2017, through March 31, 2019, the PSC has set the ZEC price at $17.48 per MWh for each MWh of electricity produced by the facility.  In other words, each qualifying nuclear generator will get an additional $17.48 for each MWh of electricity it generates (subject to a possible cap), in addition to the price the facility receives for the sale of the electricity and capacity in the FERC-regulated wholesale market.  As wholesale energy prices in the region now average around $20 per MWh, the ZEC adder discriminatorily boosts the nuclear generators' revenue by over 80 percent for each MWh generated.  The ZEC price was said to be based on the "social cost of carbon" (as estimated by a federal inter-agency working group on a dollars-per-short ton basis, times a fixed 0.53846 "conversion factor" from short tons to MWh) minus the generator's putative value of avoided greenhouse gas emissions under the Regional Greenhouse Gas Initiative (the "baseline RGGI effect").  *Id.* at 51, 130.

71.     After the first two years, the amount of the subsidy, if any, is again directly tied to forecast prices in the FERC-regulated NYISO wholesale market. Specifically, the price of each ZEC will be, for each two-year tranche, the social cost of carbon minus the baseline RGGI effect, **and** minus the amount by which the NYISO "Zone A [western New York] forecast energy price and ROS [rest of state] forecast capacity price combined exceeds $39/MWh."  ZEC Order at 131.  In other words, as forecast prices in the FERC-regulated NYISO wholesale auctions

increase, the ZEC subsidies directly decrease, to the point of ultimate elimination if forecast prices in the FERC-regulated markets increase enough.

72.     In addition to this price-tethering, the ZEC program directly affects the quantity of electricity available in the wholesale markets. ZECs are provided up to the "MWh amount that represents the verifiable historic contribution the facility has made to the clean energy resource mix consumed by retail consumers in New York State, as specified in the NYSERDA contract." *Id*. at 51. The calculated amount is both a "cap and obligation" – if more is produced, no additional subsidy is given; if less is produced, the underperforming generator is subject to "appropriate financial consequences." *Id*. at 144-46. The PSC is thus dictating the quantity of electricity to be sold into the FERC-regulated wholesale electricity markets, as well as the price.

73.     After buying the ZECs from the nuclear generators at the price mandated by the PSC, NYSERDA is to resell them to each NY LSE on a *pro rata* basis. Each LSE is required "to purchase an amount of ZECs per year of the total amount of ZECs purchased by NYSERDA in proportion to the electric energy load served by the LSE in relation to the total electric energy load served by all load serving entities in the New York Control Area." *Id*. at 51. Even competitive retail suppliers providing 100 percent carbon emission-free energy to their customers as a premium service are required to purchase ZECs from the State. The rate-

33

regulated LSEs (that is, the traditional distribution utilities) are authorized to pass

on the costs of LSE purchases to their customers, the retail ratepayers, while the

PSC presumes that competitive LSEs will likewise add the cost of ZECs into the

prices they offer to consumers.

74.     If the ZEC program goes into effect as planned, in April 2017,

Plaintiffs will be damaged, because the subsidies will enable the nuclear

generators, who compete against Plaintiffs in interstate markets, to continue

operating money losing facilities, and selling uneconomic capacity and energy into

the FERC-regulated auctions, causing the auctions to return significantly lower

prices, which disrupts FERC's efforts to promote, design, and implement

competitive wholesale energy and capacity markets.

75.     The PSC and defendant commissioners are immune from damages

liability.  Accordingly, the harm to Plaintiffs from implementation of the

unconstitutional ZEC program will be irreparable.

## CLAIMS FOR RELIEF

### COUNT I
### FIELD PREEMPTION – SUPREMACY CLAUSE

76.     Plaintiffs herein incorporate all previous allegations.

77.     Under the Supremacy Clause, if Congress enacts a federal law

regulatory scheme and intends to fully occupy the field it has chosen to regulate,

any state law in this field is "field preempted" and thus invalid, without regard for the impact of the state regulation upon the national interest.

78.     The ZEC Order is field preempted.  Under the FPA, 16 U.S.C. § 824(b), FERC has exclusive jurisdiction over the sale of electric energy and the sale of capacity at wholesale in interstate commerce.  Federal law exclusively occupies the entire field of wholesale electricity sales.

79.     NYISO's energy and capacity auctions are wholesale interstate markets for the sale of electricity, and they fall within the field of FERC's exclusive authority.  The ZEC Order invades that field because it directly affects the wholesale clearing price of electricity sales in the NYISO auctions.

80.     Specifically, the nuclear generators offer into the NYISO auctions. Under FERC-approved rules, all generators whose offers "clear" receive the market clearing price, which is the wholesale market price.  The ZEC requirement invades FERC's exclusive regulatory field by directly altering the revenue to be paid to the nuclear generators.  The ZECs would provide the nuclear plants with substantial out-of-market payments for each MWh of electricity they produce, thus effectively replacing the auction clearing price received by these plants with the alternative, higher price preferred by the PSC.

81.     The FERC-determined price paid to competing generators in the energy market is also suppressed by the uneconomic retention of the nuclear units,

which also frustrates FERC's market design, causing a concomitant lowering of the clearing price to be paid to plaintiffs and other competitors.

82.   Finally, the continued operation of the otherwise non-economic nuclear generators has a significant price suppressive effect in the capacity market, frustrating FERC's goals of ensuring electric reliability through the capacity market.  But for the subsidy, these units would leave the market, temporarily decreasing the amount of supply in the market, and increasing prices until the market responded with the necessary level of investment in new generation, thereby finding a new equilibrium level.

83.   The ZEC Order is therefore field preempted, because (a) FERC has exclusive jurisdiction to set wholesale prices, yet the ZEC program guarantees the favored generators a higher price than the competitive market price set by FERC; and (b) the ZEC program interferes with FERC's exclusive jurisdiction over wholesale prices by affecting the behavior of participants in both energy and capacity auctions.

**COUNT II**
**CONFLICT PREEMPTION – SUPREMACY CLAUSE**

84.   Plaintiffs herein incorporate all previous allegations.

85.   Even in the absence of field preemption, any state law or regulation is "conflict preempted" and thus invalid if it conflicts with federal law or frustrates the purpose of a federal law.

86.    The ZEC Order is conflict preempted by the FPA.  FERC, the agency charged with implementing the FPA, has determined that market-based processes – approved and overseen by FERC – are the best way to bring more efficient, lower cost power to the Nation's electricity consumers.  As NYISO has explained, the auction market process "creates [an] incentive for capacity providers to be efficient and cost effective in order to be selected.  Further, it creates price signals for new capacity to enter the market if it can supply capacity at prices below the clearing price.  At the same time, the market provides price signals for existing suppliers to exit the market if they are unable to beat the clearing price." *NYISO Markets*, *supra* at 4.

87.    The ZEC Order enables the nuclear generators to offer in the auction markets at a lower price, likely below actual costs, over a lengthy twelve-year period of time.  The clearing price of the auctions will thus be artificially suppressed well into the next decade.  The offers of some generators will be rejected, even though (absent the nuclear generators' subsidized participation) they would have cleared the auction; and the generators whose offers are accepted will be under-compensated, because the clearing price will be artificially lower than what a competitive market process – as established by FERC – would have produced, and lower than the actual cost to provide the capacity service.

88.     The ZEC Order will disrupt market signals.  The subsidized nuclear generators, even though uneconomic, will stay in operation; generators that are otherwise economic will exit the market because they are receiving an artificially suppressed price and thus lower revenues; and investors will be discouraged from financing and building new economic generators.  Supply will then be reduced, and the market price will increase yet new investors will be deterred from entering a marketplace plagued by subsidized distortions.

89.     The ZEC program also interferes with FERC's decision to structure the wholesale markets for capacity and energy on market-based principles in order to encourage the exit of uneconomic generating capacity – when a generator's costs exceed its revenues – to encourage the entry, when appropriate, of more efficient generators.  It is clear from the ZEC Order that the PSC simply disagrees with FERC's determination that the markets should determine the fate of the uneconomic nuclear generators.

90.     The ZEC program will also affect interstate and international wholesale markets outside New York and the NYISO.  Because the ZEC Order will artificially suppress the NYISO auction prices, generators will prefer, where possible, to sell in wholesale markets other than NYISO, for example in markets run by the New England area ISO, by PJM (the ISO for Pennsylvania, twelve other states, and the District of Columbia), or by Canadian entities.  This shift will

increase supply and reduce prices in those other markets, and thus the ZECs will have market-distorting ripple effects throughout the national market and beyond New York's borders.

91.     If New York truly believes that nuclear generators require a subsidy to achieve environmental goals, it is entitled to petition FERC to adopt market rule changes that would encourage better price formation in the FERC-jurisdictional markets, or take other steps to increase market prices to levels sufficient to allow the nuclear generators to recover their costs.  Instead of following this course, the PSC has opted to disregard FERC's exclusive jurisdiction over wholesale electricity rates.

92.     The ZEC Order therefore stands as an obstacle to FERC's regulatory scheme, which depends upon fair competition and the functioning of competitive auction markets without interference from out-of-market subsidies.  Under the Supremacy Clause, the PSC may not supplant FERC's scheme with its own preferred approach.

## COUNT III
### DORMANT COMMERCE CLAUSE, UNDER 28 U.S.C. § 1983

93.     Plaintiffs herein incorporate all previous allegations.

94.     The ZEC Order is invalid under the dormant Commerce Clause, U.S. Const. art. I, § 8.  Under this provision, states cannot discriminate against interstate commerce nor can they unduly burden interstate commerce, even in the absence of

federal legislation regulating the activity.  Any state action that burdens interstate

commerce is invalid if the burden is clearly excessive in relation to the putative

local benefits.  A state action is invalid if it does not regulate evenhandedly to

effectuate a legitimate local public interest, or if its effects on interstate commerce

are more than incidental.

95.     Although states have the right to regulate the retail sale of electricity

within their own borders, the wholesale sale of electricity involves interstate

commerce, which the state may not regulate.  NYISO's wholesale markets are

interstate and international in nature, as they involve the sale and transmission of

energy and capacity from generators located in other states and in Canada, and the

purchase of such commodities by customers in other states.

96.     The ZEC Order is purely protectionist in nature, enacted for political

reasons to save jobs at the subsidized generators and the property tax revenues

therefrom.  The PSC's attempts to preserve local industry from the rigors of

interstate competition are prohibited by the Commerce Clause.

97.     Although the reduction of carbon emissions is important, this can be

achieved more effectively by means that would neither discriminate against

interstate or international commerce nor frustrate the progress competitive markets

have been delivering in the form of environmental benefits.

98.    The ZEC Order is directly discriminatory, as only specified New York nuclear facilities are eligible to receive ZECs.  The program is not even-handed with respect to other technologies that could produce carbon-free electricity and with respect to out-of-state generation.  It therefore violates the Commerce Clause.

99.    Even if the ZEC program is not deemed discriminatory, it is still invalid under the Commerce Clause because it imposes market-distorting burdens on interstate and international commerce that far outweigh the purported local benefits.  As detailed above, the ZECs would cause more efficient interstate generators to leave the market and discourage the entry of new competitors.

100.   In fact, the purported local benefits are largely illusory. Artificially suppressed prices – achieved through ratepayer subsidies provided to uneconomic nuclear generating units – will ultimately lead to reduced supply and higher prices, as they will deter the development of newer, more efficient market entry needed to moderate higher prices.

101.   Defendants' actions in enacting and implementing the ZEC Order have deprived plaintiffs of their Commerce Clause "rights, privileges, or immunities" within the meaning of 28 U.S.C. § 1983.  Plaintiffs have been injured by these deprivations and are entitled to redress under § 1983. *Dennis v. Higgins*, 498 U.S. 439 (1991).

41

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiffs seek:

A.    a declaration that the portions of the ZEC Order addressing nuclear

subsidies are invalid because it is preempted by federal law;

B.    a permanent injunction requiring Defendants to withdraw the portions

of the ZEC Order addressing the nuclear subsidies and/or preventing defendants

from implementing the ZEC Order;

C.    reasonable attorneys' fees (28 U.S.C. § 1988) and costs; and

D.    all such other relief to which they may be entitled.

Dated:  October 19, 2016

Edward J. Normand
Jason C. Cyrulnik
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
enormand@bsfllp.com
jcyrulnik@bsfllp.com

Stuart H. Singer (pro hac vice pending)
William T. Dzurilla
(pro hac vice pending)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
wdzurilla@bsfllp.com

Respectfully submitted,

Jonathan D. Schiller
BOIES SCHILLER & FLEXNER, LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com

By: _____
Jonathan D. Schiller