**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| COALITION FOR COMPETITIVE ELECTRICITY et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:16-cv-08164-VEC |
| AUDREY ZIBELMAN, in her official capacity as Chair of the New York Public Service Commission, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS OF MOVANT-INTERVENORS
CONSTELLATION ENERGY NUCLEAR GROUP, LLC, EXELON CORPORATION,
R.E. GINNA NUCLEAR POWER PLANT LLC,
AND NINE MILE POINT NUCLEAR STATION LLC**

Elizabeth A. Edmondson
JENNER & BLOCK LLP
919 Third Ave.
New York, NY 10022
(212) 891-1606
eedmondson@jenner.com

Matthew E. Price*
Paul M. Smith
Zachary C. Schauf*
William K. Dreher*
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6873
mprice@jenner.com

*Counsel for Intervenors*

*\*Pro hac vice* application pending.

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    A.    Regulatory Background ............................................................................... 3

    B.    Factual Background ..................................................................................... 4

LEGAL STANDARD .............................................................................................................. 6

ARGUMENT ........................................................................................................................... 6

I.    Plaintiffs' Field Preemption Claim Fails As A Matter Of Law. ........................................ 6

    A.    Plaintiffs' Contention That The ZEC Program Alters The Auction Clearing Price Fails To State A Field Preemption Claim. .............................................. 6

        1.    FERC Has Already Rejected the Premise of Plaintiffs' Claim ................... 7

        2.    *EPSA* Rejects Plaintiffs' Claim That The ZEC Program "Effectively" Adjusts The Auction Clearing Price. .................................. 10

        3.    The ZEC Program Is Consistent With *Hughes*. ......................................... 12

    B.    Plaintiffs Fail To State A Field Preemption Claim Because Effects On Auction Prices Do Not Trigger Field Preemption. ................................................. 15

II.    Plaintiffs Fail To State A Conflict Preemption Claim. ..................................................... 17

III.    Plaintiffs' Dormant Commerce Clause Claim Should Be Dismissed. .............................. 20

    A.    The Dormant Commerce Clause Does Not Apply To Subsidy Programs Like The ZEC Program. ............................................................................... 20

    B.    Plaintiffs' Discrimination-Based Claims Fail. ............................................. 22

    C.    Plaintiffs' *Pike* Claim Fails. ...................................................................... 24

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Board of Education*, 107 F. Supp. 3d 323 (S.D.N.Y. 2015), *aff'd*, 648 F. App'x 118 (2d Cir. 2016)..........................................................................................23

*Allco Finance Ltd. v. Klee*, No. 3:15-cv-608, 2016 WL 4414774 (D. Conn. Aug. 18, 2016), *appeal docketed*, No. 16-2946 (2d Cir. Aug. 23, 2016) ........................21, 22

*American Ref-Fuel Co.*, 105 FERC ¶ 61,004 (2003)...............................................8, 10

*California Public Utilities Commission*, 133 FERC ¶ 61,059 (2010) ...........................19

*Connecticut Department of Public Utility Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009) ......................................................................................................................15, 16

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010)......................................1

*Edison Electric Institute*, 69 FERC ¶ 61,344 (1994) ......................................................8

*Energy & Environment Legal Institute v. Epel*, 43 F. Supp. 3d 1171 (D. Colo. 2014), *aff'd*, 793 F.3d 1169 (10th Cir. 2015)..........................................................................25

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978) .................................24, 25

*FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760 (2016) ..................3, 4, 11, 12, 16

*Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009) ...................................................................6

*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976) .........................................20, 21

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) ....................................................................23

*Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) ...................2, 3, 12, 13, 14, 15

*ISO New England Inc.*, 155 FERC ¶ 61,023 (2016) ......................................................17

*ISO New England Inc.*, 147 FERC ¶ 61,173 (2014) ......................................................17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................22

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ........................23, 24, 25

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988).......................7

*Morgantown Energy Associates City of New Martinsville*, 139 FERC ¶ 61,066 (2012) ..........7, 10

*National Solid Waste Management Ass'n v. Pine Belt Regional Solid Waste Management Authority*, 389 F.3d 491 (5th Cir. 2004) ..............................................................22

*New England States Committee on Electricity v. ISO New England Inc.*, 142 FERC ¶ 61,108 (2013) ...................................................................................................................19

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating District*, 673 F.3d 84 (2d Cir. 2012) ...........................................................................................................6

*Northwest Central Pipeline Corp. v. State Corporate Commission of Kansas*, 489 U.S. 493 (1989) ...................................................................................................................17, 18

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015) ............................................18

*Pacific Gas & Electric Co.*, 123 FERC ¶ 61,067 (2008) ................................................19

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ..........................................................24

*PPL Energyplus, LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014), *aff'd sub nom.*, *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) ..........................................15

*PPL Energyplus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) .................................2, 15, 16, 17

*Proceeding on Motion of the Commission Regarding Retail Renewable Portfolio Standard*, No. 03-E-0188, 2004 WL 2267219 (N.Y. P.S.C. Sept. 24, 2004) ........................10

*Proceeding on Motion of the Commission Regarding Retail Renewable Portfolio Standard*, No. 03-E-0188, 2015 WL 4609944 (N.Y. P.S.C. July 22, 2015) ..........................10

*Rochester Gas & Electric Corp. v. Public Service Commission*, 754 F.2d 99 (2d Cir. 1985) ......................................................................................................................13, 14

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013)..................................23

*Southern California Edison Co.*, 71 FERC ¶ 61,269 (1995) ................................................4, 17, 19

*Selevan v. New York Thruway Authority*, 584 F.3d 82 (2d Cir. 2009) .........................................20

*Silva Run Worldwide Ltd. v. Gaminy Lottery Corp.*, 2001 WL 396521 (S.D.N.Y. Apr. 19, 2001) ....................................................................................................................................8

*Starr International Co. v. Federal Reserve Bank of New York*, 742 F.3d 37 (2d Cir. 2014) ....6, 20

*Town of Southold v. Town of East Hampton*, 477 F.3d 38 (2d Cir. 2007)....................................24

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Authority*, 438 F.3d 150 (2d Cir. 2006), *judgment aff'd*, 550 U.S. 330 (2007)..........................................................24

*Wheelabrator Lisbon, Inc. v. Connecticut Department of Public Utility Control*, 531 F.3d 183 (2d Cir. 2008) ......................................................................................4, 5, 7, 8, 9

*Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1 (1st Cir. 2007) ................................22

*WSPP Inc.*, 139 FERC ¶ 61,061 (2012) ............................................................2, 4, 5, 7, 9, 13, 17

STATUTES

16 U.S.C. § 796(17)(A)(ii) ........................................................................................................9

16 U.S.C. § 824(b)(1) .........................................................................................................3, 4

16 U.S.C. § 824a-3(a) ..............................................................................................................9

16 U.S.C. § 824d(a) ..............................................................................................................3, 7

16 U.S.C. § 824e(a) .................................................................................................................3

OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6) ...........................................................................................................6

18 C.F.R. § 366.7(c)(3) ...........................................................................................................9

Amicus Br. of United States, *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016), 2016 WL 344494 ....................................................................................................19

FERC, *Energy Primer: A Handbook of Energy Market Basics* (Nov. 2015), https://www.ferc.gov/market-oversight/guide/energy-primer.pdf. ...........................................3

J. Heeter et al., National Renewable Energy Laboratory, *A Survey of State-Level Cost and Benefit Estimates of Renewable Portfolio Standards* (2014) ....................................................14

NYISO Letter, No. 15-E-0302 (N.Y. P.S.C. July 8, 2016) ........................................................20

NYISO Supplemental Comments, No. 15-E-0302 (N.Y. P.S.C. July 22, 2016) ..........................19

Barry Rabe, *Race to the Top: The Expanding Role of U.S. State Renewable Portfolio Standards*, 7 Sustainable Dev. L. & Pol'y (2007) ...................................................................1

## INTRODUCTION

The Clean Energy Standard recently adopted by the New York Public Service Commission ("PSC") is the Nation's most ambitious effort to curb greenhouse gases, aiming to reduce New York's emissions 40 percent by 2030.  The PSC recognized that preserving existing nuclear power plants—which generate large amounts of electricity, without emitting carbon—was essential to that goal.  Yet two nuclear facilities that serve New York had announced their intention to retire, and a third was also in danger of retiring.  These retirements would cause a large increase in emissions, overwhelming progress on renewable technologies.  *See* Order Adopting a Clean Energy Standard 19, No. 15-E-0302 (N.Y. P.S.C. Aug. 1, 2016) ("Order").[1]

In response, the PSC chose a tested tool whose legality is well-established.  Since 1999, dozens of states have adopted "renewable portfolio standards" ("RPS") based on "renewable energy credits" (or "RECs").  RECs are given to renewable generators to certify that a quantity of electricity was produced without the air pollution that results from burning fossil fuels.  Utilities and other retail sellers of electricity must buy RECs in proportion to their share of a State's electricity consumption (or "load").  REC programs have been essential in promoting renewable generation that would not be cost-competitive absent recognition of its environmental value.[2]

The PSC's Zero Emission Credit ("ZEC") Program, *see* Order, App. E, applies this model to value the environmental benefits of nuclear generation: Like RECs, ZECs are credits certifying that electricity was created using emission-free technology.  Retail sellers—*e.g.*, utilities—are required to buy a certain quantity, and the credits' value is tied to the "social cost of carbon," which

---

[1] The PSC's Order and its relevant Appendices are attached as Exhibit D to the Memorandum of Law in Support of Movant-Intervenors' Unopposed Motion to Intervene.  The Court may consider the Order in deciding the motion to dismiss, as it is integral to Plaintiff's Complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

[2] *See generally, e.g.*, Barry Rabe, *Race to the Top: The Expanding Role of U.S. State Renewable Portfolio Standards*, 7 Sustainable Dev. L. & Pol'y 10 (2007).

is the federal government's measure of the social value of avoiding carbon emissions.

The ZEC Program respects the same jurisdictional line that has established REC programs' legality.  While the Federal Energy Regulatory Commission ("FERC") has jurisdiction over wholesale electricity sales (*i.e.*, sales by generators for resale), states regulate generation facilities and retail electricity sales (*i.e.*, sales to end-use consumers).  FERC has recognized states' authority to adopt programs for the sale and purchase of credits certifying that electricity was generated using environmentally friendly technologies.  *See WSPP Inc.*, 139 FERC ¶ 61,061, P 21 (2012). And the Supreme Court recently reaffirmed states' authority to "encourag[e] production of new or clean generation through measures 'untethered to a generator's wholesale market participation.'" *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1299 (2016) (citation omitted).

Plaintiffs—competitor generators who burn fossil fuels and believe New York's climate-change efforts will cost them money—claim that the PSC acted illegally in applying the REC model to nuclear generation.

In Counts I and II, Plaintiffs argue that the ZEC Program is preempted because it "alter[s] the revenue … nuclear generators" receive and affects the behavior of participants and prices in FERC-regulated wholesale electricity auctions.  Compl. ¶¶ 80, 87-88.  Those arguments fail as a matter of law.  Like REC programs, the ZEC Program does not alter the revenue that participating generators receive for their wholesale electricity sales.  That is because payments for ZECs are payments for the environmental benefits of an emission-free method of generation, not payments for electricity.  Such payments fall squarely under state jurisdiction, as FERC has confirmed.  Even if the ZEC Program has indirect *effects* on wholesale markets, that does not trigger preemption. After all, "every conceivable regulation [has] some effect" on wholesale markets.  *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 255 (3d Cir. 2014).  If mere effects could trigger

preemption, scores of regulations—not only REC programs, but tax incentives, cap-and-trade programs, environmental regulations, and others—would fall.

In Count III, Plaintiffs contend that the ZEC Program violates the dormant Commerce Clause.  This claim likewise is without merit and should be dismissed as a matter of law.

## BACKGROUND

### A.    Regulatory Background

*FERC's Jurisdiction.*    The Federal Power Act ("FPA") divides jurisdiction between federal and state regulators.  FERC's jurisdiction covers wholesale sales.  16 U.S.C. § 824(b)(1).  That includes setting "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with" those wholesale sales, as well as "all rules and regulations affecting … such rates or charges."  *Id.* § 824d(a).  FERC ensures that wholesale rates, along with "any rule, regulation, practice, or contract affecting such rate," are "just and reasonable."  *Id.* § 824e(a).

To set wholesale rates in New York, FERC has established auction markets, but it also allows buyers and sellers to enter bilateral contracts outside the auctions.  Order 69; Compl. ¶ 28.  The New York Independent System Operator ("NYISO") administers the auctions, including one for energy (electricity itself), and one for capacity (a commitment to deliver a set quantity of electricity in the future).  Order 69; Compl. ¶¶ 28-30, 36; *Hughes*, 136 S. Ct. at 1293.  For each, NYISO calculates how much energy or capacity is required, and accepts generators' supply offers in order of cost (least expensive first), until the need is met.  Compl. ¶¶ 31-33, 35-39; *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 768 (2016) ("*EPSA*").  The offer price of the last (most expensive) unit accepted is the "clearing price," which is paid to every supplier whose offer is accepted.  Compl. ¶¶ 33, 39; *EPSA*, 136 S. Ct. at 768; *see also* FERC, *Energy Primer: A Handbook of Energy Market Basics* 35-61 (Nov. 2015) (describing the operation of the wholesale electricity markets), https://www.ferc.gov/market-oversight/guide/energy-primer.pdf.

3

***State Jurisdiction***.  The FPA also expressly "limits FERC's regulatory reach, and thereby maintains a zone of exclusive state jurisdiction."  *EPSA*, 136 S. Ct. at 767.  It "places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale'—most notably, any retail sale—of electricity."  *Id.* at 766 (quoting 16 U.S.C. § 824(b)).  States also retain exclusive jurisdiction "over facilities used for the generation of electric energy," like power plants.  16 U.S.C. § 824(b)(1).  Pursuant to that authority, states "have broad powers … to direct the … resource decisions of utilities under their jurisdiction"—for example, by "order[ing] utilities to build renewable generators … [or] order[ing] utilities to purchase renewable generation." *S. Cal. Edison Co.*, 71 FERC ¶ 61,269, 62,080 (1995).

## B.    Factual Background

The PSC's Order implements Governor Cuomo's goals to reduce greenhouse emissions by 40 percent and ensure that 50 percent of the State's electric generation will be renewable by 2030. Order 2.  The first two "tiers" of the PSC's Order create the Renewable Energy Standard, which compensates renewable generators for the lack of harmful pollution accompanying their electricity production.  *See id.* at 14-18.  New York does so by awarding such generators a credit—a REC— for each megawatt-hour of zero-emissions generation.  *See id.* at 106.  Dozens of states have enacted similar REC programs, which "are inventions of state property law."  *Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 186 (2d Cir. 2008) (quoting *Am. Ref-Fuel Co.*, 105 FERC ¶ 61,004, 61,005 (2003)).  RECs acknowledge that a generator is more than just the energy it sells: A pollution-emitting coal plant and a renewable wind farm might sell the same amount of energy, but their environmental attributes differ.  *See* Order 9.  REC programs recognize this distinction by providing renewable generators credits certifying that their "energy was generated" using emissions-free technology.  *WSPP*, 139 FERC ¶ 61,061, at P 21.  RECs have value because the PSC's Order, like nearly all REC programs, requires "load serving entities"—

4

or "LSEs," meaning companies (such as utilities) that sell electricity to retail consumers—to buy a certain quantity of them.  Order 14-16; *Wheelabrator*, 531 F.3d at 186.  The New York State Energy Research and Development Authority ("NYSERDA") acts as the middleman for RECs: It purchases RECs from generators, and in turn, sells these RECs to LSEs.  Order 107-08.

The third tier, the ZEC Program, applies the REC model to nuclear generation facilities, which, like renewable resources, do not emit carbon or other air pollutants.  *Id.* at 19.  As the PSC found, "New York's upstate nuclear plants avoid the emission of over 15 million tons of carbon dioxide per year."  *Id.*  If these plants retire, the result would be "significantly increased air emissions due to heavier utilization of existing fossil-fueled plants or the construction of new gas plants."  *Id.* at 128.  The ZEC Program aims to prevent such "backsliding."  *Id.* at 145.

Like a REC, a ZEC is a "credit for the zero-emissions attributes of one megawatt-hour of electricity production by" a nuclear facility participating in the program.  Order, App. E, at 1; *cf. WSPP*, 139 FERC ¶ 61,061, at P 21.  Again, NYSERDA acts as the middleman, purchasing ZECs from eligible nuclear facilities for 12 years, through 2029.  Order 19-20.  In turn, each of New York's LSEs is obligated to purchase ZECs from NYSERDA in an amount proportional to its customers' share of the total energy consumed in New York.[3]  *Id.* at 20, 151.  LSEs recover the costs of these purchases through a charge on customers' bills.  *Id.* at 20.

The price of a ZEC is based on the social cost of carbon, which is the federal government's economic estimate of the damage inflicted by a quantity of carbon emissions.  This accords with the Program's purpose: compensating nuclear facilities for the environmental value of carbon-free electricity production.  *Infra* at 18 n.11.  The ZEC price cannot rise above the social cost of carbon.  But in years 3 through 12, it can fall if projected energy and capacity prices rise above a benchmark

---

[3] LSEs may choose to purchase ZECs directly from the eligible nuclear facilities. Order 152.

of $39/MWh—ensuring the program remains affordable for consumers.  *See* Order 129-30, 138.

A nuclear facility is eligible to participate if the PSC finds there is a "public necessity to encourage the preservation of [its] zero-emission environmental values," based on a five-factor test.  Order, App. E, at 2.  Every two years, the PSC revisits the eligibility of nuclear plants not already participating.  *See id.*  The PSC found three nuclear facilities eligible for the first two-year phase of the program.  Order 128.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges "the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor."  *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009).  "The complaint must 'state a claim to relief that is plausible on its face,'" *Starr International Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 40 (2d Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

## I.   Plaintiffs' Field Preemption Claim Fails As A Matter Of Law.

There is a "strong presumption against finding that the [state's] powers are federally preempted," which the Second Circuit has held applies with full force to the FPA.  *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012).  The Complaint "fails to overcome" that presumption.  *Id.*

### A.   Plaintiffs' Contention That The ZEC Program Alters The Auction Clearing Price Fails To State A Field Preemption Claim.

Plaintiffs first assert the ZEC Program is preempted because it "directly alter[s]" and "effectively replac[es]" the price "paid to … nuclear generators" for the electricity they sell.

Compl. ¶ 80.  FERC has rejected that argument: it has held that payments for the environmental attributes of electricity production do not alter the price of the electricity itself.  Instead, as the *Hughes* decision confirms, ZEC payments fall outside of FERC's exclusive jurisdiction over wholesale rates because New York has not tied ZEC payments to wholesale market participation.

### 1.    FERC Has Already Rejected The Premise Of Plaintiffs' Claim.

Under the FPA, "States may not regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates."  *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 374 (1988).  But that principle does not apply here.  FERC has decided that its jurisdiction does not encompass the creation and sale of environmental credits, like RECs, when they are sold separately from electricity—in what is known as an "unbundled" transaction.

"Generally speaking," in a REC transaction, "the renewable energy attributes are 'unbundled' from the energy itself and sold separately."  *Wheelabrator*, 531 F.3d at 186.  For example, a renewable generator could sell its electricity to one utility, but sell the REC representing the environmental benefits of that electricity's production to another utility.  A renewable generator can even sell RECs to a utility to which it would be physically impossible to deliver electricity (because of transmission constraints).  When a REC sale is "unbundled" in this way, its sale is separate from and unrelated to any wholesale sale of electricity.

For that reason, FERC has confirmed that payment for an unbundled REC is "not a charge in connection with a wholesale sale," and that the sale of an unbundled REC "does not affect wholesale electricity rates."  *WSPP*, 139 FERC ¶ 61,061, at P 24; 16 U.S.C. § 824d(a).  Thus, "an unbundled REC transaction … does not fall within [FERC's] jurisdiction" over wholesale sales. *WSPP*, 139 FERC ¶ 61,061, at P 24; *cf. Morgantown Energy Assocs.*, 139 FERC ¶ 61,066 (2012);

*Am. Ref-Fuel Co.*, 105 FERC ¶ 61,004 (2003).[4]   "Rather, [FERC] explicitly acknowledges that state law governs" such transactions, and has "not evince[d] an intent to occupy the relevant field—namely, the regulation of renewable energy credits."  *Wheelabrator*, 531 F.3d at 190.

Those holdings reflect the common-sense principle that regulating a method of *production* is not the same thing as regulating the price of the *product*.  If a state pays corn farms to produce corn without environmentally harmful pesticides, the state is not regulating the price of corn.  So too, FERC has held, if a state pays wind farms to produce electricity without harmful air pollution, the state is not regulating the price of electricity.  Similarly, Plaintiffs presumably do not dispute that a state could, consistent with its reserved statutory authority over generation facilities, tax the carbon emissions that result from producing electricity using coal, oil, or natural gas.  Taxing those emissions would not be regulating the price of the electricity produced.  RECs simply do the reverse: they pay for the absence of carbon emissions, rather than taxing their presence.

FERC's determination that RECs lie outside its jurisdiction disposes of Plaintiffs' first theory of field preemption.  ZEC payments do not "directly alter[]" the wholesale auction price any more than REC payments do.  Compl. ¶ 80; *cf. Silva Run Worldwide Ltd. v. Gaminy Lottery Corp.*, 2001 WL 396521, at *1 (S.D.N.Y. Apr. 19, 2001) ("[T]he court will not credit ... characterizations presented as factual allegations.").  ZEC payments, like REC payments, cannot alter those prices, because both are payments for the environmental attributes of production, not for electricity sold through the wholesale markets.  *See* Order, App. E, at 1; *supra* at 7.

That is clear from how ZECs and RECs work.  A REC or ZEC "certif[ies] that electric energy was generated pursuant to certain requirements and standards," and is therefore created

---

[4] The same is true for emissions allowances, which likewise represent an environmental attribute associated with electrical generation.  *See Edison Elec. Inst.*, 69 FERC ¶ 61,344, 62,288 (1994).

when electricity is *produced*, *WSPP*, 139 FERC ¶ 61,061, at P 21, regardless of whether, how, or to whom the electricity is sold.  A REC or ZEC is created even if the generator bypasses the wholesale market altogether and sells that electricity directly to a retail customer, or bypasses the NYISO-administered wholesale energy auction and sells it through a bilateral contract.[5]  Order 94. Like a REC, a ZEC representing the environmental benefits of generation can be sold to one LSE (through NYSERDA), while the actual electricity generated is sold to another LSE.  Like a REC, a ZEC can be sold by a generator (through NYSERDA) to an LSE even if the LSE *physically cannot* purchase the underlying electricity from that generator because of transmission constraints. In short, ZEC sales to NYSERDA are "unbundled" from any sale of electricity in just the same way as the unbundled REC sales over which FERC has disclaimed jurisdiction.  Order 68, 132-33; *Wheelabrator*, 531 F.3d at 186.  Therefore, the sale of ZECs to NYSERDA "fall[s] outside of [FERC's] jurisdiction," because payments for ZECs (like payments for RECs) are not "charges in connection with" wholesale sales.  *WSPP*, 139 FERC ¶ 61,061, at PP 18, 24.

Aware that their arguments fly in the face of FERC's holding, Plaintiffs claim that REC programs "differ … in several … important respects" from the ZEC Program.  Compl. ¶ 51.  They claim "[f]ederal law authorizes States to provide a different level of compensation to certain types of renewable generators," but not "nuclear generators."  *Id.* ¶ 50 (citing 16 U.S.C. § 796).  But that authorization has nothing to with why REC programs are lawful.  Plaintiffs' citation is to the Public Utilities Regulatory Policies Act ("PURPA"), which allows states to set prices for *electricity* generated by certain generators smaller than 80 MW.  *See* 16 U.S.C. §§ 796(17)(A)(ii), 824a-3(a).

---

[5] Plaintiffs assert that ZEC-eligible facilities "can only … sell [energy] at wholesale" because they are "Exempt Wholesale Generators" ("EWGs") under the Public Utility Holding Company Act ("PUHCA").  Compl. ¶ 53.  EWGs are exempt from certain reporting requirements and inspection rights under the PUHCA.  But the ZEC Program does not require that eligible facilities be EWGs, and a ZEC-eligible facility wanting to sell at retail could simply notify the Commission that it "no longer seeks to maintain its [EWG] ... status" and then seek permission from the PSC to engage in retail sales.  18 C.F.R. § 366.7(c)(3).

REC programs, however, "exist outside the confines of PURPA," *Am. Ref-Fuel*, 105 FERC 61,004, at P 23; *see also Morgantown*, 139 FERC 61,066, at P 46, and they include many facilities *not* covered by PURPA, including facilities larger than 80 MW, *see* Order, App. A. Because REC programs' legality is not grounded in PURPA, the fact that PURPA applies only to renewable generators (and not nuclear generators) is irrelevant. Plaintiffs also claim that "Congress has provided renewable generators with tax incentives." Compl. ¶ 50 (citing 20 U.S.C. §§ 45, 48). But that is equally irrelevant to Plaintiffs' legal theory: Congress's decision to provide tax incentives has nothing to do with whether RECs or ZECs "alter" wholesale prices.

Plaintiffs' final observation that REC programs include no "economic need" requirement, Compl. ¶ 51, is a distinction without a difference: The purpose of REC programs, like the ZEC Program, is to support emission-free generation that otherwise would not be economic.[6] Plaintiffs' apparent position—that the Program would be legal if extended to *all* nuclear facilities, regardless of need—is nonsensical. Plaintiffs claim that ZEC payments impermissibly distort wholesale markets. But were the ZEC Program extended to all nuclear facilities, that distortion would (under Plaintiffs' theory) increase, harming Plaintiffs further. The "economic need" limitation minimizes, rather than exacerbates, any claimed effect of the program on wholesale markets.

### 2. *EPSA* Rejects Plaintiffs' Claim That The ZEC Program "Effectively" Adjusts The Auction Clearing Price.

Plaintiffs contend that even though the ZEC Program operates within the state's reserved regulatory field—generation—it "effectively" steps into FERC's sphere and sets wholesale rates, by increasing the amount of money a generator receives for producing electricity. Compl. ¶ 80.

---

[6] *See, e.g.*, *Proceeding on Mot. of Comm'n re Retail Renewable Portfolio Standard*, No. 03-E-0188, 2015 WL 4609944, at *1 (N.Y. P.S.C. July 22, 2015) (stating that RPS program should provide "financial support" to "maintain the financial solvency of" certain renewable facilities); *In re Retail Renewable Portfolio Standard*, No. 03-E-0188, 2004 WL 2267219 (N.Y. P.S.C. Sept. 24, 2004) (stating that RPS program's purpose is to provide "sufficient financial incentives … that [renewables] may more readily compete with [fossil fuel] facilities").

But the Supreme Court's *EPSA* decision rejected essentially that same argument.

*EPSA* concerned the flip side of this case: the challengers contended that FERC (rather than the state) was intruding into the state's (rather than FERC's) exclusive jurisdiction over retail sales under the FPA by regulating "demand response" bids—that is, compensation paid to retail consumers for curtailing their electricity use. 136 S. Ct. at 767, 777. Like Plaintiffs, the *EPSA* challengers argued that even though FERC's regulation operated within FERC's regulatory field— the demand-response payments were made through the FERC-regulated wholesale markets—it "*effective*[*ly*]" reached into the states' regulatory field and set retail rates, by increasing the amount of money a retail consumer saves by not using electricity. *Id.* at 777.

That argument, the Supreme Court held, made "[t]he modifier 'effective'" do "more work than any conventional understanding of rate-setting allows." *Id.* at 777. Under that conventional understanding—based on the "prosaic, garden-variety" meaning of the term "rate"—"[t]o set a retail electricity rate" means "to establish the amount of money a consumer will hand over in exchange for [electricity]." *Id.* at 777-78. The Court reasoned that nothing in the FPA "suggest[ed] a more expansive" definition under which any regulation that "effectively" influenced a rate could be said to set that rate. *Id.* at 777. So "whatever the effects" of demand response "at the retail level," FERC was within its authority because it was only "regulat[ing] what takes place on the wholesale market" rather than regulating "the amount of money a consumer will hand over in exchange" for electricity in the retail market. *Id.* at 776-77.

That forecloses Plaintiffs' field preemption theory. *EPSA* makes clear that the same principles apply regardless of whether FERC is allegedly intruding into states' regulatory spheres (as there) or a state is allegedly stepping on FERC's (as here). *Id.* at 775. And under those principles, Plaintiffs' argument stretches the word "effectively" beyond its breaking point. Under

11

the "conventional understanding of rate-setting," "[t]o set a [wholesale] rate" means "to establish the amount of money a [purchaser] will hand over in exchange for [wholesale electricity]." *Id.* at 777. But as explained above, the ZEC Program does not change the amount of money a wholesale purchaser will pay for electricity. ZECs are created based on production, and they change hands independent of any wholesale transaction. *See supra* at 8-9. *EPSA* thus makes clear that ZECs, which are grounded squarely in the state's authority to regulate generation facilities, do not set wholesale rates, "effectively" or otherwise.

### 3.    The ZEC Program Is Consistent With *Hughes*.

The Supreme Court's decision in *Hughes* illustrates a state program that *can* be said to *actually* set wholesale rates—and makes doubly clear that the ZEC Program does not. The Maryland program in *Hughes* subsidized a new gas-powered generator but "condition[ed] receipt of those subsidies on the new generator selling capacity into a FERC-regulated wholesale auction." *Hughes*, 136 S. Ct. at 1292. The generator would "receive[] no [subsidy]" at all "if its capacity fail[ed] to clear the auction," but would receive a subsidy for each unit of capacity successfully sold in the auction. *Id.* at 1295. The subsidies were "[]tethered to a generator's wholesale market participation" and thus directly adjusted the wholesale rate. *Id.* at 1299 (citation omitted).

That is nothing like the ZEC Program. The ZEC Program is not "conditioned" on or "tethered to" "wholesale market participation." As explained, it does not tie any payment to a wholesale sale or participation in a wholesale market, but pays generators for environmental benefits derived from *production* of electricity, regardless where, how, or if that electricity is sold. *Supra* at 8-9. Indeed, *Hughes* reinforces why the ZEC Program is not preempted. The Court emphasized that its holding was "limited," and that "[n]othing in [its] opinion should be read to foreclose … States from encouraging production of new or clean generation through measures

'untethered to a generator's wholesale market participation.'" *Id.* at 1299 (citation omitted). "So long as a State does not condition payment of funds on capacity clearing the auction," the Court stressed, "the fatal defect that renders Maryland's program unacceptable" would be absent. *Id.*

Notwithstanding *Hughes*'s clarity, the Complaint suggests that the ZEC price is impermissibly "'[]tethered' to FERC-regulated wholesale electricity prices." Compl. ¶ 63 (quoting *Hughes*, 136 S. Ct. at 1299). Plaintiffs must concede that the ZEC price is based on the social cost of carbon, which has nothing to do with wholesale prices. *Supra* at 5. Nonetheless, Plaintiffs claim that the ZEC price is "tethered" to wholesale prices because, after two years, the ZEC price can drop if wholesale prices are forecast to increase. *See* Order, App. E, at 5-9.

The ZEC Program's limited use of projected wholesale prices to set a price cap does not run afoul of *Hughes*. The "tether" *Hughes* found objectionable was not to wholesale *prices*, but to the generator's "wholesale market participation." 136 S. Ct. at 1299 (citation omitted). *Hughes* does not foreclose a state from making use of the prices that emerge from FERC's wholesale markets when regulating generation and retail sales—so long as the state does not regulate wholesale rates themselves by conditioning payments on wholesale market *participation*.[7] Indeed, the Second Circuit has held that the PSC may use forecasts in exactly the way it does here without intruding on FERC's jurisdiction. *See Rochester Gas & Elec. Corp. v. PSC*, 754 F.2d 99 (2d Cir. 1985). The challenger there argued, like Plaintiffs, that a rate set by the PSC was "preempted" because it included "an estimate of [wholesale] sales … revenue." *Id.* at 101. The Second Circuit rejected that argument, explaining that there is "a distinction between" a state actually "regulating [wholesale] sales" and a state "reflecting the profits from a reasonable estimate of those sales"

---

[7] Moreover, the price paid for an unbundled ZEC cannot be "tethered" to wholesale sales if it is not even a charge "*connect[ed] with*" those sales, as FERC has already determined with respect to RECs, which are analogous. *WSPP*, 139 FERC ¶ 61,061, at P 24; *supra* at 7.

when acting within its proper regulatory area.  *Id.* at 105.  Hence, the Second Circuit held that the PSC may "impute revenue from a reasonable estimate of [a utility's]" wholesale sales when setting rates.  *Id.*  The ZEC Program's use of projected wholesale prices is not materially different.  *Id.*[8]

Plaintiffs' "tether" argument is particularly weak because the ZEC Program does not even use actual wholesale prices.  The ZEC price only drops in response to *projected* wholesale prices— which come from futures trading markets that are *not* part of the wholesale markets and thus are not regulated by FERC.[9]  *See* Order, App. E, at 6-8.  Moreover, unlike in *Hughes*, where the state subsidies increased to help offset the generator's losses if wholesale prices fell, *see* 136 S. Ct. at 1295, here the ZEC price cannot rise above the social cost of carbon even if electricity prices are forecast to fall, *see* Order 138; *id.* App. E, at 6.  Thus, the potential decrease in the ZEC price does not insulate participating generators against market risk.  Rather, that program feature is aimed at protecting consumers, by ensuring the program remains affordable even if electricity prices are forecast to rise.  *See id.* App. E, at 5-9.  It is a kind of rate cap, often included in REC programs, which limits the total compensation the state will pay to moderate the impact on retail rates.  *See, e.g.*, J. Heeter et al., National Renewable Energy Laboratory, *A Survey of State-Level Cost and Benefit Estimates of Renewable Portfolio Standards* vi, 47 (2014) (stating that "cost containment mechanisms" such as "[c]ost caps" are "built into most RPS policies").

---

[8] Even if the ZEC price were not tied to the social cost of carbon, *Rochester Gas* still would permit the PSC to rely on forecast wholesale prices.  Plaintiffs are thus wrong that an earlier version of the ZEC Program would have been "unconstitutional" because it allegedly set prices based on "the difference between the anticipated operating costs of the units and forecast wholesale prices."  Compl. ¶¶ 62-63.  The Court need not opine on that unenacted proposal, which is not at issue here, but Plaintiffs' reliance on it underscores the weakness of Plaintiffs' preemption argument.

[9] Moreover, even those projections are for an entirely different location than where the participating generators actually reside (the generators are located in Zones B and C of the New York Control Area, but the mechanism depends upon forecast prices for Zone A).  *See* Order 139.

**B.      Plaintiffs Fail To State A Field Preemption Claim Because Effects On Auction Prices Do Not Trigger Field Preemption.**

Plaintiffs also argue the ZEC Program is field preempted because of its alleged effect on the prices and participants in FERC's auctions.  Compl. ¶¶ 80-83.  Plaintiffs hypothesize that nuclear generators would retire without the Program, and that preventing those retirements artificially inflates "the amount of supply in the market," reducing prices.  Compl. ¶ 82.

But the "law of supply-and-demand is not the law of preemption."  *Solomon*, 766 F.3d at 255.  Even assuming the truth of Plaintiffs' factual allegations, their legal premise—that state programs are preempted if they affect "the clearing price" in FERC's auctions or "the behavior of [auction] participants," Compl. ¶¶ 81, 83—is false.  "FERC's authority over interstate rates does not carry with it exclusive control over any and every force that influences interstate rates." *Solomon*, 766 F.3d at 255.  Courts have therefore found it "[o]bvious[]" that "not every state regulation that incidentally affects federal markets is preempted."  *PPL Energyplus, LLC v. Nazarian*, 753 F.3d 467, 479 (4th Cir. 2014), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016).  Instead, when states "regulate within the domain Congress assigned," the FPA does not stand as an obstacle "even when their laws incidentally affect areas within FERC's domain."  *Hughes*, 136 S. Ct. at 1298.

Plaintiffs' contention that the ZEC Program will lead to nuclear generators' "retention" in the market when they otherwise "would leave," even if true, does not change matters.  Compl. ¶¶ 81-82.  Courts have held that states may "require retirement of existing generators, [require construction of] expensive, environmentally-friendly units, or … take any other action in their role as regulators of generation facilities," even though "those choices affect the pool of bidders in the [wholesale capacity market], which in turn affects the market clearing price."  *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009).  Plaintiffs' allegation that existing

15

units will remain in the market as a result of the ZEC Program thus cannot ground a preemption claim. As the D.C. Circuit has made clear, whether the state forces a generator to leave the market (by "requir[ing] [its] retirement") or enter the market (by requiring its construction), the legal principle remains the same: mere "[e]ffects" on the "market clearing price" do not trigger preemption. *Id.*

That principle is not just settled, but essential: "[O]therwise, the states might be left with no authority whatsoever to regulate power plants because every conceivable regulation would have some effect on operating costs or available supply." *Solomon*, 766 F.3d at 255; *EPSA*, 136 S. Ct. at 774 (stating that if "indirect or tangential impacts on wholesale electricity rates" implicated FERC's jurisdiction, "a vast array" of state programs would be subject to its control). The REC programs of nearly three dozen states would not be the only programs on the chopping block. So too would be the Regional Greenhouse Gas Initiative, which requires greenhouse-gas emitting facilities, such as coal and natural gas plants, to acquire emissions credits that effectively increase their cost of generating electricity. That program, too, "affect[s] the behavior of participants in … auctions," and would be invalid if Plaintiffs' theory stated a preemption claim. Compl. ¶ 83. The same fate would await state-imposed emission controls on coal plants, which increase those plants' cost of production, and may lead (and be intended to force) those plants to leave the market. Tax credits, brownfield development credits, and other financial incentives for the construction of new generation facilities or maintenance of existing ones—all would be invalid. Such a destructive theory of preemption simply "is not the law." *Solomon*, 766 F.3d at 255.

FERC agrees. REC programs affect auction prices in *exactly* the way Plaintiffs claim trigger preemption: REC programs provide payments to certain generators, "alter[ing] the revenue" they receive; the higher revenues in turn permit these generators to enter the market when

16

the auction price alone would make it "uneconomic" to do so; and their presence "lower[s]" the "clearing price … paid to" other participants. Compl. ¶¶ 80-81.[10] Yet FERC has held that an "unbundled REC transaction does not affect wholesale electricity rates," and so falls beyond its jurisdiction. *WSPP*, 139 FERC ¶ 61,061, at P 24. Indeed, FERC has gone further, allowing states "to encourage renewable or other types of resources … by giving direct subsidies," even if doing so "allow[s] states to affect the price." *S. Cal. Edison Co.*, 71 FERC ¶ 61,269, at 62,080; *see ISO New England Inc.*, 155 FERC ¶ 61,023, P 32 (2016) (rates do not become unjust or unreasonable "simply because [state support for renewables] has the potential to suppress prices").

## II.   Plaintiffs Fail To State A Conflict Preemption Claim.

Plaintiffs' conflict-preemption allegations also fail to state a claim. Plaintiffs merely rehash their field preemption theory by alleging that FERC's auctions "create[] price signals" to encourage suppliers to enter or exit the market, and that the ZEC Program "will disrupt [these] market signals" by causing "the clearing price [to] be … lower" than it otherwise would be. Compl. ¶¶ 86-88 (quoting *NYISO Markets: New York's Marketplace for Wholesale Electricity* 4).

This claim fails because, as discussed above, the "law of supply-and-demand is not the law of preemption." *Solomon*, 766 F.3d at 255; *supra* at 15-17. If anything, Plaintiffs' "price signal" theory has *less* merit when captioned as a conflict preemption argument, because the bar for conflict preemption is so stringent. Under the FPA, "conflict-pre-emption analysis must be applied sensitively … so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 515 (1989). Hence, when the state "regulate[s] production or other subjects

---

[10] Although Plaintiffs attempt to distinguish RECs from ZECs in other ways, Compl. ¶¶ 50-51, they do not (and could not) deny that RECs can affect wholesale prices and alter which resources participate in the wholesale markets. Indeed, several of the Plaintiffs have argued to FERC that renewable resources' receipt of such subsidies artificially suppresses prices by several billion dollars. *See, e.g.*, *ISO New England Inc.*, 147 FERC ¶ 61,173, P 67 (2014).

of state jurisdiction," "and the means chosen [are] at least plausibly … related to matters of legitimate state concern," there is no conflict between the state rule and the federal regulatory scheme, unless "clear damage to federal goals would result." *Id.* at 518, 522.  Judged by these standards, Plaintiffs' claim fails as a matter of law.

The ZEC Program is plainly "related to matters of legitimate state concern." *Id.* at 518. The ZEC Program is part of the Clean Energy Standard, a broader initiative to promote renewable resources and reduce greenhouse gas emissions.  Order 1-6.  The Program advances these goals by "preserv[ing] existing zero-emissions nuclear generation resources as a bridge to the clean energy future," in order to "prevent backsliding … that likely could not be avoided in any other way." *Id.* at 1, 145.  The PSC repeated this purpose over and over.[11]  Plaintiffs cannot seriously dispute that the ZEC program "relate[s] to" New York's efforts to maintain low-carbon energy.

Nor do New York's chosen means create "clear damage" to FERC's stated goals in regulating wholesale markets.  *Nw. Cent. Pipeline*, 489 U.S. at 522.  Plaintiffs assert that efficiency is one such goal, Compl. ¶ 86, but the ZEC Program is fully consistent with that goal.  Fossil-fuel generation imposes negative externalities via the emission of carbon and other harmful pollutants. Those externalities are inefficient: Fossil-fuel generators supply energy and capacity at artificially low prices because they are not required to pay for those costs.  The ZEC program helps to address this inefficiency by valuing the environmental attributes of zero-emissions generation.  *See* Order 133 ("[The program] addresses a well-recognized externality that otherwise would lead to

---

[11] *See* Order 152 ("ZECs provide a vehicle for monetizing the state's environmental preferences and … allow time for new clean energy technologies to mature … [ZECs] contribute uniquely to serving the long-term goal of achieving a largely de-carbonized energy system by the middle of the century."); *id.* at 150 ("[P]reservation of [nuclear facilities'] zero-emissions attributes ... is crucial in the strategy to fight climate change and to achieve New York State's commitment to reduce carbon emissions."); *id.* at 149 ("The Commission is instituting this program to prevent widespread damage from carbon emissions …."); *id.* at 128 ("Retention of the [nuclear facilities] would avoid the emission of approximately 15 million tons of carbon per year."); *cf. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015) (emphasizing the "importance of considering the target at which the state law aims in determining whether that law is pre-empted").

economic inefficiencies [due] to the costs [of] environmental damage … [and] climate change.").

States are not required to ignore those externalities merely because FERC has not yet addressed them.  Indeed, FERC has sought to "accommodat[e] the ability of states to pursue … legitimate state policy objectives," including environmental protection.  *New England States Comm. on Elec. v. ISO New England Inc.*, 142 FERC ¶ 61,108, P 35 (2013).  And FERC has characterized states' "renewable portfolio mandates and greenhouse reduction goals" as "consistent with significant policy objectives of the Commission."  *Pac. Gas & Elec. Co.*, 123 FERC ¶ 61,067, PP 34 (2008).  FERC has thus repeatedly approved of state programs that, like the ZEC program, penalize fossil fuel generation or subsidize zero-emissions generation.  *See id.*; *Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, P 31 (2010); *S. Cal. Edison Co.*, 71 FERC ¶ 61,269, 62,080.  Just this year, FERC affirmed to the Supreme Court that states are "free" to incentivize clean generation, "even if the price signals in the regional wholesale capacity market indicate that [those] resources are [not] needed," Amicus Br. of United States 33, *Hughes*, 2016 WL 344494, and that "[p]ermissible state programs" include creating "renewable energy certificates" or requiring "that local utilities purchase … electricity" from clean generators.  *Id.* at 34.  FERC thus rejects Plaintiffs' view that any action that affects wholesale price signals is conflict preempted.

Moreover, while Plaintiffs claim that the ZEC Program "contravenes the … market structure that NYISO designed," and ground their argument on NYISO's description of the aims of its auction process, Compl. ¶¶ 45, 86, they remarkably fail to disclose that NYISO *supports* the ZEC Program.  According to NYISO, "[r]etaining all existing nuclear generators is critical to the State's carbon emission reduction requirements."  NYISO Supp. Comments 12-13, No. 15-E-0302 (N.Y. P.S.C. July 8, 2016).[12]  And NYISO concluded that the ZEC Program "generally addresses

---

[12]   NYISO's comments are available on the PSC's public docket, located at http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=15-e-0302.

[its] concerns that nuclear resources be retained until longer term market solutions can be developed." NYISO Letter 2, No. 15-E-0302 (N.Y. P.S.C. July 22, 2016). NYISO's support underscores the absence of any conflict with the FERC-regulated auctions that it administers.

## III. Plaintiffs' Dormant Commerce Clause Claim Should Be Dismissed.

Plaintiffs also contend that the ZEC Program violates the dormant Commerce Clause. *See* Compl. ¶¶ 93-101. A regulation "may violate the dormant Commerce Clause only if," as relevant here, "it (1) 'clearly discriminates against interstate commerce in favor of intrastate commerce,' [or] (2) 'imposes a burden on interstate commerce incommensurate with the local benefits.'" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quoting *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004)). Plaintiffs assert both theories, but they have not pled facts that could yield a "plausible claim" for relief. *Starr*, 742 F.3d at 42. As Plaintiffs admit, the Program functions as a subsidy, to which the dormant Commerce Clause does not apply. In any event, the Order makes clear that the Program does not discriminate against out-of-state nuclear facilities. New York can permissibly favor zero-emission nuclear plants, with all the environmental benefits they bring, without running afoul of the dormant Commerce Clause.

### A. The Dormant Commerce Clause Does Not Apply To Subsidy Programs Like The ZEC Program.

As Plaintiffs repeatedly assert, the ZEC Program functions as a "subsidy" for zero-emissions nuclear generation. Compl. ¶¶ 2, 3, 42, 44, 45, 46, 47, 56, 57, 59, 63, 64, 67, 68, 71, 72, 74, 82, 87, 88, 91, 92, 96, 100. But the dormant Commerce Clause *does not apply* to subsidies.

The Supreme Court's decision in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), forecloses Plaintiffs' claim. It addressed a complaint directed at another environmental program—a Maryland subsidy program intended to deal with the problem of a growing number of aging automobile hulks sitting in Maryland streets and junkyards. *Id.* at 796-97. The program paid a

"bounty" for these hulks' destruction, and immunized processors from liability in certain circumstances. *See id.* at 797. But the program was not evenhanded: The rules were significantly less onerous for processors in Maryland than those out of state, and the "practical effect" was "to limit the [bounty] to hulks that stayed inside Maryland" for processing. *Id.* at 799-802, 803.

The Court held that such subsidy programs do not implicate the dormant Commerce Clause. That Clause applies when a state acts "either through prohibition or through burdensome regulation." *Id.* at 806. But when the state enters "into the market as a purchaser, in effect, of a potential article of interstate commerce," that does not warrant dormant Commerce Clause scrutiny. *Id.* at 808. Maryland's purpose—"commendable as well as legitimate"—was to "protect[] the State's environment." *Id.* at 809. And as "the means of furthering [that] purpose," Maryland had permissibly "elected the payment of state funds … to encourage the removal of automobile hulks." *Id.* Such a subsidy—a bounty paid for removing an environmental problem— was not "the kind of action with which the Commerce Clause is concerned." *Id.* at 805.

*Alexandria Scrap* applies here. New York's purpose, "commendable as well as legitimate," is to "protect[] the State's environment." *Id.* at 809. "As the means of furthering this purpose," New York has elected to pay a bounty—a ZEC payment—in exchange for the elimination of carbon emissions. *Id.* As the Complaint acknowledges, that bounty is paid by NYSERDA, using state funds. Compl. ¶¶ 67, 69. Thus, the Commerce Clause has no application.

Just two months ago, a Connecticut district court rejected a dormant Commerce Clause challenge to a state REC program on precisely that ground. *See Allco Fin. Ltd. v. Klee*, No. 3:15-cv-608, 2016 WL 4414774, at *23-25 (D. Conn. Aug. 18, 2016), *appeal docketed*, No. 16-2946 (2d Cir. Aug. 23, 2016). Such programs, the court explained, may make "it more lucrative for generators to produce and distribute clean energy," but they do not "prevent[] the flow of clean

21

energy or regulat[e] the conditions on which it may occur." *Id.* at *24. And because "Connecticut created [the] market for RECs," it was "not obligated to spread the benefit … to states that do not also bear the … cost of the subsidy, which is ultimately paid by Connecticut ratepayers." *Id.* Thus, the REC program was "protectionist only in the [permissible] sense that it limits benefits generated by a state program to those who fund the state treasury and whom the State was created to serve." *Id.* (citation omitted). And so "the dormant Commerce Clause [did] not apply." *Id.* at *25. The same is true of the ZEC Program here.

### B.      Plaintiffs' Discrimination-Based Claims Fail.

Plaintiffs principally allege that the ZEC Program is facially discriminatory because, they claim, nuclear facilities are only eligible if located in New York. Compl. ¶ 98. But Plaintiffs cannot show standing to pursue this claim. To establish Article III standing, plaintiffs must allege a sufficient "causal connection between the injury" of which they complain "and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Similarly, plaintiffs have prudential standing to raise a discrimination-based dormant Commerce Clause claims only if they allege a nexus between their injury and the *discriminatory* aspect of the state's regulation. *See Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491 (5th Cir. 2004). Plaintiffs cannot do so here: they allege that out-of-state *nuclear* facilities are excluded from the ZEC Program, but Plaintiffs do not allege that they operate any such facilities. Compl. ¶¶ 10-15. Their only alleged harm is receiving lower wholesale market prices because the Program will allow non-economic nuclear plants to stay in the market. *See id.* ¶ 74. That harm, however, would be the same even if nuclear plants outside of New York also received ZECs. So even "if favoritism exists, [Plaintiffs] could [not] conceivably have suffered any cognizable harm as a result." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 12 (1st Cir. 2007).

In any event, the PSC's Order contradicts the allegation that the ZEC Program

discriminates against non-New York resources.  When "allegations … are contradicted by documents on which the complaint relies[,] the reviewing court need not accept" those allegations. *Alexander v. Bd. of Educ.*, 107 F. Supp. 3d 323, 331 (S.D.N.Y. 2015) (citation omitted), *aff'd*, 648 F. App'x 118 (2d Cir. 2006).  Under the Order, any "electric generating facility that uses energy released in the course of nuclear fission" is eligible to receive ZECs, "regardless of the location." Order 124; *id.* App. E, at 1.  It is irrelevant that no out-of-state facilities currently satisfy the geographically neutral criteria the PSC applied for the ZEC Program's *first* tranche.  *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473 (1981) (facially geographically neutral regulation constitutional despite benefiting predominantly in-state pulpwood industry); *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1089 (9th Cir. 2013) ("[A] regulation is not facially discriminatory simply because it affects in-state and out-of-state interests unequally."). Out-of-state facilities could have qualified for the first tranche by demonstrating that they had historically contributed to the clean energy mix serving New York, and they can qualify for future tranches if they begin doing so.

Plaintiffs fare no better with their theory that the ZEC program is "purely protectionist in nature, enacted for political reasons to save jobs at the subsidized generators and the property tax revenues therefrom." Compl. ¶ 96.  This Court must "assume that the objectives articulated by the [state] are [the] actual purposes of the [state's regulation], unless an examination of the circumstances forces us to conclude that they 'could not have been a goal.'"  *Clover Leaf Creamery*, 449 U.S. at 463 n.7 (citation omitted); *see id.* at 471 n.15.  Plaintiffs bear the burden. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).  Here, the PSC's Order expressly states that its purpose was to reduce carbon emissions, and it relies on evidence showing that nuclear facilities are crucial to achieving that aim.  *Supra* at 18 & n.11.  Plaintiffs do not, and cannot, plead facts

that could show that this purpose "*could not* have been" at least "*a* goal" of the ZEC Program. *Clover Leaf Creamery*, 449 U.S. at 463 n.7 (citation omitted).  Indeed, the Complaint admits both that "the reduction of carbon emissions is important" and that the ZEC Program *furthers* such reductions, alleging only that such progress "can be achieved more effectively by [other] means." Compl. ¶ 97.  Plaintiffs emphasize that the ZEC Program will also bring local jobs and an expanded local tax base. *Id.* ¶ 96; *see also* Order 7, 61 n.43.  But the Supreme Court has rejected the argument that states violate the dormant Commerce Clause by invoking such benefits.  *See Clover Leaf Creamery*, 449 U.S. at 463 n.7 (refusing to look past a state's "environmental" purpose merely because legislators had provided an "economic defense" of the legislation based on its "beneficial side effects on state industry").[13]

### C.   Plaintiffs' *Pike* Claim Fails.

Plaintiffs also contend the ZEC Program is invalid under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  *Pike* held that even when a state does not discriminate, it violates the dormant Commerce Clause if it imposes a "burden" on interstate commerce that is "clearly excessive in relation to the putative local benefits."  *Id.* at 142.  *Pike* only applies, however, when the "burden on interstate commerce … [is] different from that imposed on intrastate commerce."  *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 50 (2d Cir. 2007) (citation omitted).  That is, a regulation passes muster unless it has "a disparate impact on [a] non-local commercial entity." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 156-57 (2d Cir. 2006), *judgment aff'd*, 550 U.S. 330 (2007).  But Plaintiffs do not allege that the ZEC Program

---

[13] Plaintiffs also claim that the Order discriminates against other forms of carbon-free generation, *see* Compl. ¶¶ 66, 98, but the Supreme Court has repeatedly held that states may choose to benefit particular products, technologies, or industry segments without violating the dormant Commerce Clause.  *See Clover Leaf Creamery Co.*, 449 U.S. at 473 (state could ban plastic milk cartons, thereby favoring pulpwood producers over producers of plastic resin); *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978) (the dormant Commerce Clause protects "the interstate market, not particular interstate firms," and state could favor certain gasoline stations over others).

has a disparate impact on "non-local" entities (aside from falsely claiming it is closed to non-New York facilities, *see supra* at 22-23).  Plaintiffs allege only that suppressed prices and disrupted markets will harm non-nuclear facilities—which would be equally true of local and non-local facilities alike.  *See* Compl. ¶¶ 44-48, 66.  That is fatal under *Pike*.

Illustrating this point is *Energy & Environment Legal Institute v. Epel*, 43 F. Supp. 3d 1171, 1183 (D. Colo. 2014), *aff'd*, 793 F.3d 1169 (10th Cir. 2015).  There, plaintiffs argued that Colorado's renewable portfolio standard impermissibly favored the state's renewable resources and "decrease[d] … the market share for [fossil fuel]" facilities outside the state.  *Id.* at 1182.  The court rejected that *Pike* claim because there was no disparate impact: "out-of-state [fossil-fuel] generators" suffered no more than "in-state" fossil-fuel generators, and any "shift from one type of supplier to another" was irrelevant because it had "not resulted in a decrease in interstate electricity transmission between [the state] and elsewhere."  *Id.* at 1183.  The same is true here.[14]

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed with prejudice.

December 9, 2016

Respectfully submitted,

/s/ Elizabeth A. Edmondson

Elizabeth A. Edmondson
JENNER & BLOCK LLP
919 Third Ave.
New York, NY 10022
(212) 891-1606
eedmondson@jenner.com

*Pro hac vice* application pending.

Matthew E. Price*
Paul M. Smith
Zachary C. Schauf*
William K. Dreher*
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6873
mprice@jenner.com

*Counsel for Intervenors*

---

[14] Moreover, Plaintiffs' claim that the burdens on interstate commerce are excessive relative to the local benefits are facially implausible.  *See Clover Leaf Creamery*, 449 U.S. at 473-74.  Plaintiffs cite only "reduced supply and higher [electricity] prices" due to "more efficient" generators leaving or not entering the market.  Compl. ¶¶ 99-100.  They do not contest the program's environmental benefits, and their claim that the "public will be injured by the loss of … low-priced" electricity "relates to the wisdom of the statute, not to its burden on commerce."  *Exxon*, 437 U.S. at 128.