UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COALITION FOR COMPETITIVE
ELECTRICITY, *et al*.,

        Plaintiffs,

   v.

AUDREY ZIBELMAN, in her official
capacity as Chair of the New York Public
Service Commission *et al*.,

        Defendants.

Docket No. 1:16-CV-8164 (VEC/KNF)

# PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO MOTIONS TO DISMISS

Stuart H. Singer
William T. Dzurilla
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
wdzurilla@bsfllp.com

Jonathan D. Schiller
David A. Barrett
BOIES SCHILLER & FLEXNER, LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
dbarrett@bsfllp.com

Edward J. Normand
Jason C. Cyrulnik
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
enormand@bsfllp.com
jcyrulnik@bsfllp.com

January 6, 2017

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................. 1

FACTS ................................................................................................................. 5

STANDARD OF REVIEW ................................................................................ 12

ARGUMENT ..................................................................................................... 12

I.      THE COURT HAS EQUITY JURISDICTION OVER ALL COUNTS......................... 12

        A.      Federal Courts Have Equity Jurisdiction Based on Asserted Preemption of State Law ........................................................................12

        B.      A Federal Court's Equity Power Is Limited Only in Circumstances Where Congress Has Made Such an Intent Manifest ........................................13

        C.      The FPA Does Not Limit the Equity Jurisdiction of Federal Courts....................15

                1.      Congress Did Not Provide a "Sole Remedy" in the FPA .........................15

                2.      The Relief Plaintiffs Seek Is Not Judicially Unadministrable ..................16

II.     THE COMPLAINT STATES A CLAIM FOR FIELD PREEMPTION......................... 17

        A.      The ZEC Program Is Field Preempted Because the FPA Voids State Regulations That "Directly Affect" Wholesale Prices...........................................17

                1.      The ZEC Program Plainly "Affects" Wholesale Electricity Prices under Standards Reconfirmed Repeatedly by the Supreme Court............18

                2.      The Effects of the ZEC Program on Wholesale Prices Are Far Greater Than Those of a Wide Variety of State Measures That Have Been Held Preempted.......................................................................22

                3.      The Supreme Court's Decision in *EPSA* Supports Plaintiffs, Not Defendants...........................................................................................26

        B.      ZECs Are Critically Different from "Unbundled RECs" .....................................28

III.    THE COMPLAINT STATES A CLAIM FOR CONFLICT PREEMPTION ................. 31

IV.     THE COMPLAINT STATES A CLAIM UNDER THE DORMANT COMMERCE CLAUSE ................................................................................................. 35

      A.     Dormant Commerce Clause Challenges Are Fact-Specific Inquiries Unsuited for Rule 12(b)(6) Resolution ................................................................. 35

      B.     The Dormant Commerce Clause Prohibits Protectionist State Regulations Like the ZEC Order as *Per Se* Invalid ............................................................ 35

      C.     The ZEC Order Discriminates Against Interstate Commerce ............................. 37

      D.     The ZEC Order Unduly Burdens Interstate Commerce ...................................... 39

      E.     New York State Is a Regulator, Not a Market Participant ................................... 39

CONCLUSION ............................................................................................................ 40

# TABLE OF AUTHORITIES

Page

**Cases**

*Air Transp. Ass'n of Am., Inc. v. Cuomo,*
   520 F.3d 218 (2d Cir. 2008)...................................................................................... 13, 16

*Allco Finance Ltd. v. Klee,*
   No. 3:15-CV-608 (CSH), 2016 WL 4414774 (D. Conn. Aug. 18, 2016)............................... 40

*Alliance for Clean Coal v. Miller,*
   44 F.3d 591 (7th Cir. 1995) ...................................................................................... 35, 38

*Am. Ref-Fuel Co.,*
   105 FERC ¶ 61,004 (2003) ........................................................................................... 29

*Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.,*
   No. 13 CIV. 8123 (CM), 2016 WL 4275435 (S.D.N.Y. Aug. 10, 2016) ................... 35, 36, 37

*Appalachian Power Co. v. Pub. Serv. Comm'n,*
   812 F.2d 898 (4th Cir. 1987) ........................................................................................ 25

*Armstrong v. Exceptional Child Center, Inc.,*
   135 S. Ct. 1378 (2015).......................................................................................... *passim*

*Bacchus Imports, Ltd. v. Dias,*
   468 U.S. 263 (1984)......................................................................................... 36, 37, 38

*Bellsouth Telecomms., LLC v. Louisville/Jefferson Cnty. Metro Gov't,*
   No. 3:16-CV-124-TBR, 2016 WL 4030975 (W.D. Ky. July 26, 2016) ................................ 15

*Boggs v. Boggs,*
   520 U.S. 833 (1997)..................................................................................................... 32

*C & A Carbone, Inc. v. Town of Clarkstown,*
   511 U.S. 383 (1994)..................................................................................................... 36

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
   520 U.S. 564 (1997)..................................................................................................... 36

*City of Philadelphia v. New Jersey,*
   437 U.S. 617 (1978)..................................................................................................... 36

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000)..................................................................................................... 13

*FERC v. Elec. Power Supply Ass'n,*
   136 S. Ct. 760 (2016)................................................................................................... 18

*Ex parte Young*,
    209 U.S. 123 (1908) ................................................................................ 13

*Exodus Refugee Immigration, Inc. v. Pence*,
    165 F. Supp. 3d 718 (S.D. Ind. 2016) .................................................... 15

*Faulkner v. Beer*,
    463 F.3d 130 (2d Cir. 2006) .................................................................... 12

*Fiordaliso v. Talen Energy Mktg., LLC*,
    136 S. Ct. 1728 (2016) ....................................................................... 3, 22

*Foster-Fountain Packing Co. v. Haydel*,
    278 U.S. 1 (1928) .................................................................................... 38

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
    841 F.3d 133 (2d Cir. 2016) ............................................................ *passim*

*Hilmann v. Maretta*,
    133 S. Ct. 1943 (2013) ............................................................................ 32

*Hughes v. Alexandria Scrap Corp.*,
    426 U.S. 794 (1976) ................................................................................ 40

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979) ................................................................................ 39

*Hughes v. Talen Energy Mktg., LLC*,
    136 S. Ct. 1288 (2016) ......................................................................... 3, 4

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ................................................................................ 32

*Lanier v. Bats Exch., Inc.*,
    838 F.3d 139 (2d Cir. 2016) .................................................................... 32

*Lewis v. BT Inv. Managers, Inc.*,
    447 U.S. 27 (1980) .................................................................................. 39

*Maine v. Taylor*,
    477 U.S. 131 (1986) ................................................................................ 37

*Midwest Power Sys., Inc.*,
    78 FERC ¶ 61,067 (1997) .................................................................. 26, 30

*Miss. Power & Light Co. v. Mississippi ex rel. Moore*,
    487 U.S. 354 (1988) .......................................................................... *passim*

*Mitchell v. Robert DeMario Jewelry, Inc.*,
  361 U.S. 288 (1960) ................................................................................. 13

*Morgantown Energy Assocs.*,
  139 FERC ¶ 61,066 (2012) ...................................................................... 29

*Municipality of Groton v. FERC*,
  587 F.2d 1296 (D.C. Cir. 1978) ............................................................... 25

*Northern Natural Gas Co. v. State Corp. Comm'n*,
  372 U.S. 84 (1963) ............................................................................ *passim*

*Nantahala Power & Light Co. v. Thornburg*,
  476 U.S. 953 (1986) .......................................................................... *passim*

*Ne. Florida Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993) ................................................................................. 35

*New Energy Co. of Ind. v. Limbach*,
  486 U.S. 269 (1988) ................................................................................. 36

*New England Power Generators Ass'n v. FERC*,
  757 F.3d 283 (1st Cir. 2014) .................................................................... 25

*New England Power Co. v. New Hampshire*,
  455 U.S. 331 (1982) ................................................................................. 18

*Northwest Central Pipeline Corp. v. State Corp. Comm'n*,
  489 U.S. 493 (1989) ...................................................................... 24, 31, 32

*Oneok, Inc. v. Learjet, Inc.*,
  135 S. Ct. 1591 (2015) ...................................................................... *passim*

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*,
  511 U.S. 93 (1994) ................................................................................... 36

*Pa. Water & Power Co. v. FPC*,
  193 F.2d 230 (D.C. Cir. 1951) ................................................................. 18

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ................................................................................. 39

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946) ................................................................................. 13

*PPL EnergyPlus, LLC v. Hanna*,
  977 F. Supp. 2d 372 (D.N.J. 2013) .................................................... *passim*

*PPL EnergyPlus, LLC v. Nazarian,*
    974 F. Supp. 2d 790 (D. Md. 2013) .......................................................................... 3, 22, 35

*PPL EnergyPlus, LLC v. Nazarian,*
    753 F.3d 467 (4th Cir. 2019) ............................................................................... *passim*

*PPL EnergyPlus, LLC v. Solomon,*
    766 F. 3d 241 (3d Cir. 2014) ............................................................................... *passim*

*Schneidewind v. ANR Pipeline Co.,*
    485 U.S. 293 (1988) ............................................................................................ *passim*

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996) ...................................................................................................... 13

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.,*
    742 F.3d 37 (2d Cir. 2014) .......................................................................................... 12

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
    550 U.S. 330 (2007) .................................................................................................... 35

*United States v. Locke,*
    529 U.S. 89 (2000) ...................................................................................................... 18

*United States v. New York,*
    708 F.2d 92 (2d Cir. 1983) .......................................................................................... 13

*Verizon Md., Inc. v. Pub. Serv. Comm'n,*
    535 U.S. 635 (2002) .................................................................................................... 13

*W. Lynn Creamery, Inc. v. Healy,*
    512 U.S. 186 (1994) ........................................................................................ 35, 36, 38

*Weinberger v. Romelo-Barcelo,*
    456 U.S. 305 (1982) .................................................................................................... 13

*Wheelabrator Lisbon, Inc. v. Connecticut Dep't of Pub. Utility Control,*
    531 F.3d 183 (2d Cir. 2008) ........................................................................................ 29

*Windham Solar LLC,*
    156 FERC ¶ 61,042 ................................................................................................ 30(d)

*WSPP Inc.,*
    139 FERC ¶ 61,061 (2012) ............................................................................. 28, 29, 30

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) .................................................................................................... 36

**Statutes**

16 U.S.C. § 824(b)(1) ........................................................................................... 2, 17

16 U.S.C. § 824(d)(a) ..................................................................................... 2, 17, 27

16 U.S.C. § 824(e)(a) ..................................................................................... 2, 17, 27

16 U.S.C. § 825m(a) ................................................................................................ 16

16 U.S.C. § 825p ..................................................................................................... 16

42 U.S.C. § 1396a(a)(30)(A) .......................................................................... 13, 14, 17

42 U.S.C. § 1396c .................................................................................................... 13

49 U.S.C. § 47521 .................................................................................................... 14

49 U.S.C. § 47533(3) ............................................................................................... 14

U.S. Const. art. I, § 8, cl. 3 ...................................................................................... 35

**Other**

Complaint, *Hudson River Sloop Clearwater, Inc. v. N.Y. State Pub. Serv. Comm'n*, No. 7242/2016
  (N.Y. Sup. Ct. Albany Cty. Nov. 30, 2016), https://statepowerproject.files.wordpress.
  com/2014/03/ny-state-court-complaint.pdf.. .................................................................. 10

Harvard Law Sch. Envtl. Policy Initiative,
  *Minimizing Constitutional Risk: Crafting State Energy Policies that Can Withstand
  Constitutional Scrutiny* 17 (2014) ............................................................................ 31

Comments of Alliance for a Green Economy, Council on Intelligent Energy & Conservation
  Policy, Nuclear Information & Resource Service and Sierra Club-Atlantic Chapter,
  http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=15-e-
  0302 (Filing No. 328) ............................................................................................. 9

Protest of Public Citizen, Inc., FERC Docket No. EC16-169 (Oct. 11, 2016),
  http://www.politico.com/states/f/?id=00000157-b5e4-d53e-add7-b7fe190f0001 ........................ 10

## INTRODUCTION

Acting under an express delegation of authority from Congress in the Federal Power Act ("FPA"), the Federal Energy Regulatory Commission ("FERC"), has determined that wholesale electricity prices should be established by competitive, free-market forces.  To accomplish this purpose under federal law, FERC has mandated an auction market structure in which producers of electricity compete to sell their output.  The ultimate goal is to ensure the most efficient production of electricity and thereby benefit consumers over the long run.  As in any market-based system, less economically efficient producers will ultimately leave the market because they cannot make money at a competitively set price.

In 2016, claiming to "protect the environment," the New York Public Service Commission ("PSC") entered an order (the "ZEC Order") that will profoundly disrupt the federally regulated wholesale electricity market.[1]  The ZEC Order mandates that about $7.6 billion will be paid by retail electricity customers over the next twelve years to bail out three uneconomic upstate nuclear power plants by subsidizing the enormous losses that they otherwise would sustain by selling electricity under the rules of the FERC-regulated market.  Without these state-ordered payments, the plants would be driven out of business.  Unless an equitable judgment is entered, these billions in so-called "Zero Emissions Credits" ("ZECs") will go to a single company – intervenor Exelon – and enable its old, high-cost nuclear plants to remain in the market.  And because the PSC is a state agency with Eleventh Amendment immunity, Plaintiffs cannot recover damages for the millions of dollars in losses they will suffer as a result of the PSC's intrusion into the FERC-mandated auctions.

---

[1] The complete ZEC Order is attached as Exhibit A to Defendants' motion.  The Order covers several matters and includes several ordering clauses; this case concerns only the "Tier 3" subsidies to upstate nuclear generators, as set forth therein.  ZEC Order at 19-20, 45-61, 119-150.

At current wholesale prices, for every megawatt hour ("MWh") of energy that the subsidized Exelon nuclear plants sell into the FERC-regulated market, they will receive a subsidy of over 85 percent from the ZECs.  That is, at current market prices, they will be paid approximately $38 for each MWh of energy that they produce, while competing non-nuclear units owned by Plaintiffs will receive only the market price of about $20 per MWh set by the FERC-jurisdictional auctions.  Plaintiffs will lose millions of dollars of revenue because they will lose competitive auctions they otherwise would have won, and they will receive less money in auctions they do win.  Indeed this is the purpose of the ZEC program; if the ZECs do not cause Plaintiffs to lose business, the PSC will not accomplish its intended objective.  Moreover, the ZEC program will force more efficient but non-subsidized generators to exit the market and potential new sources of supply – including generators of clean, renewable sources of energy – will not enter the market.  The eventual result will be reduced supply and increased electricity prices for consumers, thereby thwarting the FERC regulatory framework.

All electricity produced by the subsidized nuclear generators is sold "at wholesale in interstate commerce" and thus is subject to FERC's exclusive jurisdiction pursuant to the FPA, 16 U.S.C. § 824(b)(1), prohibiting states from (i) regulating wholesale electricity rates; (ii) imposing any charges "in connection with" the rates; and (iii) enacting any "rules and regulations affecting or pertaining to such rates or charges," *id.* §§ 824(b)(1), 824d(a), 824e(a); *Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 374 (1988) ("Congress has drawn a bright line between state and federal authority in the setting of wholesale rates and in the regulation of agreements that affect wholesale rates.").  As the Supreme Court recently held in striking down a Maryland subsidy program similar to New York's, states are prohibited from "invad[ing] FERC's regulatory turf" by "adjusting an interstate wholesale rate" with a price

supplement to a favored generator. *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016); *see also PPL EnergyPlus, LLC v. Solomon*, 766 F. 3d 241, 253 (3d Cir. 2014) (striking similar New Jersey program where the "functional result" was the price received by favored plants would exceed the FERC market price), *cert. denied*, 136 S. Ct. 1728 (2016). All sixteen of the judges and justices who considered *Hughes* and *Solomon* found the state subsidies to be preempted.[2]

The New York ZEC subsidy, like the Maryland and New Jersey subsidies, invades FERC's "regulatory turf" by "adjusting an interstate wholesale rate" with a price supplement to a favored generator. Defendants argue that the ZEC program is "different" from the Maryland and New Jersey programs because the ZEC program purports to concern the "environmental attributes" of electricity. But the result in *Hughes* would have been the same had the subsidy been labeled an "environmental credit" instead of a price subsidy; or – in light of Maryland's goal to increase electric production – a "capacity generating credit." Otherwise, a state could always intrude on federal jurisdiction by the artifice of creating a "credit" that purportedly is separate from the electricity sale. *Defendants have failed to cite a single case where any remotely similar program was upheld against a preemption and Commerce Clause challenge*.

The ZECs are not saved by Defendants' assertion that the program has a *bona fide* environmental purpose (which Plaintiffs dispute in the Complaint). The subsidy payments depend upon and directly affect the wholesale price, and "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates." *Hughes*, 136 S. Ct. at 1298.

---

[2] *See PPL EnergyPlus, LLC v. Hanna*, 977 F. Supp. 2d 372 (D.N.J. 2013), *aff'd sub nom. PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014), *cert. denied sub nom. Fiordaliso v. Talen Energy Mktg., LLC*, 136 S. Ct. 1728 (2016); *PPL EnergyPlus, LLC v. Nazarian*, 974 F. Supp. 2d 790 (D. Md. 2013) ("*Nazarian I*"), *aff'd*, 753 F.3d 467 (4th Cir. 2014) ("*Nazarian II*"), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016).

Holding that the ZEC program is preempted will not affect Renewable Energy Credits ("RECs"), which many states have created.  Under the New York REC program, an eligible renewable generator gets one REC for each MWh it produces, and local utilities (called load serving entities or "LSEs") are required to procure RECs in an amount based on a percentage of their total load or make alternative compliance payments.  LSEs can buy RECs from various generators, from the public at large, or from NYSERDA.[3]  The REC price is determined solely by competitive processes, as the State does not and cannot fix a price for RECs.  ZEC Order at 14-16, 38, 78, 92-94.  In sharp contrast to ZECs, RECs are available to all businesses that opt to produce qualifying renewable-generated electricity, not just facilities that are otherwise uneconomic in the FERC-jurisdictional markets.  REC programs do not require participants to prove that they cannot operate profitably at FERC auction prices.  REC program do not involve a state-mandated price, let alone a price tied to forecasts of wholesale market prices.  And RECs do not require, as ZECs do, that the recipient has historically contributed to producing power used within the State.  This case does not involve REC programs, and the Court need not consider any issue concerning them, but the ZEC program is entirely different and should be deemed unconstitutional.

Defendants' contention that *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), precludes equitable relief on Plaintiffs' preemption claims ignores long-established law that allows relief in FPA preemption cases.  The Second Circuit's post-*Armstrong* decision in *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 144-47 (2d Cir. 2016), makes clear that *Armstrong* is inapplicable here.

---

[3] The New York State Energy Research and Development Authority ("NYSERDA") issues competitive RFPs for RECs from new renewable generators. The lowest bidders win until the money runs out.  NYSERDA then pays for those RECs as they are generated over a 10 or 20-year period.  In addition to the primary REC program, the ZEC Order calls for the establishment of a "maintenance tier" to assist certain small existing renewable facilities.  ZEC Order at 117.

4

In addition to preemption, the Complaint also states a claim under the dormant Commerce Clause. Defendants claim that the ZEC program does not discriminate against out-of-state generators of electricity. However, they ignore the PSC's limitation which makes ZECs available only to nuclear generators that have made a "historic contribution" to New York's retail consumption. This effectively excludes out-of-state generators. The program thus does not regulate evenhandedly to effectuate a legitimate local public interest, and the effects on interstate commerce are more than incidental.

## FACTS

Defendants and Intervenors do not (and on motions to dismiss cannot) dispute the detailed factual allegations of the Complaint regarding (i) FERC's exclusive jurisdiction over wholesale rates and regulations "affecting" such rates, Compl. ¶¶ 24-26; (ii) the FERC regulatory regime and the role of the New York Independent System Operator ("NYISO"), *id.* ¶¶ 27-29; (iii) the role and operation of NYISO's energy and capacity markets, *id.* ¶¶ 30-40; (iv) total market compensation to nuclear generators, *id.* ¶¶ 41-42; (v) the factual history and planned operation of the ZEC program, *id.* ¶¶ 52-75; (vi) the damages (lost revenues) Plaintiffs will incur, and (vii) the massive and highly disruptive effect the ZEC program would have on FERC-regulated wholesale markets, *id.* ¶¶ 43-48. Accepting these factual allegations as true, the Court should deny the motions to dismiss because, as set forth below, those factual allegations bring this case squarely within the standards for preemption established by the Supreme Court and the courts of appeals.

FERC has determined to regulate wholesale electricity sales by using market-based auctions that are administered to establish the "just and reasonable rates" that the FPA requires. *Id.* ¶¶ 24-29. FERC regulates "independent system operators" ("ISOs") to oversee the interstate auctions that are part of these market processes. The State of New York is in a region where

5

wholesale electricity is bought and sold through auctions conducted by the NYISO.  *Id*. ¶ 28.
The NYISO conducts energy auctions, in which actual electricity is bought and sold, and
capacity auctions, which involve the purchase and sale of *options* to purchase electricity.  The
buyer of a capacity-market option receives the right to require the seller of the option (a power
generator) to produce a specified amount of energy if and when needed.

In both energy and capacity auctions, the NYISO "stacks" the bids from generators, first
accepting the lowest bids and then moving up and accepting higher bids until all demand is
satisfied.  *Id*. ¶¶ 30-39.  The price of the highest stacked bid that satisfies the demand is known
as the "market clearing price" and is paid uniformly to all successful bidders (even those who bid
lower).  *Id.* ¶ 33.  Markets naturally deploy the most efficient and least costly generators first;
additional quantity must be provided by less efficient generators that operate at higher cost.  *Id*.
The auction's stacking mechanism creates an incentive for a generator to be efficient and cost
effective so that its product will "clear" the auctions and produce revenue.  *Id*. ¶ 40.  The auction
process creates price signals for new capacity to enter the market if it can do so below the
clearing price.  *Id*.  And it provides price signals for existing suppliers to exit the market if they
are unable to beat the clearing price, or if the clearing price is so low that the supplier cannot
operate profitably at that price.  *Id*.

Unlike other types of electricity generators, which can be turned on and off, or adjusted
quickly to produce more or less energy as conditions warrant, nuclear generators run
continuously at maximum output.  *Id*. ¶ 34.  The favored nuclear plants therefore bid as "price
takers" in the NYISO actions, meaning that they agree to sell their entire output at whatever
clearing price the market determines.  *Id; see* Tr. of Dec. 16, 2016 hearing at 24-25 (Defendants'
counsel admitted "price taker" bidding).

6

Large price-taking units like the favored Exelon plants significantly decrease the clearing prices for all market participants, including Plaintiffs. *Id.* The nuclear plants' price-taking low bids cause Plaintiffs' and other competitors' bids to fail to clear the auctions (in which case Plaintiffs get zero revenue), or to clear at a lower price (meaning Plaintiffs get less revenue than they otherwise would have received). *Id.* ¶ 87.

Even with price-taker bidding, recent decreases in energy production costs, largely due to cheap shale gas, have reduced electricity clearing prices below the level necessary for some nuclear units to operate profitably. *Id.* ¶ 34. Among these are the older upstate New York units selected to receive ZECs. These are the Robert Emmett Ginna plant ("Ginna") in Ontario and the James A. FitzPatrick ("FitzPatrick") and Nine Mile Point (composed of Units 1 and 2) plants, both in Scriba. *Id.* ¶¶ 52-57.

The PSC adopted the ZEC subsidies after the owners announced that Ginna, FitzPatrick, and Nine Mile 1 would be closed in the absence of state aid. *Id.* ¶¶ 54-64. In other words, the ZEC program expressly props up nuclear plants that otherwise would close due to market forces. In doing so, it distorts the functioning of the FERC-regulated energy and capacity markets. *Id.* The uneconomic nuclear generators will receive a price that is over 80 percent higher than the market clearing price in NYISO-conducted auctions that FERC has determined will set a "just and reasonable" rate for wholesale electricity. *Id.* ¶¶ 3, 44. Retail ratepayers in New York ultimately are required to fund the difference between the wholesale price authorized by FERC and the higher, subsidized rate established by the State. *Id.* ¶ 73. And Plaintiffs will steadily lose revenue due to the artificially low auction clearing prices.

The process that led to the ZEC program began in June 2015, when the PSC opened a proceeding entitled "In the Matter of the Implementation of a Large-Scale Renewable Program

and a Clean Energy Standard," Case No. 15-E-0302 (the "LSR proceeding"). *Id.* ¶ 60. There was no mention of the upstate nuclear plants, or any type of ZEC program, in the initial notice of the LSR proceeding or in the accompanying paper entitled "Large Scale Renewable Energy Development in New York: Options and Assessment," which was prepared jointly by the PSC's staff, the NYSERDA, and outside consultants. *Id.* In July 2015, the State Energy Planning Board promulgated a State Energy Plan ("SEP"), which set a goal that 50 percent of all electricity used in the State should be generated from renewable energy sources by 2030. *Id.* The SEP does not mention the upstate nuclear plants or any type of ZEC program. *Id.*

After plans to close the upstate nuclear generators were announced, the PSC expanded the scope of the LSR proceeding in January 2016 and ordered its staff to develop recommendations to keep the plants open. *Id.* ¶ 61. Just four days later, the staff issued a white paper that proposed, *inter alia*, that the PSC adopt a ZEC program "to provide qualifying nuclear plants with support payments, reflective of their going forward costs of operation, to ensure they continue to operate." *Id.* ¶ 62. To ameliorate the plants' "financial difficulties," the white paper proposed that ZECs be issued "based upon the difference between the anticipated operating costs of the units and forecasted wholesale prices." *Id.*

In April 2016, the U.S. Supreme Court decided in *Hughes* that state subsidies to electricity generators are preempted by the FPA if they are "tethered" to FERC-regulated wholesale electricity prices. *Id.* ¶ 63; *Hughes*, 136 S. Ct. at 1299. Apparently recognizing that its original proposal was unconstitutional under *Hughes*, the PSC staff issued a revised recommendation in July 2016 that changed the formula for determining the amount of the ZEC subsidies. Compl. ¶ 63. Although the new formula was ostensibly based upon a federal interagency working group's estimated "social cost of carbon," this merely changed the name,

but not the intent or effect, to greatly increase the FERC-determined price with a state subsidy

for the Ginna, FitzPatrick and Nine Mile Point plants.  *Id.*  Despite the name change, the final

ZEC price was set at a level that effectively replicated the financial need of the nuclear plants.

Indian Point, a profitable nuclear generating plant in Westchester County, was not recommended

for inclusion in the ZEC program.  *Id.*

 Although the revised ZEC recommendation was packaged as a "clean air" measure,

multiple environmental groups, as well as ratepayers and other civic organizations, strongly

opposed it.  The Sierra Club and other environmental groups objected that the ZEC program was

"blatant corporate favoritism" and a "consumer rip-off" to force New York's consumers to buy

"dirty and dangerous nuclear power" at high cost, even though "real clean energy options are

available for lower cost."[4]  The premise for the ZEC program was that the nuclear plants needed

to stay open to prevent "backsliding" that would increase the use of carbon-based fuel until

additional renewable sources become available, but the environmental objectors rejected this

premise.[5]  Despite the objections, the PSC adopted the revised recommendation on August 1,

2016.  Compl. ¶ 64.  Environmental groups' and other petitions for rehearing[6] were denied.[7]  An

environmental group and a ratepayer have sued in state court for injunctive relief against the

---

[4] http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=15-e-0302 (Filing No. 328) (comments of Alliance for a Green Econ. (AGREE), Council on Intelligent Energy & Conservation Policy (CICEP), Nuclear Info. & Res. Serv. (NIRS), Sierra Club-Atl. Chapter).  Other groups filing objections to the ZEC program include Citizens' Environmental Coalition (Filing No. 320), Ampersand Hydro (Filing No. 331), the New York Association of Public Power (NYAPP) (Filing No. 333), the City of New York (Filing No. 338), the Public Utility Law Project (PULP) (Filing No. 343), and Promoting Health and Sustainable Energy (PHASE) (Filing No. 348).

[5] *See, e.g., id.* (Filings nos. 194 & 348) ("voluminous literature demonstrates that nuclear power is extremely ill-suited to combating to climate change").

[6] *See id.*, particularly the rehearing petitions of CICEP and the Sierra Club (Filing No. 373), AGREE and NIRS (Filing No. 365), and the Alliance for Clean Energy New York (Filing No. 369).

[7] *Id.* (Filing No. 426), Order on Petitions for Rehearing (Dec. 15, 2016).

ZEC program,[8] and Public Citizen, a consumer advocacy group, has filed a protest against the ZEC program with FERC.[9]

Under the ZEC Order, a New York nuclear generator is entitled to a long-term subsidy contract with NYSERDA upon a showing of "public necessity."  Compl. ¶ 67.  The PSC must find, *inter alia*, that the facility's revenues "are at a level that is insufficient to provide adequate compensation to preserve the zero-emission environmental values or attributes historically provided by the facility."  *Id*.  In other words, entitlement to ZECs depends upon the PSC's determination that the generator's compensation from the FERC-regulated auctions is "inadequate."  *Id.*  Accordingly, the ZEC program turns on PSC findings that necessarily contradict FERC's determination that the wholesale price is "just and reasonable."  The subsidized facility is obligated to "produce" electricity, subject to penalties if it does not, and the only way it can produce power is to sell it in the NYISO wholesale auctions.  The facility sells its ZECs to NYSERDA at a price determined administratively by the PSC.  *Id.* ¶¶ 64, 69, 72.

The PSC has set the ZEC price at $17.48 per MWh for each MWh of electricity produced by the facility from April 1, 2017, through March 31, 2019.  *Id.* ¶ 70.  The amount of the subsidy thereafter is again tethered to forecast prices in the FERC-regulated NYISO wholesale market.  *Id.* ¶ 71.  Specifically, the price of a ZEC for each two-year tranche going forward will be lowered by the amount by which the NYISO "Zone A [western New York] forecast energy price

---

[8] Complaint, *Hudson River Sloop Clearwater, Inc. v. N.Y. State Pub. Serv. Comm'n*, No. 7242/2016 (N.Y. Sup. Ct. Albany Cty. Nov. 30, 2016), https://statepowerproject.files.wordpress. com/2014/03/ny-state-court-complaint.pdf. *See, e.g.*, *id.* ¶¶ 112 (ZEC environmental claims "misleading and not based in scientific fact"), 119 ("cost effective and viable" alternatives).

[9] "Elements of the NYDPS ZEC order suggest that its primary purpose is not to reduce greenhouse gas emissions, but rather to serve as an economic development program to retain certain preferred nuclear power plant jobs and the associated tax base, all funded through a wholesale-market-distorting subsidy ultimately funded by captive New York ratepayers."  Protest of Public Citizen, Inc., FERC Docket No. EC16-169 (Oct. 11, 2016), http://www.politico.com/states/f/?id=00000157-b5e4-d53e-add7-b7fe190f0001.

and ROS [rest of state] forecast capacity price combined exceeds $39/MWh." *Id.*  In other words, as forecast prices in the FERC-regulated NYISO wholesale auctions increase, the ZEC subsidies decrease, possibly to the point of ultimate elimination. *Id.*[10]  The preservation of uneconomic nuclear generators has a downward impact on NYISO prices, which necessarily prolongs the life of the ZEC program.  This vicious cycle will have a far-reaching, long-lasting impact on the FERC regulated markets.

After buying the ZECs from the nuclear generators at the price mandated by the PSC, NYSERDA is required to resell the ZECs to each of LSEs. *Id.* ¶ 73.  The purchase requirement for each LSE is proportional to its share of "the total electric energy load served by all" LSEs in the State.  *Id.*  The rate-regulated LSEs are authorized to pass on the costs of their ZEC purchases to their customers, the retail ratepayers.  *Id.*

The ZEC program damages Plaintiffs because the ZEC subsidies will enable the nuclear generators, which compete against Plaintiffs in interstate markets, to continue operating money-losing facilities and selling uneconomic capacity and energy into the FERC-regulated auctions. *Id.* ¶ 74.  As a result, auction clearing prices will be significantly lower, which will both disrupt FERC's efforts to promote, design, and implement competitive wholesale energy and capacity markets and greatly lower Plaintiffs' revenues.  *Id.*

By artificially retaining the otherwise uneconomic nuclear units, the PSC is using the ZEC subsidy to exert a large depressive effect on energy and capacity prices, estimated at $15 billion over 12 years.  *Id.* ¶ 47.  Plaintiffs will incur irreparable damages, New York ratepayers

---

[10] Intervenors refer (Br. at 13) to the "ZEC Program's limited use of projected wholesale prices to set a price cap," but they have it backwards.  The social cost of carbon metric is what sets the "price cap" for the ZEC (initially $17.48/MWh), while the difference between forecast wholesale prices and $39/MWh (used in the ZEC price formula beginning in Tranche 2) determines the actual "make whole" payment.  If wholesale market prices rise in the future, the "make whole" ZEC payment would be reduced, because the gap between the uneconomic units' expected revenues and costs would decline.

will pay more for electricity, and both will lose the benefits of fair competition and more efficient generation over the long run. *Id.* ¶¶ 47-48.  New York – like Maryland in *Hughes* and New Jersey in *Solomon* – has taken action to alter what the State views as unsatisfactory consequences of the prices set by the wholesale markets under FERC's exclusive jurisdiction.

## STANDARD OF REVIEW

Under Rule 12(b)(6) motions, the well-pleaded factual allegations of the complaint must be regarded as true, all reasonable inferences must be drawn in plaintiffs' favor, and no facts outside the complaint may be considered.  *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).  The motions must be denied if the complaint states any plausible claim to relief.  *See Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 40 (2d Cir. 2014).

## ARGUMENT

## I.   THE COURT HAS EQUITY JURISDICTION OVER ALL COUNTS

Defendants wrongly contend that the FPA "implicitly forecloses" the Court's equitable power to enjoin the ZEC Order on preemption grounds.  (Defendants do not contest jurisdiction to enjoin the program on Commerce Clause grounds.)

### A.   Federal Courts Have Equity Jurisdiction Based on Asserted Preemption of State Law

The Supreme Court has "long recognized" that where private individuals assert that federal law preempts state regulation, "the court may issue an injunction upon finding the state regulatory actions preempted."  *Armstrong*, 135 S. Ct. at 1384; *accord Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144-47 (2d Cir. 2016) (applying *Armstrong*).  This equity power "reflects a long history of judicial review of illegal executive action, tracing back to England."  *Armstrong*, 135 S. Ct. at 1384.  The Supreme Court has

12

consistently recognized federal jurisdiction over private injunctive actions in which plaintiffs assert that federal law preempts state law.[11]  The Second Circuit has done the same.[12]

**B.      A Federal Court's Equity Power Is Limited Only in Circumstances Where Congress Has Made Such an Intent Manifest**

Congress may limit a federal court's equity power to enjoin state action, but must make its intent to do so unmistakably clear.  *See Armstrong*, 135 S. Ct. at 1385; *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73-74 (1996).  "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *accord Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291 (1960).

In *Armstrong*, the Supreme Court decided that the Medicaid Act precludes healthcare providers from invoking a federal court's equity jurisdiction to enjoin state officials from reimbursing medical service providers at rates lower than the Act requires under 42 U.S.C. § 1396a(a)(30)(A).  The Court's decision was based on factors that are notably absent here. First, the "sole remedy" that Congress provided for a state's failure to comply with Medicaid's requirements was "the withholding of Medicaid funds by the Secretary of Health and Human Services."  *Armstrong*, 135 S. Ct. at 1385 (citing 42 U.S.C. § 1396c).  Second, reasoning that the Act's remedy provision "by itself" might not be a sufficient basis for precluding equitable relief,

---

[11] *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645-46 (2002) (exercising jurisdiction over suit by telecommunications carriers asserting preemption of state order); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000) (enjoining state statute barring certain foreign transactions in face of federal statute imposing conflicting sanctions).

[12] *See, e.g.*, *E. Hampton*, 841 F.3d at 144-47 (affirming exercise of federal equity jurisdiction in challenge by airport users and aviation companies to preempted local laws restricting airport use); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 221-22 (2d Cir. 2008) (airline trade organization's action for declaratory and injunctive relief against preempted state regulatory statute); *United States v. New York*, 708 F.2d 92, 94 (2d Cir. 1983) (relying on "equitable power" recognized in *Ex parte Young*, 209 U.S. 123 (1908), to uphold injunction against nighttime ban on airport use).

the Court concluded that it did have such effect "when combined with the judicially unadministrable nature of § 30(A)'s text."  *Id.*  The Court explained that "[i]t is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'"  *Id.* (quoting 42 U.S.C. § 1396a(a)(30)(A)).

The Second Circuit recently applied the two-prong *Armstrong* framework in *East Hampton*.  The court held that in the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521 *et seq.*, Congress did not intend to limit a federal court's equity power to enjoin preempted local laws restricting the use of and access to a town airport.  *E. Hampton*, 841 F.3d at 144-47.  The court concluded that "ANCA cannot be analogized to the Medicaid statute in either of the two ways prompting jurisdictional concerns in *Armstrong*."  *Id.* at 145.

With respect to the first concern in *Armstrong*, the Second Circuit concluded that although ANCA permits the Secretary of Transportation to eliminate an airport's federal funding if its noise or access restrictions violate ANCA, "there is no textual basis to conclude that the loss of federal funding is the *only* consequence for violating ANCA."  *Id.* (emphasis added). Instead, ANCA provides that the provision concerning the loss of federal funding "'does not affect . . . the authority of the Secretary of Transportation to seek and obtain legal remedies the Secretary considers appropriate, including injunctive relief.'"  *Id.* (quoting 49 U.S.C. § 47533(3)).  The court reasoned that the breadth of authority that the Federal Aviation Administration (FAA) enjoys under ANCA does not suggest that Congress meant to limit private parties from invoking federal equity jurisdiction "where, as here, they do so not to enforce the

14

federal law themselves, but to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements." *Id.* at 146.

With respect to the second concern in *Armstrong*, the Second Circuit explained that the "plaintiffs' ANCA-based challenge to the Town's Local Laws would not require application of a judicially unadministrable standard." *Id.* Considering the ANCA provision "detailing various factors that can inform an FAA decision to approve local noise restrictions," the court concluded that the provision "sets forth a simple rule: that airports seeking to impose noise restrictions on Stage 3 aircraft must obtain either the consent of all aircraft operators or FAA approval." *Id.* The court concluded: "A federal court can evaluate the Town's compliance with these obligations without engaging in the sort of 'judgement-laden' review that the Supreme Court in *Armstrong* concluded evinced Congress's intent not to permit private enforcement of § 30A of the Medicaid Act." *Id.* at 147.[13]

## C.   The FPA Does Not Limit the Equity Jurisdiction of Federal Courts

The FPA does not provide any basis to infer that Congress intended to limit equity jurisdiction over matters in which a private party asserts that the FPA preempts state law.

### 1.   Congress Did Not Provide a "Sole Remedy" in the FPA

Defendants cannot meet the first element of *Armstrong*. Under the FPA, the "sole remedy" for violations is not limited to loss of funding, agency fines, or other administrative action. To the contrary, in order to enforce the FPA, Congress authorized both suits in equity and FERC administrative proceedings. FERC has discretion to file compliance actions in federal

---

[13] Other federal courts have similarly applied *Armstrong*. *See, e.g., Bellsouth Telecomms., LLC v. Louisville/Jefferson Cnty. Metro Gov't*, No. 3:16-CV-124-TBR, 2016 WL 4030975, at *4-6 (W.D. Ky. July 26, 2016) (Pole Attachment Act does not contain a sole remedy exclusive of an equitable action in federal court and does not create a judicially unadministrable standard); *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 728 (S.D. Ind. 2016) (Refugee Act of 1980 does not contain a sole remedy to the exclusion of an equitable action and that its anti-discrimination provisions are the types of standards "routinely enforce[d]" by courts), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

courts, 16 U.S.C. § 825m(a), and, in addition, federal district courts are given exclusive

jurisdiction of "a*ll suits in equity* and actions at law" – a term not limited to FERC actions, and

written against a history of private injunction suits.  16 U.S.C. § 825p (emphasis added); *see*

*generally E. Hampton*, 841 F.3d at 145-46; *Air Transp. Ass'n of Am.*, 520 F.3d at 221-22; *New*

*York*, 708 F.2d at 93-94.[14]  These provisions show that Congress did not intend FERC

administrative enforcement to be the only means of enforcing the FPA's requirements and

FERC's orders thereunder.

    2. The Relief Plaintiffs Seek Is Not Judicially Unadministrable

   Plaintiffs' claims implicate subject matter – state regulations affecting wholesale energy

rates – that the federal courts have addressed for decades.[15]  Plaintiffs are *not* asking the Court to

determine or set reasonable rates for the wholesale sale of electricity.  Rather, this action seeks

only to ensure that the FERC-set rate continues to govern wholesale energy transactions in New

York.  This contrasts with the plaintiffs in *Armstrong*, who were effectively asking the court to

set reimbursement rates under the equal access provision of the Medicaid Act.  Here, Plaintiffs

ask the Court only to resolve whether, as in *Hughes*, a state regulatory program "impermissibly

intrudes upon the wholesale electricity market, a domain Congress reserved to FERC alone."

*Hughes*, 136 S. Ct. at 1292.

---

[14] Defendants cite, to no avail, part of the district court's decision in *East Hampton* that they contend the Second Circuit did not overrule.  The district court concluded that Congress intended to place authority for the enforcement of the Airport and Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C. § 47101 *et seq.*, "exclusively in the hands of the Secretary of Transportation through a comprehensive administrative enforcement scheme."  *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 104 (E.D.N.Y. 2015).  In contrast to ANCA, which the Second Circuit addressed on appeal, and the FPA in this case, the district court found no provision giving general jurisdiction to the courts under the AAIA, but only an authorization allowing the Secretary of Transportation to bring a "civil action" in narrow circumstances involving recoupment of government payments.  *See id.* at 104-05.

[15] *See, e.g.*, *Hughes*, 136 S. Ct. at 1297; *Miss. Power & Light Co.*, 487 U.S. at 369-70; *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 308 (1988); *N. Nat. Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 90-92 (1963).

Plaintiffs' position that the ZEC program is field-preempted and conflict-preempted involves the type of traditional legal determinations that the federal courts regularly make in preemption cases. There is no more judgment involved here about the effect of the ZEC program on the federal system of energy regulation than what the federal courts capably addressed n *Hughes* and *Nazarian*. The Court can address these issues without engaging in the "judgment-laden" review that would have been required in *Armstrong* for a court to determine if Medicaid reimbursement rates were "consistent with efficiency, economy, and quality of care" and assured "care and services" equivalent to that "available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). *See Armstrong*, 135 S. Ct. at 1389 (Breyer, J., concurring) (examining courts' familiarity with subject matter in addressing the issue of administrability).

## II.      THE COMPLAINT STATES A CLAIM FOR FIELD PREEMPTION

### A.      The ZEC Program Is Field Preempted Because the FPA Voids State Regulations That "Directly Affect" Wholesale Prices

Under the FPA, FERC has exclusive regulatory authority, to the exclusion of state governments, over "the sale of electric energy at wholesale in interstate commerce," 16 U.S.C. § 824(b)(1). This exclusive authority, as Defendants (Br. at 14) and Intervenors (Br. at 3) admit, extends to the imposition of any charges "in connection with" wholesale rates, and the enacting of any "rules and regulations affecting or pertaining to such rates or charges." *Id*. §§ 824d(a), 824e(a); *see Miss. Power & Light*, 487 U.S. at 374 ("Congress has drawn a bright line between state and federal authority in the setting of wholesale rates and in the regulation of agreements

17

that affect wholesale rates.").[16]  With respect to field preemption, the issue is thus whether, under

the facts as alleged, the ZEC program "affects," "pertains to," or is "connected with" wholesale

electricity rates.  The answer clearly is yes, so the ZEC program cannot stand.[17]

> 1.    The ZEC Program Plainly "Affects" Wholesale Electricity Prices under
>        Standards Reconfirmed Repeatedly by the Supreme Court

Courts and FERC have for decades construed the FPA terms "affects," "pertains to," and

"connected with," and the Supreme Court has reconfirmed these longstanding interpretations in a

trio of recent cases – *Hughes*, *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760 (2016)

("*EPSA*"), and *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015).  In *EPSA*, to avoid giving

FERC's "affecting" jurisdiction "near-infinite breadth," the Court limited it to "rules or practices

that *directly* affect the [wholesale] rate."  136 S. Ct. at 774 (emphasis in original).  In *Oneok*, the

Court held that whether a state regulation "directly" affects wholesale rates depends on

"the *target* at which the state law *aims*."  135 S. Ct. at 1599 (emphasis in original); *see also*

*EPSA*, 136 S. Ct. at 776 (citing *Oneok*).  Thus, "measures *aimed directly at* interstate purchasers

and wholesalers for resale" are field-preempted, while those aimed at "subjects left to the States

to regulate," such as generally applicable state antitrust laws, blue sky laws, tax laws, and

recycling laws, are not, because their impact on interstate wholesale rates is incidental or

indirect.  *Oneok*, 136 S. Ct. at 1600-01 (quoting *N. Nat. Gas Co.*, 372 U.S. at 94).  Although not

---

[16] *See also, e.g.*, *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (FPA grants FERC "exclusive authority to regulate the transmission and sale at wholesale of electric energy"); *Pa. Water & Power Co. v. FPC*, 193 F.2d 230, 239 (D.C. Cir. 1951) (through the FPA, Congress has "occupied the field with regard to interstate wholesale rates of electric companies"), *aff'd*, 343 U.S. 414 (1952).

[17] Contrary to Intervenors' contention (Br. at 6), there is no presumption against preemption.  The presumption "is not triggered when the State regulates in an area where there has been a history of significant federal presence."  *United States v. Locke*, 529 U.S. 89, 108 (2000); *see Nazarian II*, 753 F.3d at 477("The presumption 'is almost certainly not applicable here because the federal government has long regulated wholesale electricity rates'. . . . [and] even were we to apply the presumption, we would find it overcome by the text and structure of the FPA, which unambiguously apportions control over wholesale rates to FERC."  (citation omitted)).

field-preempted, even these types of indirect state regulations may be conflict preempted. *Id*. at 1602. The ZEC program is field-preempted because it is targeted directly at three nuclear generators selling exclusively at wholesale in interstate commerce – with the existence and amount of the ZEC subsidies tethered directly to wholesale prices, in a manner that directly affects the price in FERC-regulated auctions.

Defendants strain credulity in asserting (Br. at 6-7) that the ZEC program is valid because it is only tethered to *projected* wholesale energy and capacity prices, not actual prices. Complaint ¶ 71; ZEC Order at 130. There is no reason to think the result in *Hughes* would have been different if the subsidy had been calculated based on forecasts of FERC-jurisdictional wholesale prices rather than on actual FERC-jurisdictional wholesale prices. Nothing about the forecasts changes the fact that the ZEC payments directly alter the wholesale price paid by LSEs and received by the nuclear generators. Moreover, the price forecasts are based on actual market prices, supplemented by expectations of future changes. Under the ZEC program, the price for each separate two-year pricing "tranche" is set just before the beginning of the relevant time period. ZEC Order, App'x E at 7-8 & n.3. Accordingly, as forecasts applicable to a tranche are updated based on charges in actual prices over time, the ZEC prices will be inherently and very closely "tethered" to actual market prices, which will be effectively embedded in future ZEC prices.

In *Hughes*, the Supreme Court's most recent pronouncement, the Court reaffirmed *EPSA* and *Oneok* and held that a Maryland program that subsidized the cost of building a new in-state electric generating unit was field-preempted. Even though the subsidy was for the legitimate purpose of "encourag[ing] construction of new in-state generation," it was "*aimed directly* at interstate purchasers and wholesalers for resale" and thus an invalid "intru[sion] on FERC's

authority over interstate wholesale rates." 136 S. Ct. at 1298-99 (emphasis in original) (citing *Oneok*, 135 S. Ct. at 1600). Thus, even if the ZEC program was enacted for valid environmental reasons, the legitimate purpose does not excuse the direct intrusion on FERC's authority, as states are prohibited from "adjusting an interstate wholesale rate." *See id.* at 1297.

The *Hughes* Court stated: "Nothing in this opinion should be read to *foreclose* Maryland and other States from encouraging production of new or clean generation through measures '*untethered to a generator's wholesale market participation*.'" 136 S. Ct. at 1299 (emphasis added, quotation omitted).[18]  In this regard, the Court stressed:

> "*[A] State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable*.  A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." . . . *States interfere with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable, even when States exercise their traditional authority over retail rates or, as here, in-state generation.*

*Id.* at 1298-99 (emphasis added) (quoting *Miss. Power & Light*, 487 U.S. at 373); *see id*. at 1300 (Sotomayor, J., concurring) (Maryland's actions "must be preempted" because it "has acted to guarantee CPV a rate different from FERC's 'just and reasonable' rate and has thus contravened the goals of the Federal Power Act"); *id*. at 1301 (Thomas, J., concurring) ("By 'fiddling with the effective . . . price' that CPV receives for its wholesale sales, Maryland has 'regulate[d]' wholesale sales.").

Even more so than the subsidies in *Hughes*, the ZECs are "tethered" to the favored generators' wholesale market participation.  The threshold right to ZECs is triggered by a specific finding that the rate deemed "just and reasonable" by FERC is "insufficient" to produce

---

[18] At the December 16 hearing (Tr. at 38), Defendants' counsel omitted the final clause ("untethered to a generator's wholesale market participation") when he paraphrased this sentence from *Hughes* as stating, "Nothing in this case is designed to constrain – or some verb like that – the state's ability to pursue clean and renewable energy programs."

a profit – a direct contradiction. *See Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986) ("[A] State may not conclude . . . that the FERC-approved wholesale rates are unreasonable."). The PSC has "fiddled with the effective price," by guaranteeing the nuclear generators a higher price than FERC has allowed, and thus has impermissibly "interfere[d] with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable." *Hughes*, 136 S. Ct. at 1299. As Intervenor Exelon argued in the New Jersey case (contrary to its position here), state-mandated price adders "bring about precisely the harms that FERC sought to avoid by instituting market-based regulation" and "prevent[] true market forces from setting energy prices, thus undermining FERC's implementation of the FPA." Complaint ¶¶ 78, 89f, *PPL EnergyPlus, LLC v. Hanna*, 977 F. Supp. 2d 372 (D.N.J. 2013) (Civil Action No. 11-745) ("N.J. Complaint").

Just as Defendants do here, Maryland attempted to characterize the subsidy as something other than an "adjustment" of the interstate wholesale rate. The Maryland program involved a state-mandated "contract for differences" that obliged LSEs to pay the favored generator a supplement to the FERC auction price. *See Hughes*, 136 S. Ct. at 1294-95. The state argued this was valid because the contract did not change the auction price and was analogous to a "traditional bilateral contract" or a "hedging contract" and was merely "compensation for construction of a plant." The Supreme Court, like the lower courts in the case, rejected these arguments. *Id.* at 1299 & n.12 (Maryland's program "mandates that LSEs and CPV exchange money based on the cost of CPV's capacity sales to PJM" and "compels private actors (LSEs) to enter into contracts for differences—like it or not—with a generator that must sell its capacity to PJM through the auction"); *Nazarian II*, 753 F.3d at 476-77 ("The scheme thus effectively supplants the rate generated by the auction with an alternative rate preferred by the

21

state. . . .   The fact that it does not formally upset the terms of a federal transaction is no defense, since the functional results are precisely the same."); *id.* at 475 ("[S]tates are barred from relying on mere formal distinctions in 'an attempt' to evade preemption."); *Nazarian I*, 974 F. Supp. 2d at 840 (holding the Maryland program to be field preempted because it "dictat[ed] the ultimate price received by the generation facility for its actual wholesale energy and capacity sales"); *accord Solomon*, 766 F.3d at 254 (New Jersey program preempted even though it "artfully steps around" the auctions and does not "formally upset the terms of a federal transaction" (quoting *Nazarian II*)); *see also* Brief of Exelon, *et al.*, in Opposition to Petition for Writ of Certiorari at 26, *Fiordaliso v. Talen Energy Mktg., LLC*, 136 S. Ct. 1728 (2016) (No. 14-694) ("Exelon Cert. Opposition") ("[N]o creative refashioning can change the fact that the [New Jersey subsidy] by both design and intent supplants FERC-approved rates.")

The Maryland and New Jersey programs would still be unconstitutional if the states had "creatively refashioned" the subsidies as "environmental credits."  Exactly the same is true here: the PSC seeks to compel private actors (LSEs) to enter into ZEC purchase contracts – like it or not – for the benefit of generators that must sell their output through the auctions, thus increasing the total wholesale revenues received by the favored generating facilities.  Intervenors complain (Br. at 18) that ZECs are needed because fossil-fuel generators' wholesale sales are at "artificially low prices," but it is for FERC, not any state, to decide whether wholesale prices are just and reasonable.  The decisions reached unanimously by sixteen judges and justices in the Maryland and New Jersey subsidy cases will ultimately mandate a similar result here.

> 2.    The Effects of the ZEC Program on Wholesale Prices Are Far Greater Than Those of a Wide Variety of State Measures That Have Been Held Preempted

In *Schneidewind*, the Supreme Court unanimously struck down a Michigan statute requiring natural gas companies to obtain state approval before issuing securities.[19] 485 U.S. at 296-97, 310.  Although this statute did not change the terms of wholesale sale agreements, explicitly deal with pricing, or require any payments, it was preempted as "amount[ing] to a regulation of rates and facilities" and thus "an attempt to regulate matters within FERC's exclusive jurisdiction."  *Id*. at 307-08.  Unlike generally applicable blue sky laws, the preempted provision applied "only to utilities" and was directed at "matters within FERC's exclusive jurisdiction" – specifically, "the control of rates and facilities of natural gas companies."  *Id.* at 308 & n.11.  As even a state law that merely requires approval of a gas company's issuance of securities is an unconstitutional "regulation of rates and facilities," it follows *a fortiori* that the ZEC program cannot stand, as it has a far greater direct and substantial effect on wholesale prices than the Michigan statute at issue in *Schneidewind*.

As *Schneidewind* demonstrates, *Hughes* broke no new ground, but instead applied established FERC field-preemption principles.  The *Hughes* Court cited *Mississippi Power & Light* and *Nantahala Power & Light*, both of which upheld preemption of state efforts to deny utilities recovery of costs required by FERC-directed power allocations.  Since power allocations affect rates, the states were banned by the FPA from making a "*de facto* reallocation" by "substituting their own determinations of what would be just and fair."  *Miss. Power & Light*, 487 U.S. at 371; *accord Nantahala Power & Light*, 476 U.S. at 966.  The same applies here – New York cannot give the nuclear generators a *de facto* higher wholesale price than what FERC has determined to be just and reasonable.

---

[19] Courts have "routinely relied on [Natural Gas Act] cases in determining the scope of the [Federal Power Act], and vice versa."  *Hughes*, 136 S. Ct. at 1298 n.10.

Similarly, in *Northern Natural Gas Co. v. State Corporation Commission*, the Court struck down two Kansas regulatory orders requiring interstate pipeline companies to purchase gas ratably from all wells connected with its pipeline system.  372 U.S. at 88-89.  Because the Kansas Supreme Court found that the statute "in no way involves the price of gas," it rejected preemption, but the Supreme Court reversed:

> [O]ur inquiry is not at an end because the orders do not deal in terms with prices or volumes of purchases. . . .  These state orders necessarily deal with matters which directly affect the ability of [FERC's predecessor] to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act.  They therefore invalidly invade the federal agency's exclusive domain.

*Id.* at 90-92 (emphasis added).  Even though a state has the power to take action "to conserve its natural resources," the Supremacy Clause did not "sanction[] the particular means chosen by Kansas to exercise the conceded power," because "those means threaten effectuation of the federal regulatory scheme."  *Id.* at 93.  The orders "could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers."  *Id.* at 92.  By the same logic, the ZEC program is field-preempted because it directly affects FERC's ability to regulate the wholesale markets comprehensively, effectively, and uniformly.  These facts are alleged in the Complaint and preclude dismissal.

As made clear by *Hughes*, *Schneidewind*, *Mississippi Power*, *Nantahala*, and *Northern Natural Gas*, a state regulation affecting wholesale rates is preempted even if (i) its purpose is laudable; (ii) it is within an area of traditional state jurisdiction; and (iii) it does not expressly

alter rates.[20]   Under these and many other cases,[21] the New York ZEC program is field-

preempted.  We are aware of no case that has upheld any similar program.

Defendants cannot explain away these cases.  They do not even mention *Schneidewind*,

*Nantahala*, or *Northern Natural Gas*, and their attempt to distinguish *Hughes* is largely based on

quoting one sentence:  "So long as a State does not condition payment of funds on capacity

clearing the auction, the State's program would not suffer from the fatal defect that renders

Maryland's program unacceptable."  *Hughes*, 136 S. Ct. at 1299.  Defendants (Br. at 20-21) and

Intervenors (Br. at 12) assert that this sentence in *Hughes* saves the ZEC program because

entitlement to ZECs is based on production of electricity rather than its sale, and thus the

program does not "condition payment" on the favored generators "clearing the auction."  The

Complaint alleges in detail, however, that payment of ZECs is so conditioned, because the

favored generators "have no alternative to selling their output in the NYISO energy auctions" as

"price takers."  Compl. ¶ 34; *see also id*. ¶ 64.  ("All electricity produced by these nuclear

generators must be sold directly or indirectly in the NYISO auctions, as there are no alternative

markets.").  These allegations are taken as true, and the evidence will disprove Defendants'

---

[20] Defendants imply (Br. at 12) that FERC can modify the auction rules to avoid the distortion caused by the ZEC subsidies, but plaintiffs dispute this, and even if true it does not save the program.  *See Hughes*, 136 S. Ct. at 1298 n.11 (state cannot compel FERC to act to accommodate the state's intrusion into areas of exclusive federal control).

[21] *See, e.g.*, *New England Power Generators Ass'n, Inc. v. FERC*, 757 F.3d 283, 290 (D.C. Cir. 2014) (FERC has exclusive jurisdiction over resources – "whether self-supplied, state-sponsored, or otherwise" – that "directly impact" auction clearing prices); *Appalachian Power Co. v. Pub. Serv. Comm'n*, 812 F.2d 898, 902 (4th Cir. 1987) (preempting state attempt to regulate FERC-approved transmission agreement because, "[a]lthough the [agreement] does not explicitly set a dollar rate for the transmission and sale of electricity in commerce, it has the same effect as if it did in that it creates the obligations owed by or payable to utility companies for the privilege of exchanging interstate electricity"); *Municipality of Groton v. FERC*, 587 F.2d 1296, 1302 (D.C. Cir. 1978) (FERC has exclusive jurisdiction over any charge that "affects the fee that a participant pays for power and reserve service, irrespective of the objective underlying that charge").

suggestion (Br. at 21) that the nuclear generators have the ability to avoid the auctions by selling

their output through bilateral contracts or at retail.[22]

Even if the ZEC program did not have the "fatal defect" of mandatory auction

participation, moreover, it would still be field preempted.  To the extent Defendants are claiming

that the single sentence in *Hughes* means that a state program is invalid *only* if it requires auction

participation, they are ignoring the remainder of the *Hughes* opinion and the entire body of the

Supreme Court's FERC preemption law discussed above.  State programs and regulations were

struck down without hesitation in these cases, even though the state measures did not involve any

type of forced payments.  These cases, and *Hughes*, all make clear that state regulation must be

enjoined if it has even the potential to result in *de facto* wholesale price adjustments, substitution

of a state's "own determinations of what would be just and fair," or other interference with

FERC's ability to regulate the wholesale markets effectively and uniformly.  No matter how

laudable the reason or how much it is within the scope of traditional police power, states are

prohibited from "adjusting an interstate wholesale rate."  *Hughes*, 136 S. Ct. at 1297.

### 3.     The Supreme Court's Decision in *EPSA* Supports Plaintiffs, Not Defendants

Intervenors' claim (Br. at 10-12) that *EPSA* "rejected" Plaintiffs' position is baseless.

*EPSA* took a broad view of FERC jurisdiction.  It reaffirmed FERC's power over practices that

"directly affect" wholesale rates and held that FERC could regulate "demand response," a

practice in which "operators of wholesale markets pay electricity consumers for commitments

not to use power at certain times."  *EPSA*, 136 S. Ct. at 767, 774.  Demand-response transactions

---

[22] Even if the subsidized nuclear generators could sell their output via a bilateral contract rather than
via the auctions (and in fact they cannot do this), the bilateral contract would require FERC approval,
and where there is a FERC-approved bilateral contract for the wholesale sale of electricity, state
measures are preempted if they would cause the price to be higher than the negotiated contract price.
*See Midwest Power Sys., Inc*., 78 FERC ¶ 61,067, 61,248 (1997).

do not even involve the sale of wholesale electricity, yet the Court held that demand response "directly affects" wholesale rates and therefore is FERC-jurisdictional. *Id.* at 775.

Despite this broad holding, Intervenors try to turn the *EPSA* holding on its head, by focusing (Br. at 11-12) on the Court's discussion of the FPA's bar on FERC jurisdiction over retail rates. In that discussion, the Court rejected a claim that, by exercising jurisdiction over demand response, FERC was effectively regulating retail rates. 136 S. Ct. at 775-80. The Court found that FERC was only precluded from setting "the amount of money a consumer will hand over" for retail electricity, and not from "altering consumers' incentives to purchase that product," even though doing so would "increas[e] effective retail rates." *Id.* at 777. Intervenors argue that states likewise must be free to take actions that "effectively" increase rates. Intervenors' argument ignores, however, that the FPA's prohibition on state action is much broader than its federal counterpart. While the FPA only prevents FERC from regulating retail rates, states are expressly prohibited *both* from regulating wholesale rates *and* from taking actions that "affect," "pertain to," or are "connected with" wholesale rates. 16 U.S.C. §§ 824d(a), 824e(a). Thus, "a FERC regulation does not run afoul of § 824(b)'s proscription [of retail regulation] just because it affects – even substantially – the quantity or terms of retail sales." *EPSA*, 136 S. Ct. at 776. On the other hand, a state regulation that substantially affects the quantity or terms of wholesale sales is preempted.[23] In any event, the state action here *does* involve the amount of money that LSEs will be forced to "hand over" (on behalf of their retail customers) to pay for wholesale electricity.

---

[23] *See, e.g.*, *Miss. Power & Light*, 487 U.S. at 371 (states prohibited from *de facto* regulation of wholesale rates); *Schneidewind*, 485 U.S. at 307-08 (state action preempted even though it did not involve the amount of money a purchaser will hand over for wholesale energy); *N. Nat. Gas.*, 372 U.S. at 90-93 (same); *Nazarian II*, 753 F.3d at 476 (FPA preempts state action that "effectively supplants the [wholesale] rate generated by the auction").

**B.    ZECs Are Critically Different from "Unbundled RECs"**

Defendants (Br. at 13) and Intervenors (Br. at 7-8) argue that ZECs are similar to "unbundled RECs," over which FERC has disclaimed jurisdiction.  Their theory is that ZECs are merely payments for the "environmental attributes" of the nuclear plants, unrelated to the price of the electricity to which they are attached.  They suggest that states are free to regulate on environmental "attributes" of wholesale electricity, regardless of whether their measures would directly affect wholesale prices.  This argument is unfounded.

In making the argument, Defendants rely primarily on two decisions that actually support Plaintiffs.  The first is *WSPP Inc.*, 139 FERC ¶ 61,061 (2012), where FERC stated:

> RECs are state-created and state-issued instruments certifying that electric energy was generated pursuant to certain requirements and standards.  Thus, a REC does not constitute the transmission of electric energy in interstate commerce or the sale of electric energy at wholesale in interstate commerce.  Therefore, RECs and contracts for the sale of RECs are not themselves jurisdictional facilities subject to the Commission's jurisdiction under FPA section 201.
>
> *Nevertheless, although a transaction may not directly involve the transmission or sale of electric energy, the transaction could still fall under the Commission's jurisdiction because it is "in connection with" or "affects" jurisdictional rates or charges.*

*Id.* at 61,426 (emphasis added).

Under this standard, a sale or other transaction involving RECs is not within FERC's jurisdiction as long as the transaction "occurs independent of a sale of electric energy for resale in interstate commerce" and does not "affect" jurisdictional rates.  *Id.*  However, "if a wholesale sale of electric energy by a public utility *requires the use* of an emissions allowance," the sale is subject to FERC's jurisdiction, because the "emissions allowance may 'affect' the rates a utility charges 'for or in connection with' jurisdictional service."  *Id.* (emphasis added, quotations omitted.)  The ZEC program fits the latter model – that is, for every MWh of wholesale electricity that an LSE buys (even if not from a nuclear generator), the ZEC program "requires

28

the use" of an environmental credit in the form of a ZEC purchase.  These forced ZEC purchases, at a state-mandated price, are inextricably tied to the LSEs' purchases of wholesale electricity.  They thus bear no resemblance to "unbundled" REC transactions, which are voluntary transfers of RECs, at market prices, between private parties, "independent of a sale of electric energy for resale in interstate commerce."  *Id.*

The second case, *Wheelabrator Lisbon, Inc. v. Connecticut Dep't of Public Utility Control*, 531 F.3d 183 (2d Cir. 2008), dealt with long-term power supply agreements that had been made before RECs had been developed.  As a result, the contracts at issue did not mention RECs at all.  *Id.* at 186.  The contracts were subject to FERC regulation and the issue in *Wheelabrator* (and in other cases cited by Defendants[24]) was how these pre-REC contracts should be construed – did the buyer purchase only the electricity or also the RECs?  *See id.* at 187.  A FERC decision had ruled that federal law did not address this issue one way or the other, and on this basis, the Second Circuit found that a Connecticut utilities commission decision which decided the REC purchase issue was not preempted.  *Id.* at 189-90.  In this context, the Court of Appeals' use of broad language relied on by Defendants and Intervenors (that the FERC decision "does not evince an intent to occupy the relevant field – namely, the regulation of renewable energy credits," *id.* at 190) is not controlling here.  The Second Circuit deferred to FERC's interpretation of its own jurisdiction, and in *WSPP* four years later, FERC expressly did assert "an intent to . . . regulat[e] . . . renewable energy credits," *id.*, where they "'affect[]' jurisdictional rates."  *WSPP* at 61,426.

Most states have crafted their REC programs to ensure they do not run afoul of federal preemption, but a REC program, or any type of environmental program or regulation, is invalid

---

[24] *Morgantown Energy Assocs.*, 139 FERC ¶ 61,066 (2012); *Am. Ref-Fuel Co.*, 105 FERC ¶ 61,004 (2003).

to the extent it is "'in connection with' or 'affects' jurisdictional rates or charges." *WSPP*, 139 FERC at 61,426; *see Windham Solar LLC*, 156 FERC ¶ 61,042 (preempting state REC program to the extent it prohibited generators from entering into long-term energy sale contracts unless RECs were "bundled" into the sale).

States have the power to build or subsidize the construction of renewable power plants, and they have the power to require LSEs to buy electricity from the subsidized plants. However, states cannot set or affect the price of wholesale electricity sold by the subsidized generators. *Midwest Power Sys., Inc.*, 78 FERC at 61,248 (Iowa could require LSE to "purchase a certain amount of generation from the alternative facilities," but federal law preempted Iowa's attempt to "set rates for wholesale sales by FPA jurisdictional public utilities").

A REC program, as shown above, is treated the same as any other state regulatory program for preemption purposes, and the same is true for New York's ZEC program. It is not saved by the purported laudatory environmental purpose that Defendants assert. *See Hughes*, 136 S. Ct. at 1298 (preempting program despite legitimate purpose of "encourag[ing] construction of new in-state generation"); *Schneidewind*, 485 U.S. at 308-09 & n.11 (preemption despite valid securities regulation purpose); *N. Nat. Gas*, 372 U.S. at 91-93 (preemption despite legitimate conservation purpose); *Midwest Power Sys.*, 78 FERC at 61,245-46 (preemption despite environmental purpose). Regardless of purpose, a state measure is preempted if it directly affects wholesale rates. *Hughes*, 136 S. Ct. at 1298-99; *EPSA*, 136 S. Ct. at 773-75; *Schneidewind*, 485 U.S. at 307-08; *N. Nat. Gas*, 372 U.S. at 91-93.

Unlike New York's REC program, which is not tethered to the wholesale markets (and which Plaintiffs do not challenge), the ZEC program directly affects wholesale rates. Unlike ZECs, whose price is set by the State – and is tethered to wholesale prices and forced upon

unwilling buyers – the price of RECs is determined by competitive processes.[25]  Unlike ZECs, which are solely provided to three favored nuclear generators, any business that opts to produce renewable energy receives RECs.

Defendants insist (Br. at 13) that "like RECs, ZECs are "inventions of state law whereby 'energy attributes are 'unbundled' from the energy itself and sold separately.'"  Unlike RECs, however, ZECs are *not* independent of other "attributes" of the specific generating units targeted by the ZEC program – particularly, their "insufficient" revenue from wholesale market sales relative to their costs.  The ZEC payment could be just as easily – and more accurately – be characterized as compensating these plants for their "attribute" of not having sufficient wholesale market revenues to meet their operating costs – an attribute that is determined by the wholesale markets and prices overseen by FERC.

## III.     THE COMPLAINT STATES A CLAIM FOR CONFLICT PREEMPTION

Two of the decisions in the Maryland and New Jersey cases invalidated the state programs on the basis of conflict preemption as well as field preemption.  *See Nazarian II*, 753 F.3d at 478-80; *Hanna*, 977 F. Supp. 2d at 410-11.  The other decisions in those cases did not reach conflict preemption.  Defendants, Intervenors, and *amici* do not cite a single conflict preemption case; they rely primarily on *Hughes* and *Oneok*, but both of those cases stated they were *not* addressing conflict preemption.  *Hughes*, 136 S. Ct at 1299 n.13; *Oneok*, 135 S. Ct. at 1595.  Intervenors cite one conflict preemption case, *Northwest Central Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493 (1989), but their argument in this regard relies on disputing the factual allegations in Plaintiffs' Complaint.

---

[25] *See* Harvard Law Sch. Envtl. Policy Initiative, *Minimizing Constitutional Risk: Crafting State Energy Policies that Can Withstand Constitutional Scrutiny* 17 (2014), https://statepowerproject. files.wordpress.com/2014/11/minimizing-constitutional-risk2.pdf ("According to FERC, a state policy that sets REC prices could be preempted.").

As *Northwest Central Pipeline* recognizes, a state measure is preempted by federal law if "it is impossible to comply with both" or if "the state law stands as an obstacle to the accomplishment and execution of congressional objectives." 489 U.S. at 509; *accord Oneok*, 135 S. Ct. at 1595; *Hilmann v. Maretta*, 133 S. Ct. 1943, 1949-50 (2013); *Nazarian II*, 753 F.3d at 478; *Hanna*, 977 F. Supp. 2d. at 410. A state law is conflict-preempted if it "would undermine the purpose" of federal law. *Boggs v. Boggs*, 520 U.S. 833, 844 (1997). A state law is conflict-preempted, for example, if it interferes with a federal agency's effort to "create a national market system" and to "insure the maintenance of fair and honest markets." *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 155 (2d Cir. 2016).

States may enact environmental protection measures, but any such law must yield "if it interferes with the methods" prescribed by federal law. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). *Ouellette* held that when federal law prohibits states from regulating out-of-state pollution sources and sets up a permit system to deal with such pollution, state measures that "have the potential to undermine this [federal] regulatory structure" are preempted, as states cannot "do indirectly what they could not do directly." *Id*. at 494-97 (preempting Vermont nuisance law as an obstacle to full implementation of the Clean Water Act).

As in *Ouellette*, the ZEC program undermines the auction-based regulatory structure that FERC has prescribed for wholesale electricity markets. The ZEC program will cause "clear damage to federal goals," *Nw. Cent. Pipeline*, 489 U.S. at 522, particularly FERC's goal of free and fair energy markets, in which competitive forces set "just and reasonable" electricity prices. As Exelon acknowledged in the New Jersey case, a state subsidy "erects obstacles to FERC's achievement of its regulatory goals in the wholesale capacity and energy markets" by "chilling private investment in new generation," because investors will fear losing "expected market share

to comparatively inefficient facilities that can sell capacity at artificially low prices owing to a state-ordered subsidy."  N.J. Complaint ¶¶ 89, 89d.

In *Hanna*, the court recognized that the conflict preemption inquiry is inherently factual in nature, requiring fact and expert testimony.  *See* 977 F. Supp. 2d at 410-11.  *Hanna's* conflict preemption holding was based on testimony regarding the impact of the New Jersey subsidies on FERC's market-based system:  "The effects described by the witnesses demonstrate that the … imposition of a government imposed price creates an obstacle to the Commission's preferred method for the wholesale sale of electricity in interstate commerce."  *Id.* at 411.  Citing *Hanna*, the Fourth Circuit reached the same conclusion in *Nazarian II*, reasoning that the Maryland subsidy program "has the potential to seriously distort the PJM auction's price signals," which serve a variety of objectives and on which market participants rely, such that "Maryland's initiative disrupts this scheme by substituting the state's preferred incentive structure for that approved by FERC."  753 F.3d at 478-79 (internal quotation marks and citations omitted).

The ZEC program will fundamentally distort the operations of FERC-regulated wholesale energy and capacity markets.  These distorting effects extend not only to the "just and reasonable" prices that would otherwise result from the market mechanisms designed, approved, and overseen by FERC, but also to FERC's broader regulatory objectives with these markets. Indeed, the entire objective of the FERC-approved capacity markets is to provide appropriate market signals that will encourage efficient market entry and *exit*, *i.e.*, the retirement of uneconomic/inefficient generating units.  The ZEC program is designed explicitly to frustrate this central regulatory objective of FERC.  The ZEC program interferes with FERC's regulatory objective because it keeps inefficient nuclear generating units in the wholesale markets, rather than retiring; and because it thereby artificially depresses prices in wholesale energy and

capacity markets.  The PSC's artificial retention of uneconomic nuclear units in the wholesale markets in turn prevents other, more efficient generation from entering the market – including zero-emissions renewable generation.

In establishing wholesale energy and capacity markets, one of FERC's primary regulatory objectives is the promotion of competition.  But it is this very competition – from new, low-cost, efficient natural gas and renewable generators that have incurred substantial risks to enter these markets, and from previously existing units that have improved efficiency from investments in more modern technology – that the PSC is now undermining with the ZEC program.  In Appendix G of the ZEC Order, the PSC states that the ZEC program is the result of "increased competition" from low-cost natural gas generation:  "Nuclear Energy Tier: Increased natural gas availability has *increased competition* in the wholesale electricity market, pricing out some nuclear operators that face increasing costs.  This *problem* is especially relevant to upstate nuclear plants."  ZEC Order, App'x G, at 5 (emphasis added).  What the PSC perceives as a "problem" – increased competition, and resulting lower prices – is at the very heart of FERC's wholesale market design efforts.  The PSC's distortion of FERC-approved "just and reasonable" rates in wholesale markets, and its frustration of FERC's broader regulatory objectives, are therefore not just "incidental" effects, but rather a fundamental objective of the ZEC program.

The question whether the ZEC program is conflict-preempted presents a factual issue concerning whether it will be an "obstacle" to FERC's regulatory goals.  Plaintiffs have alleged in detail how and why the program will cause "clear damage to federal goals," and they are entitled to an opportunity to prove it.

## IV.  THE COMPLAINT STATES A CLAIM UNDER THE DORMANT COMMERCE CLAUSE[26]

### A.  Dormant Commerce Clause Challenges Are Fact-Specific Inquiries Unsuited for Rule 12(b)(6) Resolution

A dormant Commerce Clause claim turns on a "sensitive, case-by-case analysis" of classic fact issues, including the "purposes and effects" of the law at issue.  *See, e.g., W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994).  The claim implicates the nature of the market and the practical effect of the law, both of which typically cannot be decided until after an evidentiary record is developed through discovery.  *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 337 (2007) (dormant Commerce Clause analysis based on record built after "protracted discovery").[27]

### B.  The Dormant Commerce Clause Prohibits Protectionist State Regulations Like the ZEC Order as *Per Se* Invalid

The Commerce Clause empowers Congress to "regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  The "negative corollary" is that "the states may not pass legislation that improperly burdens or discriminates against interstate commerce."  *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, No. 13 CIV 8123 (CM), 2016 WL 4275435, at *14 (S.D.N.Y. Aug. 10, 2016).  This "dormant" component of the Commerce Clause "prohibits economic protectionism – that is, regulatory measures designed to benefit in-state

[26] Intervenors make the untenable argument that Plaintiffs lack standing (Br. at 22).  As alleged in the Complaint, however, Plaintiffs have suffered a palpable injury – the loss of millions of dollars caused by their inability to compete on equal footing in the interstate wholesale electricity market due to the ZEC subsidies received by their competitors. Compl. ¶¶ 8, 74.  Such an injury plainly confers standing, just as it did in *Alliance for Clean Coal*, 44 F.3d at 594 (quoting *Ne. Florida Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).

[27] Defendants note that no Commerce Clause violation was found in the Maryland and New Jersey cases (Br. at 22), but they fail to mention that both courts denied Rule 12(b)(6) motions to dismiss the Commerce Clause claims.  *PPL EnergyPlus, LLC v. Nazarian*, No. MJG-12-1286, 2012 WL 4092952, at *5 (D. Md. Aug. 3, 2012); *PPL EnergyPlus, LLC v. Solomon*, No. 11-745, 2011 WL 5007972, at *5-6 (D.N.J. Oct. 20, 2011).  Those claims were tried on the merits, but the courts found insufficient factual proof of the pertinent allegations.  *See Hanna*, 977 F. Supp. 2d at 411-12; *Nazarian I*, 974 F. Supp. 2d at 841-55.

economic interests by burdening out-of-state competitors." *W. Lynn Creamery*, 512 U.S. at 192

(quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)); *C & A Carbone, Inc. v.*

*Town of Clarkstown*, 511 U.S. 383, 390 (1994) ("The central rationale for the rule against

discrimination is to prohibit state or municipal laws whose object is local economic

protectionism, laws that would excite those jealousies and retaliatory measures the Constitution

was designed to prevent.").  "[R]egulating interstate commerce in such a way as to give those

who handle domestic articles of commerce a cost advantage over their competitors handling

similar items produced elsewhere constitutes such protectionism." *Or. Waste Sys., Inc. v. Dep't*

*of Envtl. Quality*, 511 U.S. 93, 106 (1994).

When state law amounts to discriminatory economic protectionism, a "virtually *per se*

rule of invalidity" applies.  *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) (quoting *City of*

*Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).  As Intervenor Exelon argued in the New

Jersey case, contrary to its position here, a regulation violates the dormant Commerce Clause

where "its intent and effect are to discriminate in favor of in-state generation and against out-of-

state generation," N.J. Complaint ¶ 100; such regulations must be "subject to the strictest

scrutiny," *id.* ¶ 106; and "state laws favoring in-state economic interests over out-of-state

economic interests" are "nearly *per se*" invalid, *id.* ¶ 99.  Three situations trigger *per se*

invalidity:  (1) the rule discriminates against interstate commerce on its face, *see, e.g.*, *Camps*

*Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575 (1997); (2) the rule has the

effect of favoring in-state economic interests over out-of-state interests, *see, e.g.*, *Am. Trucking*

*Ass'ns*, 2016 WL 4275435, at *14; or (3) the rule harbors a discriminatory purpose, *see, e.g.*,

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984).  Where a rule meets any of the

foregoing tests, it is invalid as a *per se* violation unless the state proves that it "has no other

means to advance some legitimate local purpose." *Am. Trucking Ass'ns*, 2016 WL 4275435, at

*14 (citing *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

      **C.**     **The ZEC Order Discriminates Against Interstate Commerce**

      *First*, the ZEC Order facially discriminates between in-state and out-of-state providers.  It

expressly provides that only three New York State plants were awarded the ZEC subsidies.

Compl. ¶ 98.  Although the Defendants suggest (Br. at 23) that ZECs are not limited to in-state

facilities, the ZEC Order requires that to qualify for a ZEC, the generator must show a "verifiable

historic contribution the facility has made to the clean energy resource mix consumed by retail

consumers in New York State."  Compl. ¶ 68 (quoting ZEC Order at 124).  This is a thinly veiled

mechanism for ensuring that no out-of-state generators are eligible to receive ZECs.  And

although states have the right to regulate the *retail* sale of electricity *within* their borders,

NYISO's wholesale markets involve the sale and transmission of energy and capacity from

generators across the United States and Canada and the purchase of such commodities by

customers in other states.  *Id.* ¶ 95.  Nor does it matter that only some in-state actors are

benefitted.  *See Bacchus Imports*, 468 U.S. at 271 ("[T]he effect of the exemption is clearly

discriminatory, in that it applies only to locally produced beverages, even though it does not

apply to all such products.  Consequently, as long as there is some competition between the

locally produced exempt products and non-exempt products from outside the State, there is a

discriminatory effect.").  As Intervenor Exelon argued in the New Jersey case – contrary to its

position here – it is not even a close question "whether a state may avowedly provide in-state

generators a different and more stable wholesale rate than prevails on the federally regulated

wholesale market."  Exelon Cert. Opposition at 16.

      *Second*, the ZEC Order has the effect of favoring in-state economic interests over out-of-

state interests.  Even if it were facially neutral (and it is not), the ZEC Order provides a subsidy

that alters the wholesale market price to *three* in-state plants and *no* out-of-state plants. As
Exelon admits (Br. at 23), no out-of-state providers meet the criteria for ZEC eligibility. The
subsidies will have the effect of allowing the in-state plants to sell electricity far below their
costs – creating downward pricing pressure and driving out-of-state competitors out of the
wholesale market. Compl. ¶¶ 98-100.

     *Third*, the ZEC Order's was intended to be protectionist regulation. ZEC recipients are
uneconomic plants that had previously announced impending closure. Defendants have acted to
protect in-state tax revenues and jobs that would have been lost if the failing plants were closed.
Compl. ¶¶ 54-57, 96. The ZEC Order seeks to prop up those in-state interests by protecting the
uneconomic businesses from interstate competition. *Id.* ¶¶ 58, 96. Those objectives are
constitutionally impermissible. *See Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10
(1928) (invalidating a law that sought to preserve the shrimp packing and canning industries
within the state); *Bacchus Imports*, 468 U.S. at 270 (invalidating a law meant to stimulate the
local fruit wine industry).

     In *Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995), the Seventh Circuit
struck down a protectionist energy measure, rejecting several defenses similar to those that
Defendants assert here:

- The law was an impermissible "non-too-subtle attempt to prevent Illinois electric
  utilities from switching" to lower cost out-of-state options for coal. *Id.* at 595.

- "[T]he Illinois Coal Act, like the milk-pricing order in *West Lynn*, has the same effect
  as a 'tariff or customs duty—neutralizing the advantage possessed by lower cost out
  of state producers.'" Such measures are plainly "repugnant to the Commerce Clause
  and the principle of a unitary national economy which that clause was intended to
  establish." *Id.* (quoting *W. Lynn Creamery*, 512 U.S. at 194).

- Illinois' effort to "save the Act by claiming that it merely 'encourages' the local coal
  industry and does not in fact discriminate" was meritless. *Id.* at 596. The law
  "cannot continue to exist merely because it does not facially compel the use of Illinois

coal or forbid the use of out-of-state coal." *Id.*  Citing *West Lynn Creamery*, the court held that "even ingenious discrimination is forbidden by the Commerce Clause." *Id.*  The parallel arguments by Defendants and Intervenors should likewise be rejected here.

Finally, Plaintiffs have alleged that legitimate goals underlying the ZEC order, such as a reduction of carbon emissions, can be achieved through other means without the discriminatory effect of the ZEC Order.  Compl. ¶ 97.  Plaintiffs are entitled to prove those allegations at trial by showing that "nondiscriminatory alternatives would seem likely to fulfill the State's purported legitimate local purpose more effectively." *Hughes v. Oklahoma*, 441 U.S. 322, 338 (1979); *see Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980) ("There is thus no reason to believe that the State's interest in local control, to the extent it legitimately exists, has been significantly or evenhandedly advanced by the statutory means that have been employed.").

### D.     The ZEC Order Unduly Burdens Interstate Commerce

A law is also unconstitutional under the dormant Commerce Clause if its burden on commerce is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Such an analysis implicates fact issues that cannot be resolved on the pleadings:  "If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*  The Complaint alleges that (1) the ZEC Order imposes market-distorting burdens on interstate and international commerce that far outweigh the claimed environmental benefits, Compl. ¶ 99; and (2) any potential benefits are short term and illusory because artificially reduced prices will drive more cost efficient producers out of the market, and deter new entrants, *id.* ¶ 100.  These allegations defeats the motions to dismiss.

### E.     New York State Is a Regulator, Not a Market Participant

Intervenors (Br. at 20) make the unsupportable claim that "the dormant Commerce Clause *does not apply* to subsidies." There is no such exemption, and Intervenors do not cite any case even purporting to pronounce such a rule. Instead, they cite *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976) – where, as Defendants themselves note (Br. at 22), the Court permitted the state to enter "into the market as a purchaser, in effect, of a potential article of interstate commerce." *Alexandria Scrap Corp.*, 426 U.S. at 808. For starters, that is not a rule that exempts "subsidies" from compliance with the Commerce Clause; it is a different rule entirely that concerns state actions as a market participant, not a regulator – and it does not apply to the program at issue here. New York is not acting as a participant in the existing wholesale energy market: It is not facilitating commerce, nor taking ownership or possession of any goods. It promulgated the ZEC Order as a *regulator*: The Order has its effect on the commercial activity between the market participant themselves – as a subsidized New York generating plant sells electricity into the wholesale market, the State steps in to mandate the additional payments to keep the struggling plant afloat against more efficient competitors.

The ZEC program also differs in material ways from the REC programs at issue in *Allco Finance Ltd. v. Klee*, No. 3:15-CV-608 (CSH), 2016 WL 4414774 (D. Conn. Aug. 18, 2016), *appeal filed*, No. 16-2949 (2d Cir. Aug. 23, 2016). The states that created REC programs created genuine new markets in which RECs are publicly traded, and the free market – not the state – sets the value of the RECs. *Allco*, 2016 WL 4414774, at *23-24. In addition, the RECs in *Allco* (like other RECs) were not tethered to the wholesale price in the interstate market, nor were they based on economic need. *See id.* at *20-21, 23-24. Those programs stand in stark contrast to the ZEC program at issue, which possesses none of those features. *See supra* at 3-4, 9-10, 29-30.

## **CONCLUSION**

For all of the foregoing reasons, the Court should deny the motions to dismiss.

Dated:  January 6, 2017

Stuart H. Singer (pro hac vice)
William T. Dzurilla (pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
wdzurilla@bsfllp.com

Respectfully submitted,

By: /s/ Jonathan D. Schiller
Jonathan D. Schiller
David A. Barrett
BOIES, SCHILLER & FLEXNER, LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
dbarrett@bsfllp.com

Edward J. Normand
Jason C. Cyrulnik
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
enormand@bsfllp.com
jcyrulnik@bsfllp.com