UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/25/2017
```

-------------------------------------------------------------X

COALITION FOR COMPETITIVE       :
ELECTRICITY,                    :
DYNEGY INC.,                    :
EASTERN GENERATION, LLC,        :
ELECTRIC POWER SUPPLY ASSOCIATION, :      16-CV-8164 (VEC)
NRG ENERGY, INC.,               :
ROSETON GENERATING LLC, and     :      MEMORANDUM
SELKIRK COGEN PARTNERS, L.P.,   :      OPINION & ORDER
                                :
                     Plaintiffs, :
                                :
        -against-               :
                                :
AUDREY ZIBELMAN, in her official :
capacity as Chair of the New York Public :
Service Commission, PATRICIA L. :
ACAMPORA, GREGG C. SAYRE, and   :
DIANE X. BURMAN, in their official :
capacities as Commissioners of the New York :
Public Service Commission,      :
                                :
                     Defendants, :
                                :
        -and-                   :
                                :
CONSTELLATION ENERGY NUCLEAR    :
GROUP, LLC, EXELON CORPORATION, R.E. :
GINNA NUCLEAR POWER PLANT LLC, and :
NINE MILE POINT NUCLEAR STATION LLC, :
                                :
                     Intervenors. :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Some say that human-caused global warming is a "hoax,"[1] while others accept the

overwhelming scientific conclusion that human activities, and particularly carbon dioxide

---

[1]      Multiple times before and during his presidential campaign, President Donald Trump stated that climate change is a hoax.  Louis Jacobson, *Yes, Donald Trump Did Call Climate Change a Chinese Hoax*, POLITIFACT (June 3, 2016), http://www.politifact.com/truth-o-meter/statements/2016/jun/03/hillary-clinton/yes-donald-trump-did-call-climate-change-chinese-h/.  President Trump has recently refused to confirm whether he still considers climate

discharges into the atmosphere, are causing the planet to warm.  Although no individual State can reverse the trend all by itself, New York and many other States have decided that they will do their part to reduce the emissions that contribute to global warming.  The issue in this case is whether the method New York has chosen to facilitate its doing so is constitutional.  For the reasons that follow, the Court concludes that the New York program is constitutional.

Plaintiffs are various electrical generators and trade groups of electrical generators.  They challenge one aspect of the Clean Energy Standard ("CES") Order, adopted by the New York Public Service Commission ("PSC"), that awards credits to certain nuclear generators for their zero-emissions electricity production.  Plaintiffs claim that this program is preempted under the Federal Power Act ("FPA") and that it violates the dormant Commerce Clause.

Defendants, who are PSC members, move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that there is no private right of action for Plaintiffs' preemption claims and that, even if there were, Plaintiffs' claims would fail as a matter of law.  Notice of Defendants' Motion to Dismiss, Dkt. 54.  Intervenors, who are the nuclear generators receiving the zero-emissions credits and their owners, also move to dismiss pursuant to Rule 12(b)(6).  Notice of Motion, Dkt. 76.  For the following reasons, the Court GRANTS both motions to dismiss.

---

change to be a hoax, Peter Baker, *Does Donald Trump Still Think Climate Change Is a Hoax? No One Can Say*, NEW YORK TIMES (June 2, 2017), https://www.nytimes.com/2017/06/02/us/politics/climate-change-trump-hoax-scott-pruitt.html, and a number of senior leaders and advisers in the Executive and Legislative branches, including Scott Pruitt, the head of the Environmental Protection Agency, have been deeply skeptical of human-caused climate change, including to the point of outright denial.  Coral Davenport, *Climate Change Denialists in Charge*, NEW YORK TIMES (Mar. 27, 2017), https://www.nytimes.com/2017/03/27/us/politics/climate-change-denialists-in-charge.html.

## BACKGROUND[2]

**The Electricity Market**

In New York, wholesale electricity is bought and sold through market-based auctions administered by the New York Independent System Operator ("NYISO").  Compl. ¶ 28.  The NYISO, which is regulated by the Federal Energy Regulatory Commission ("FERC"), conducts two types of auctions: energy and capacity.  Compl. ¶¶ 28-29.  Energy auctions are for the purchase and sale of electricity itself, whereas capacity auctions are for the purchase and sale of options to purchase electricity.  Compl. ¶ 36.  Retail electricity suppliers, also called load-serving entities ("LSEs"), purchase electricity at wholesale from generators in these auctions.  Compl. ¶ 35.  Although some of the buyers are located outside New York, most of the buyers are in-state utilities that resell energy at retail to New York customers and businesses.  Compl. ¶ 28.  The energy suppliers in the wholesale auction include generators located inside and outside of New York.  Compl. ¶ 28.

The NYISO auctions determine electricity prices in the New York wholesale market.  Compl. ¶ 27.  The auction operates by "stacking" bids from generators for the sale of energy or capacity, beginning with the lowest bid and moving up until demand is satisfied.  Compl. ¶¶ 32-33.  The price of the highest-stacked bid that satisfies demand is known as the "market clearing price." Compl. ¶ 33.  Any generator that bids at or below the market-clearing price "clears" the

---

[2]      The facts are taken from the Complaint and the Order Adopting a Clean Energy Standard ("CES Order"), which is incorporated by reference in the Complaint.  In deciding the motions to dismiss, the Court accepts as true the facts alleged in the Complaint and draws all reasonable inferences in Plaintiffs' favor.  *Koch v. Christie's Intern, PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court may rely directly on the CES Order because a complaint is "deemed to include . . . any statements or documents incorporated in it by reference."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  The parties do not dispute that the Complaint incorporated the CES Order by reference.

auction and is paid the market-clearing price, regardless of the price the generator actually bid.[3]

Compl. ¶¶ 33, 39.  This pricing mechanism incentivizes generators to be efficient and cost-

effective: "it creates price signals for new capacity to enter the market if [the generator] can

supply capacity at prices below the clearing price.  At the same time, the market provides price

signals for existing suppliers to exit the market if they are unable to beat the clearing price."

Compl. ¶ 40 (citation and internal quotation marks omitted).

Nuclear generators, such as Intervenors, bid as so-called "price-takers" in the NYISO

auctions, meaning that they sell their entire output at the market-clearing price.  Compl. ¶ 34.

Unlike other types of electricity generators that can adjust their output to produce more or less

energy depending on price, nuclear generators run continuously at maximum output.

Compl. ¶ 34.  Nuclear generators thus sell their entire electricity output into the auctions

regardless of the price—even if the price is below their cost of production.  Compl. ¶ 34.

Plaintiffs allege that the nuclear generators' price-taking behavior depresses market-

clearing prices because the nuclear generators increase the energy supply available at auction.

Compl. ¶ 34.  Plaintiffs further allege that all electricity produced by these nuclear generators

must be sold in the NYISO energy auctions because they have no alternative way to sell their

output.  Compl. ¶¶ 34, 64.

**New York's ZEC Program**

In order to promote the development of clean energy as part of New York's effort to

stanch global warning, the PSC issued the CES Order.  CES Order, Dkt. 76-1.  The CES Order

created two programs: Renewable Energy Credits ("RECs") and Zero-Emission Credits

---

[3]        An example from *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016) is illustrative:  "For example, if four power plants bid to sell capacity at, respectively, $10/unit, $20/unit, $30/unit, and $40/unit, and the first three plants provide enough capacity to satisfy projected demand, [the auction administrator] will purchase capacity only from those three plants, each of which will receive $30/unit, the clearing price."  136 S. Ct. at 1293.

("ZECs").  CES Order at 13-14.  The CES Order was adopted in furtherance of New York's goal

to generate fifty percent of its electricity using renewable sources by 2030, which supports New

York's broader mission to reduce greenhouse gas emissions statewide by forty percent by 2030.

CES Order at 2, 12.

Tier 1 of the CES Order, which implements the REC program, requires all New York

LSEs "to serve their retail customers by procuring new renewable resources."  CES Order at 14;

*see also* Compl. ¶ 49.  Generators that produce energy from renewable sources, like wind or

solar, are awarded a credit (a REC) for each megawatt-hour ("MWh") of renewable-generated

electricity produced from renewable resources.  Compl. ¶ 49; CES Order at 106.  The New York

State Energy Research and Development Authority ("NYSERDA") purchases RECs from

generators, thereby subsidizing their cost of production, and, in turn, sells those RECs to LSEs.

CES Order at 16, 107-08.  Each LSE is required to purchase RECs in an amount based on a

percentage of the total load served by that LSE or make an alternative compliance payment.

Compl. ¶ 49; CES Order at 14-16.  The cost of the RECs is passed on to commodity customers.

CES Order at 17.

Tier 3 of the CES Order establishes New York's ZEC program, the program challenged

in this case.  CES Order at 19.  A ZEC is a "credit for the zero-emissions attributes of one

megawatt-hour of electricity production by" an eligible nuclear facility.  CES Order, App'x E, at

1.  Through the ZEC program, New York aims to "encourage the preservation of the

environmental values or attributes of zero-emissions nuclear-powered electric generating

facilities for the benefit of the electric system, its customers and environment."  CES Order,

App'x E, at 1.  In particular, the ZEC program ensures that New York's nuclear generators—

which comprise thirty-one percent of New York's electric generation mix and collectively avoid

the emission of over fifteen million tons of carbon dioxide per year—continue to contribute to New York's electric generation mix pending the development of new renewable energy resources between now and 2030.  CES Order at 19.  According to the CES Order, losing the nuclear energy contributed by the generators before new renewable resources are developed "would undoubtedly result in significantly increased air emissions" and a "dangerously higher reliance on natural gas"; without the carbon-free attributes of the nuclear generators, New York would have to rely more heavily on existing fossil-fueled energy plants or the construction of new natural gas plants for its electricity, all of which would significantly increase carbon emissions.[4]  CES Order at 19.  The CES Order cites Germany as a case in point: when Germany abruptly closed its nuclear plants following the Fukushima nuclear disaster, the electricity that had formerly been produced by nuclear generation was replaced by electricity generated by coal, causing carbon emissions to rise despite a simultaneous and "aggressive" increase in solar generation.  CES Order at 19.

A nuclear generator is eligible for ZECs if it makes a showing of "public necessity," i.e., the facility's revenues "are at a level that is insufficient to provide adequate compensation to preserve the zero-emission environmental values or attributes historically provided by the facility."  Compl. ¶ 67 (quoting CES Order at 124).  Any nuclear generator, regardless of its

---

[4]     *Amici* New York Public Interest Research Group, Green Education and Legal Fund, Inc., Safe Energy Rights Group, Inc., and Promoting Health and Sustainable Energy, Inc. (collectively, "PIRG *Amici*") argue that the generation of nuclear power is "neither emissions free nor 'zero-emissions,'" but instead emits radiation, waste heat, and greenhouse gases.  Memorandum of Law of the Amici ("PIRG *Amici* Mem.") 5-13, Dkt. 112-3.  This may be true, but PIRG *Amici* do not go so far as to argue that the generation of nuclear power produces the same amount of noxious emissions as the generation of energy from fossil fuel or natural gas.  At least with respect to greenhouse gas emissions, they assert that among the various ways to generate electricity, nuclear generation falls in the middle of the spectrum (wind producing the least and coal the most greenhouse gas emissions).  PIRG *Amici* Mem. 8-9.  The thrust of PIRG *Amici*'s argument is that when creating the ZEC program, the PSC did not consider whether renewable energy sources could have replaced the nuclear generators or whether some nuclear power plants could be retired with no impact on electricity availability.  PIRG *Amici* Mem. 8, 14-16, 18.  The Court acknowledges that New York may have been able to adopt a more aggressive approach to reducing greenhouse gas emissions, but nothing requires the States to make the perfect the enemy of the good.

location, is eligible for ZECs, so long as the generator has historically contributed to the resource mix of clean energy consumed by New York retail consumers.[5]  Compl. ¶ 68 (citing CES Order at 124).  Pursuant to the CES Order, the nuclear generators sell their ZECs to NYSERDA at a price administratively determined by the PSC.  Compl. ¶ 69.  LSEs are required to purchase ZECs from NYSERDA in an amount proportional to their customers' share of the total energy consumed in New York.[6]  CES Order at 20, 151; Compl. ¶ 73.  The LSEs pass the costs of their ZEC purchases to their customers, the retail ratepayers.  CES Order at 20; Compl. ¶ 73.

ZEC prices are calculated by the PSC using the federal estimate of the social cost of carbon and a forecast of wholesale electricity prices.[7]  Compl. ¶ 71 (citing CES Order at 131).  Specifically, for a two-year period, the price of each ZEC is the social cost of carbon less the generator's putative value of avoided greenhouse gas emissions less the amount of the forecast energy price.  Compl. ¶¶ 70-71 (citing CES Order at 131).  Put differently, if the forecast wholesale price of electricity increases, the price of a ZEC decreases.  Compl. ¶ 71.  For the first two years of the ZEC program, from April 1, 2017, through March 31, 2019, the PSC has set the ZEC price at $17.48 per MWh.  Compl. ¶ 70.  Thus, "each qualifying nuclear generator will get

---

[5]     This year, only three nuclear generators in New York, Intervenors Robert Emmett Ginna plant ("Ginna"), James A. FitzPatrick plant ("FitzPatrick"), and Nine Mile Point plant, were deemed eligible for ZECs.  CES Order at 128; *see also* Compl. ¶ 58.  Plaintiffs allege that without financial support from the State, the Ginna, FitzPatrick, and Nine Mile Point nuclear generators would have gone out of business.  Compl. ¶¶ 52, 54, 56-58.  The Ginna and Nine Mile Point nuclear plants are indirectly owned by Intervenor Constellation Energy Nuclear Group, LLC, which is a joint venture between Intervenor Exelon and non-party EDF Inc.  Declaration of Jeanne Jones ("Jones Decl.") ¶ 2, Dkt. 40-3; *see also* Compl. ¶ 54.  Exelon is in the process of purchasing the FitzPatrick nuclear plant.  Jones Decl. ¶¶ 6-7.

[6]     LSEs are required to purchase the percentage of ZECs "that represents the portion of the electric energy load served by all such LSEs" in a given year.  CES Order at 20.  Although LSEs must "enter into a contractual relationship" with NYSERDA to purchase their *pro rata* portion of ZECs, LSEs also may seek permission to purchase ZECs directly from the eligible nuclear facilities.  CES Order at 151-52.

[7]     The PSC noted that it established an administrative process to set ZEC prices, rather than allowing them to be set by the market, because there would not be a competitive market process to set ZEC prices.  CES Order, App'x E at 4 ("[T]here are too few owners of the affected generation facilities for there to be a valid competitive process to determine the prices as the owners would have too much market power for effective competition.").

an additional $17.48 for each MWh of electricity it generates (subject to a possible cap), in addition to the price the facility receives for the sale of the electricity and capacity in the [NYSIO] market."  Compl. ¶ 70.

Plaintiffs allege that under the ZEC program, the nuclear generators eligible for ZECs effectively receive a higher price for their energy than they would have without the ZEC program and that the ZEC subsidies distort the market-clearing price in the NYISO auctions. Compl. ¶¶ 43-45.  Plaintiffs allege that because the ZEC program allows the eligible nuclear generators to participate in the NYISO auctions when they otherwise would have gone out of business, New York "is using the ZEC subsidy to exert a large depressive effect on energy and capacity prices, which one group of experts estimated at $15 billion over 12 years." Compl. ¶ 47.  According to Plaintiffs, this depressive effect will cause generators, including Plaintiffs, to receive a lower price than they otherwise would have received and will cause their bids to fail to clear the auctions when they otherwise would have cleared.  Compl. ¶¶ 74, 81, 87.

Plaintiffs claim that the ZEC program is preempted under the FPA and that it violates the dormant Commerce Clause.  Defendants and Intervenors move to dismiss, arguing that: Plaintiffs lack a private right of action to pursue their preemption claims in federal court; the ZEC program is not preempted; and the ZEC program does not violate the dormant Commerce Clause.  For the following reasons, the Court holds that Plaintiffs may not raise their preemption claims pursuant to the Court's equity jurisdiction; that the ZEC program is neither field nor conflict preempted; and that the ZEC program does not violate the dormant Commerce Clause.

**DISCUSSION**[8]

In reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all of the non-movant's

factual allegations as true and draws all reasonable inferences in the non-movant's favor.  *See*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Although all factual allegations contained

in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555.  To survive a

Rule 12(b)(6) motion to dismiss, the complaint must "state a claim to relief that is plausible on

its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id*.

## I.   EQUITY JURISDICTION

The Supremacy Clause does not create a cause of action for preemption claims,

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015), and Plaintiffs do not

argue that the FPA itself creates a private right of action.  Accordingly, Plaintiffs' preemption

claims are dependent on this Court having equity jurisdiction over the claims.

Since *Ex parte Young*, 209 U.S. 123 (1908), "the Supreme Court has consistently

recognized federal [equity] jurisdiction over declaratory—and injunctive—relief actions to

prohibit the enforcement of state or municipal orders alleged to violate federal law." *Friends of*

*the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016)

(collecting cases).  Nevertheless, federal courts' "equity [jurisdiction] to enjoin unlawful

---

[8]       The Court cites the parties' briefs as the following: Memorandum of Law in Support of Defendants'
Motion to Dismiss, Dkt. 55, is "Defs. Mem."; Memorandum of Law in Support of Motion to Dismiss of Movant-
Intervenors, Dkt. 77, is "Intervenors Mem."; Plaintiffs' Memorandum in Opposition to Motions to Dismiss, Dkt. 95,
is "Opp."; Reply in Support of Defendants' Motion to Dismiss, Dkt. 105, is "Defs. Reply"; and Reply in Support of
Motion to Dismiss of Intervenors, Dkt. 103, is "Intervenors Reply."

executive action is subject to express and implied statutory limitations." *Armstrong*, 135 S. Ct. at 1385.  The FPA does not expressly preclude actions in equity, but the parties contest whether Congress implicitly intended to foreclose equitable relief under the FPA.

In *Armstrong*, the Supreme Court held that Congress implicitly foreclosed equitable relief under Section 30(A) of the Medicaid Act, which healthcare providers sought to enforce by enjoining state officials from reimbursing medical service providers at rates lower than the federal statute required.  135 S. Ct. at 1382, 1385.  The *Armstrong* Court reasoned that Congress intended to foreclose equitable relief because (1) pursuant to the Medicaid Act, "the sole remedy" for a State's failure to comply with the Medicaid Act's requirements was the withholding of Medicaid funds by the Secretary of Health and Human Services, and (2) Section 30(A), which mandates that States provide for payments that are "consistent with efficiency, economy, and quality of care" while "safeguard[ing] against unnecessary utilization of . . . care and services," was judicially unadministrable.  *Id.* at 1385 (alteration in *Armstrong*).  According to the Supreme Court, the combination of those two features means that Congress intended to preclude private enforcement in equity of Section 30(A).  *Id.* ("Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes . . . that Congress 'wanted to make the agency remedy that it provided exclusive,'. . . ." (quoting *Gonzaga Univ. v. Doe,* 536 U.S. 273, 292 (2002) (Breyer, J., concurring))).

In *Friends of the East Hampton Airport*, the Second Circuit applied *Armstrong's* two criteria to the Airport Noise and Capacity Act ("ANCA") in considering whether Congress intended to foreclose equitable relief; the Second Circuit held that Congress did not so intend. 841 F.3d at 145-47.  Under ANCA, there is no "sole remedy" because ANCA not only provides for the loss of federal funding as a penalty for violating ANCA but also grants the Secretary of

10

Transportation authority to pursue appropriate legal remedies, including injunctive relief.  *Id.* at 145-46 (citing 49 U.S.C. §§ 47526, 47533).  The Second Circuit reasoned that "[t]he fact that Congress conferred such broad enforcement authority on the [Federal Aviation Administration], and not on private parties, does not imply its intent to bar such parties from invoking federal jurisdiction where, as here, they do so not to enforce the federal law themselves, but to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements."[9]  *Id.* at 146.  The Second Circuit also held that ANCA was judicially administrable because it set forth a simple rule—namely, that airports seeking to impose noise restrictions on certain types of aircraft must obtain the consent of aircraft operators or the approval of the Federal Aviation Administration.  *Id.* at 146-47 (citing 49 U.S.C. § 47524(c)).

The FPA tacitly forecloses private parties from invoking equity jurisdiction to challenge state laws enacted in alleged violation of the FPA because Congress implicitly provided a "sole remedy" in the FPA—specifically, enforcement by FERC.  Similar to ANCA, the FPA grants FERC broad enforcement authority.  For example, the FPA grants FERC discretion to bring an action in federal district court to enjoin any person violating the FPA or to enforce compliance.  16 U.S.C. § 825m(a).  The FPA also requires every public utility to file with FERC rates for all sales subject to FERC's jurisdiction and empowers FERC to hold hearings to examine new or changed rates, to suspend rates, and to determine rates.  16 U.S.C. §§ 824d(c)-(e), 824e(a).  Finally, the FPA authorizes any person to file a complaint with FERC to challenge, *inter alia*,

---

[9]      The Second Circuit's caveat relative to private parties who invoke federal jurisdiction "to enforce the federal law themselves" as compared to seeking "to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements" is not entirely clear.  It would seem that the Second Circuit is raising a standing issue because a private party who seeks to enforce the federal law but does not seek to preclude the application of a local law to itself would appear to lack standing.  But the Second Circuit does not mention standing in its equity jurisdiction analysis, nor is it clear how the issue of standing *vel non* should be viewed when attempting to determine whether a cause of action exists in the first instance.

anything done by a regulated entity in contravention of the FPA.  16 U.S.C. §§ 824e(a), 825e.

But, unlike ANCA, Congress provided for a narrow private cause of action under the FPA in the

Public Utility Regulatory Policies Act ("PURPA"), which authorizes private parties to challenge

state rules governing small power production facilities, after first exhausting their administrative

remedies.  16 U.S.C. § 824a-3(h)(2)(B).  Congress's decision to create a limited private cause of

action suggests that "the omission of a general private right of action in the [FPA] should . . . be

understood as intentional."  *Vill. of Old Mill Creek v. Star*, No. 17 CV 1163, 2017 WL 3008289,

at *9 (N.D. Ill. July 14, 2017); *see Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The

express provision of one method of enforcing a substantive rule suggests that Congress intended

to preclude others."); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) (("[W]here a

statute expressly provides a particular remedy or remedies, a court must be chary of reading

others into it." (citation and internal quotation marks omitted omitted)).  Thus, the FPA precludes

private enforcement except as provided for by PURPA, and private parties such as Plaintiffs

"cannot, by invoking [the Court's] equitable powers, circumvent Congress's exclusion of private

enforcement."  *Armstrong,* 135 S. Ct. at 1385.

The second indicator of congressional intent to preclude equitable relief to a private

litigant, according to *Armstrong*, is the presence of a judicially unadministrable standard.  The

FPA's requirement that wholesale electricity rates be just and reasonable, 16 U.S.C. § 824d(a), is

not judicially unadministrable.[10]  The fact that courts must "afford great deference" to FERC in

---

[10]      Independent of whether the FPA's requirement that wholesale electricity rates be just and reasonable is a
judicially administrable standard, the parties dispute whether Plaintiffs' preemption claims require the Court to
apply that standard.  Plaintiffs argue that they seek only to ensure that the FERC-set rate continues to govern New
York wholesale energy transactions and are not asking the Court to set rates.  Opp. 16-17.  Defendants, on the other
hand, argue that Plaintiffs' preemption claims are rate-related requests for injunctive relief that implicate the just and
reasonable rate-setting standard.  Defs. Reply 11.  The Court agrees with Plaintiffs but does not base its holding on
this argument.

its determination of just and reasonable rates, *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Wash.*, 554 U.S. 527, 532 (2008), does not mean that the determination of just and reasonable rates is judicially unadministrable—courts may defer to FERC's determination, but they do not abstain from all judgment regarding what constitutes a just and reasonable rate, *see, e.g.*, *id.* at 545-46 (the Supreme Court in *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956), "provided a definition of what it means for a rate to satisfy the just-and-reasonable standard in the contract context"); *Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 109-11 (2d Cir. 2015) (holding that FERC's determination of just and reasonable rates was adequately supported and not unreasonable); *Mont. Consumer Counsel v. FERC*, 659 F.3d 910, 918 (9th Cir. 2011) ("The Supreme Court has long held that the statutory command that rates be 'just and reasonable' means that courts must balance 'the investor and the consumer interests,' and '[i]f the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end.'" (quoting *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602–03 (1944))).  Indeed, by allowing FERC to file federal lawsuits, 16 U.S.C. § 825m(a), Congress necessarily anticipated that courts might have to oversee the enforcement of the just and reasonable rate standard, albeit with deference to FERC. [11]

In sum, the Court finds that the first but not the second of *Armstrong's* factors indicates that Congress intended to preclude equitable relief to private parties.  There is no indication in

---

[11]      In a nearly identical case in which electricity generators challenged a ZEC program as preempted by the FPA, the District Court for the Northern District of Illinois came to the opposite conclusion, namely that determining a "just and reasonable" rate is a judicially unadministrable standard.  *Vill. of Old Mill Creek*, 2017 WL 3008289, at *9.  For the reasons explained *supra*, this Court disagrees with the Northern District of Illinois's conclusion that "just and reasonable" is judicially unadministrable.  Moreover, unlike this Court, *see supra* note 10, that court thought that it would need to apply that standard and effectively get involved in rate-setting in order to resolve the plaintiffs' preemption claim.  The Northern District of Illinois concluded that because there was "too much" distortion of the wholesale market, the court would be required to address how much states could subsidize local industry that touched the wholesale energy market before the effect of those subsidies resulted in a rate that was not just and reasonable.  *Id.* at *9.

*Armstrong* that both factors must be satisfied in order to conclude that Congress intended to foreclose equitable relief to private parties.  To the contrary, the Supreme Court in *Armstrong* considered the second factor—judicial administrability—in the event the provision authorizing the Secretary of Health and Human Services to enforce the statute by withholding funds "might not, *by itself*, preclude the availability of equitable relief."  135 S. Ct. at 1385.  The limited private right of action provided by PURPA is by itself sufficient to establish that Congress intended to foreclose equitable relief.  Between a statute that establishes a narrow private cause of action allowing private lawsuits in some but not most cases and a statute that establishes a specific administrative remedy, the former indicates more clearly than the latter that Congress chose to eliminate general equitable relief for private parties.  The issue of creating a private cause of action was squarely before Congress when it drafted and enacted the former provision, whereas Congress did not necessarily consider the possibility of a private right of action in drafting and enacting the latter provision.  This Court can, therefore, more confidently infer that Congress intended to foreclose a private right of action in equity in the former scenario than in the latter.  Accordingly, this Court does not have equity jurisdiction over Plaintiffs' FPA preemption claims.  Nevertheless, even if the Plaintiffs could invoke the Court's equity jurisdiction, for the reasons provided below, Plaintiffs' preemption claims would fail.

## II.   PREEMPTION

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST., art. VI, cl. 2.  In other words, "federal law preempts contrary state law."  *Hughes*, 136 S. Ct. at 1297.

In considering a federal law's preemptive effect, "the ultimate touchstone" is Congress's purpose in enacting the law. *Id*. at 1297 (quoting *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)). Relatedly, in determining whether a state law is preempted, the Court must "consider[] the *target* at which the state law *aims*." *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015) (emphases in original).

State laws may be either "field" or "conflict" preempted. Field preemption exists where "Congress has forbidden the State to take action in the *field* that the federal statute pre-empts." *Oneok*, 135 S. Ct. at 1595. In such circumstances, "Congress may have intended to foreclose any state regulation in the *area*, irrespective of whether state law is consistent or inconsistent with federal standards." *Id*. (citation and internal quotation marks omitted). Conflict preemption, by contrast, "exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. (citation and internal quotation marks omitted).

Plaintiffs allege that the CES Order is both field and conflict preempted by the FPA. For the reasons set forth below, the Court concludes that it is neither.[12]

### A.  Field Preemption

The FPA is a paragon of cooperative federalism; it divides responsibility for the regulation of energy between state and federal regulators. *See Hughes*, 136 S. Ct. at 1292. For statutes such as the FPA, "where 'coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for

---

[12]     The Court notes that the Northern District of Illinois also held that the Illinois ZEC program was neither field nor conflict preempted, for many of the same reasons discussed *infra*. *Vill. of Old Mill Creek*, 2017 WL 3008289, at *10-14 (granting motions to dismiss).

federal pre-emption becomes a less persuasive one.'" *Id.* at 1300 (Sotomayor, J., concurring) (quoting *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 421 (1973)).

FERC, on behalf of the federal government, has exclusive authority "to regulate 'the transmission of electric energy in interstate commerce' and 'the sale of electric energy at wholesale in interstate commerce.'" *FERC v. Elec. Power Supply Ass'n* (hereafter, "*EPSA*"), 136 S. Ct. 760, 767 (2016) (quoting 16 U.S.C. § 824(b)(1)).[13]  Particularly relevant here, FERC also has the authority "to ensure that rules or practices 'affecting' wholesale rates are just and reasonable." *Id.* at 774 (discussing 16 U.S.C. § 824e(a)); *see also* 16 U.S.C. § 824d(a).  This "affecting" jurisdiction is limited to rules or practices that "*directly* affect the wholesale rate." *EPSA*, 136 S. Ct. at 774 (internal marks and citation omitted).  "Indirect or tangential impacts on wholesale electricity rates" do not suffice; otherwise, the FPA's grant of jurisdiction to FERC would "assum[e] near-infinite breadth." *Id.*

Although FERC has substantial authority over interstate wholesale energy sales, the regulation of retail rates for sales of electricity belongs to the States. *Hughes*, 136 S. Ct. at 1292. Within the zone of exclusive state jurisdiction are "within-state wholesale sales" and "retail sales of electricity (i.e.*,* sales directly to users)." *EPSA*, 136 S. Ct. at 768.  States also retain jurisdiction "over facilities used for the generation of electric energy."  16 U.S.C. § 824(b)(1). As discussed *supra*, to determine whether a State is regulating retail or wholesale rates, the Court must consider the target of the state law.  *Oneok*, 135 S. Ct. at 1599.[14]

---

[13]     A wholesale sale is "a sale of electric energy to any person for resale."  16 U.S.C. § 824(d).

[14]     Although *Oneok* involved the Natural Gas Act ("NGA") rather than the FPA, the Supreme Court "has routinely relied on NGA cases in determining the scope of the FPA, and vice versa." *Hughes*, 136 S. Ct. at 1298 n.10.

1.  Unconstitutional "Tethering" Under *Hughes*

The Supreme Court recently grappled with the issue of preemption under the FPA in

*Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016). In *Hughes*, the Court

concluded that a Maryland energy program was preempted because it impermissibly "set[] an

interstate wholesale rate, contravening the FPA's division of authority between state and federal

regulators." 136 S. Ct. at 1297. The Maryland program, which obliged Maryland LSEs to enter

into a contract-for-differences with a favored generator, required the favored generator to

participate in the wholesale capacity auction, but guaranteed that generator the more favorable

contract price (rather than the market-clearing price) for its energy. *Id*. at 1294-95, 1297.

Importantly, the generator's receipt of the subsidy was explicitly contingent on the generator's

sale of capacity into the wholesale auction: if the generator's capacity cleared the auction, and

the market-clearing price was below the price stipulated in the contract-for differences, the LSEs

paid the generator the difference between the contract price and the clearing price. *Id*. at 1295.

The generator did not receive the subsidy if its capacity failed to clear the auction. *Id*. Because

the Maryland program conditioned the generator's receipt of the subsidy on the generator's

participation in the auction, but guaranteed the generator a rate distinct from the market-clearing

price, *Hughes* concluded that the Maryland program "adjust[ed] an interstate wholesale rate" and

was accordingly preempted. *Id*. at 1297.

Hughes*, however, left open the possibility for States to "encourag[e] production of new

or clean generation through measures 'untethered to a generator's wholesale market

participation.'" *Id*. at 1299 (citation omitted). In doing so, the Supreme Court declined to

address the permissibility of other State measures to incentivize clean energy, such as "tax

incentives, land grants, direct subsidies, construction of state-owned generation facilities, or re-

regulation of the energy sector." *Id*. *Hughes* emphasized: "So long as a State does not condition

payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable."  *Id.*

Plaintiffs argue that the ZEC program is preempted under *Hughes* because, like the challenged Maryland program, the ZEC program is "tethered" to the wholesale auction. Plaintiffs argue that there is an impermissible tether because: (1) a nuclear generator is eligible for a ZEC only if the NYISO auction rates are insufficient for the generator to stay in business; (2) ZEC prices are calculated using forecast wholesale rates; and (3) the nuclear generators receiving the ZECs sell all of their power directly into the auction markets.  Opp. 19-22; Oral Arg. Tr. (hereafter, "Tr.") 22:2-23:22, 32:16-34:14, Dkt. 141 (Mar. 29, 2017).  Unsurprisingly, Defendants and Intervenors dispute all of these arguments.  The Court agrees with Defendants and Intervenors.

The Court is not convinced by Plaintiffs' first argument.  A whole host of measures that States might employ to encourage clean energy development—such as tax incentives or direct subsidies—involve propping up the operation of a generator that might otherwise be unprofitable.  *Hughes* did not prohibit such state assistance, *see Hughes*, 136 S. Ct. at 1299, and Plaintiffs have not argued that such state subsidies are *per se* preempted.

Nor does the use of forecast wholesale rates in calculating the ZEC price create an unconstitutional tether.  *Hughes* clearly stated that the impermissible tether was "to a generator's wholesale market *participation*," *id.* at 1299 (emphasis added), and nowhere stated, implied or even considered that a State program's incorporation of the wholesale market price would provide a basis for preemption.[15]  Plaintiffs have not provided any persuasive argument why

---

[15]     For that reason, Plaintiffs' argument that *Hughes* would not have been decided differently if the Maryland program incorporated forecast prices rather than actual ones, Opp. 19, misses the mark.  Plaintiffs do not cite, and the Court has not found, any language in *Hughes* indicating that the Supreme Court considered the pricing calculation for the subsidies to be constitutionally relevant.  The problem with Maryland's program was that the

using wholesale prices, actual or forecast, as a metric for calculating the price of a ZEC creates a tether that leads to preemption.

*Rochester Gas & Electric Corp. v. PSC*, 754 F.2d 99 (2d Cir. 1985) forecloses Plaintiffs' attempt to hook preemption to price.  *Rochester Gas* concluded that the State's consideration of a "reasonable estimate" of wholesale sales revenue in calculating intrastate retail rates (an area of State jurisdiction) did not render the state program at issue preempted.  754 F.2d at 100-01, 105. The Second Circuit found "a distinction between, on the one hand, regulating [wholesale] sales, and on the other, reflecting the profits from a reasonable estimate of those sales in jurisdictional rates."  *Id*. at 105.  Plaintiffs attempt to distinguish *Rochester Gas* by noting that *Rochester Gas* involved regulation at the retail level, Tr. 31:24-32:8, 48:6-10, but that is a distinction without a difference.  Regulation of retail rates, like the regulation of environmental attributes, is within the zone of state jurisdiction, and *Rochester Gas* held that merely considering or incorporating wholesale prices in rate-setting for a state-regulated activity does not intrude upon federal authority.[16]  *Rochester Gas*, 754 F.2d at 105 (New York "may impute revenue from a reasonable estimate of [wholesale] sales" in considering the generator's retail revenue).

Plaintiffs also argue that the ZEC program is directly tied to the wholesale auction because "[a]ll electricity produced by these nuclear generators must be sold directly or indirectly

---

contract-for-difference guaranteed a price and conditioned that guaranteed price on the generator's energy clearing the auction.  Although the auction-clearing price was considered in calculating the amount that would be received under the contract-for-difference (because the generator received the difference between the contract price and the clearing price), the use of the auction-clearing price as a metric was not constitutionally relevant; rather, the impermissible tether was relative to the generator's wholesale market *participation*.  *Id*. at 1295, 1299.  The Court finds no basis to conclude that consideration of wholesale prices (whether forecast or actual) in pricing a subsidy is material to the preemption analysis.

[16]     As a policy matter, using the forecast wholesale prices in the ZEC price calculation is a rational policy decision: it creates a one-way ratchet pursuant to which the ZEC price can be adjusted only downwards, s*ee* Compl. ¶ 71, Tr. 40:11-13, which inures to the benefit of Plaintiffs and the ratepayers.  In addition, and as noted by Intervenors, "this is an odd argument for [Plaintiffs] to make, because it effectively concedes the legality of the first two years of the program where the price is fixed . . . ."  Tr. 46:19-21.

in the NYISO auctions, as there are no alternative markets."  Compl. ¶ 64; *see also* Tr. 22:7-8

("[T]he nuclear plants[] have no alternative but to sell their output in the energy auction . . . .").

Plaintiffs highlight that the nuclear generators are "price takers," Tr. 22:8, and that the nuclear

generators "are exempt wholesale generators under the Public Utility Holding Act [("PUHA")],"

which, according to Plaintiffs, requires the generators to sell all of their power and capacity into

the wholesale auction.  Tr. 22:10-16.

This argument is no more than an attempt to fashion a "tether" by jamming a square peg

into a round hole; Plaintiffs' argument rewrites the CES Order.  The CES Order itself does not

require the nuclear generators to sell into the NYISO auction.  As discussed *supra*, the nuclear

generators receive ZECs for their zero-emissions *production* of energy, and not for the sale of

that energy into the wholesale market; the CES Order grants ZECs to eligible nuclear generators,

without any mention of whether or where the generators sell their power.  *See* CES Order at 124-

29 (discussing criteria for generators to receive ZECs).  In that respect, the ZEC program is

critically different from the challenged program in *Hughes*, which specifically *conditioned*

subsidy payments on the generator's sale of capacity into the auction.  *See Hughes*, 136 S. Ct. at

1295, 1297, 1299.

Even accepting as true Plaintiffs' allegation that the generators do, as a matter of fact, sell

their entire output into the auction, *see* Compl. ¶ 64, that is a business decision; it is not a

requirement imposed by New York.  Plaintiffs have not cited, and the Court has not been able to

find, any case in which a state program has been found to be field preempted based on a private

business decision rather than a state directive.  What the generators choose to do, as a matter of

their business organization or as a product of their business decisions, is irrelevant from a

preemption perspective.  *See Vill. of Old Mill Creek*, 2017 WL 3008289, at *13 (finding the ZEC

program not preempted because "the ZEC program does not *mandate* auction clearing . . . and the state, while taking advantage of these attributes to confer a benefit on nuclear power, is not imposing a condition directly on wholesale transactions").

The fact that the nuclear generators currently claim status as exempt wholesale generators under PUHA is similarly irrelevant.  Intervenors note that PUHA permits generators to withdraw their wholesale generator status, 18 C.F.R. § 366.7(c)(3),[17] but even if PUHA did not permit withdrawal and did require the generators to sell entirely into the auction, the critical point is that *New York* has not required the generators to participate in the auction: nothing about the CES Order tethers the generators' receipt of ZECs to their sale of energy into the auction.  Put differently, a change in PUHA would not unravel the CES Order or interfere with New York's ZEC program.  That is why PUHA is a red herring.  The law of preemption examines state action and considers whether state action has intruded upon the federal government's turf.  It cannot be disputed that the CES Order does not *require* the generators to sell into the auction—that is, it does not tether the generators' receipt of ZECs to their participation in the auction.  It is that aspect of the CES Order that saves the ZEC program from the problems faced in *Hughes*.

In summary, the Maryland program at issue in *Hughes* conditioned the generators' receipt of a favorable rate (distinct from the auction rate) on the generators' capacity clearing the auction; there was a direct and concrete tie (or tether) between the contracts-for-difference and the generator's wholesale market participation.  Here, a ZEC is available based on the environmental attributes of the energy production—specifically, for the generators' production

---

[17]     To claim status as an exempt wholesale generator, the generator may file with FERC a notice of self-certification or a petition for a declaratory order requesting such status, which FERC then reviews. 18 C.F.R. §§ 366.7(a)-(b).  A generator with exempt wholesale generator status may notify FERC that it no longer seeks to maintain its status if "there is any material change in facts that may affect" that generator's status. § 366.7(c)(3).  In addition, the generator's status may be revoked if it fails to conform to the criteria required for such status.  § 366.7(d).

of zero-emissions energy—without consideration of the generators' participation in the auction.

Like the challenged Connecticut program in *Allco Fin. Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017),

the ZEC program does not suffer from *Hughes*'s "fatal defect" because the ZEC program "does

not condition capacity transfers on [the wholesale] auction."  861 F.3d at 99.  Rather, the

purchase or sale of ZECs, like the contracts at issue in the Connecticut program, reflect

transactions that occur "independent of the auction."  *Id.*

2.   <u>ZECs Do Not Directly Adjust, Alter, or Affect the Wholesale Rate</u>

Plaintiffs argue that the ZEC program is preempted because "the ZEC payments directly

alter the wholesale price paid by LSEs and received by the nuclear generators."  Opp. 19.  They

argue that by guaranteeing nuclear generators greater total compensation (i.e., the auction

clearing price plus the value of its ZECs) than what they will receive at auction (clearing price

only), the ZEC program disregards interstate wholesale rates that FERC has deemed just and

reasonable.  In addition, Plaintiffs argue that ZECs artificially depress the auction market-

clearing price by allowing the nuclear generators to continue to participate as price-takers, thus

increasing the supply of energy and thereby reducing the wholesale price.

Plaintiffs' argument commits the logical fallacy of concluding that state actions that

affect the wholesale price in some way are the same as state actions that set the wholesale rate.

In *EPSA,* the Supreme Court stated that "[t]o set a retail electricity rate is . . . to establish the

amount of money a consumer will hand over in exchange for power."  *EPSA*, 136 S. Ct. at 777.

Although *EPSA* was addressing retail rates, this Court sees no principled basis—in the statutory

text, *EPSA*'s discussion or otherwise—to conclude that the definition of "to set a rate" is

different in the retail and wholesale contexts.  Moreover, the *EPSA* definition is consistent with

*Hughes*.  *Hughes* concluded that the Maryland program did adjust and "set" an interstate

22

wholesale rate because the program "required [the generator] to participate in the []capacity auction, but guarantees [the generator] a rate distinct from the clearing price for its interstate sales of capacity." *Hughes*, 136 S. Ct. at 1297.  Here, the ZEC sales and the wholesale sales of energy or capacity are entirely separate transactions, with the ZEC sales occurring independently of the wholesale auction and neither one conditioned on the other.  Therefore, the ZEC program does not adjust or "set" the amount of money that a generator receives in exchange for the generator's sale of energy or capacity into the auction.

Nor is the ZEC program preempted because of the ZECs' effects on the wholesale auction.  FERC has jurisdiction over "rules or practices that *directly* affect the [wholesale] rate," *EPSA*, 136 S. Ct. at 774 (alterations in original) (citation and quotation marks omitted), but "indirect or tangential impacts on wholesale electricity rates" fall outside FERC jurisdiction, *id.* Even if ZECs have an effect on the wholesale auction—which Plaintiffs allege and the Court must accept as true—Plaintiffs have not plausibly alleged that the ZECs directly affect wholesale rates such that they intrude upon federal jurisdiction.

In *Allco*, the Second Circuit squarely rejected the argument that the fact that the challenged contracts would "increase the supply of electricity available to Connecticut utilities," thereby exerting "downward pressure . . . that will have an effect on *wholesale* prices," meant that the Connecticut contracts "infring[ed] upon FERC's regulatory authority."  *Allco*, 861 F.3d at 101.  The Second Circuit concluded that any such effect on wholesale prices was "incidental" and did not "amount to a regulation of the interstate wholesale electricity market that infringes on FERC's jurisdiction."  *Id*.  Plaintiffs here allege that ZECs affect wholesale prices by exerting pressure on the market forces that play out in the wholesale auction, but they, too, fail to state a

plausible claim that ZECs *directly* affect wholesale rates.  Like the *Allco* contracts, ZECs have only an incidental effect on wholesale rates and thus do not intrude upon FERC jurisdiction.

Fatal to Plaintiffs' argument is their failure to offer any cogent explanation why ZECs are preempted but other state incentives to generate clean energy—such as tax exemptions, land grants, or direct financial subsidies—are not.  Such incentives also allow clean energy generators to be more competitive than they would otherwise be, and they therefore also affect price signals in the wholesale auction.  Plaintiffs even concede that such measures "would have some of the same effects" on the market.  Tr. 26:2-3.

*Hughes* declined to rule on the permissibility of such state-incentive measures, *see Hughes*, 136 S. Ct. at 1299 ("We . . . need not and do not address the permissibility of various other measures States might employ to encourage development of new or clean generation, including tax incentives, land grants, [and] direct subsidies . . . ."), and Plaintiffs do not argue here that such incentives are *per se* impermissible, Tr. 25:22-26:4 (acknowledging that "if New York decided to just write a check to a nuclear plant, that would have some of the same effects"). *Hughes* made clear that it did not mean to discourage States from incentivizing clean energy generation so long as the measures taken are not tethered to a generator's wholesale market participation.  *Hughes*, 136 S. Ct. at 1299.  The Supreme Court implicitly acknowledged that state actions to encourage clean energy production may make price signals from the auction less relevant.  *Id.* (citing Respondents' discussion that States may make the price signals in the auction "less relevant by subsidizing new generation," Brief for Respondents 40).  Other than their theories of "tethering," which this Court has already rejected, Plaintiffs offer no explanation for why the effects of ZECs on price signals in the auction are any different from, for example,

the effects a tax incentive given to the nuclear plants would have on those same price signals. There may (or may not) be a difference in degree, but there is no difference in kind.

The death knell for Plaintiffs' field-preemption argument is their failure to distinguish ZECs from RECs.  In *WSPP*, FERC concluded that RECs fall outside FERC jurisdiction because they are state-created certifications of an energy attribute that are unbundled from wholesale energy sales.  *WSPP, Inc.*, 139 FERC P 61061, 2012 WL 1395532, ¶¶ 18, 21, 24 (FERC Apr. 20, 2012).  *WSPP* held that these unbundled transactions did not affect wholesale rates and were not "in connection with" wholesale sales of electricity.  *Id.* ¶ 24; *see also Allco*, 861 F.3d at 93 ("RECs are inventions of state property law whereby the renewable energy attributes are 'unbundled' from the energy itself and sold separately." (quoting *Wheelabrator Lisbon Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 186 (2d Cir. 2008))).  Curiously, Plaintiffs argue that *WSPP* supports their position.

Plaintiffs argue that *WSPP* does not foreclose their preemption claim because *WSPP* noted that a wholesale sale that "requires the use of an emissions allowance" is subject to FERC jurisdiction because such a transaction would directly affect and be "in connection with" the wholesale rate, *WSPP* ¶¶ 22-23.  Plaintiffs argue that because the ZEC program requires that LSEs purchase ZECs in proportion to the electric energy load that they serve, Compl. ¶ 73, ZECs are not "unbundled" from wholesale sales as RECs are.  Opp. 28-29.

Plaintiffs' argument fails given the allegations in their own Complaint: the REC program also requires that LSEs purchase RECs in proportion to their total electricity load or to make a compliance payment.  Compl. ¶ 49; CES Order at 14, 16.  That LSEs may make a REC compliance payment, but no analogous ZEC compliance payment exists, is immaterial; the REC program, like the ZEC program, requires that LSEs make a proportional payment.  *See* CES

Order at 109-10.  Like RECs, ZECs are credits for the environmental attributes of energy

production.  Like the sales of RECs, sales of ZECs are unbundled from wholesale sales for

energy or capacity.  If RECs are not preempted (and *WSPP* makes clear that they are not), then

the Court fails to see how ZECs are.

Plaintiffs further argue that RECs are distinguishable from ZECs because: REC prices are

not calculated using forecast wholesale prices, Opp. 30-31; RECs are available to all generators,

not just a favored few, Opp. 31; and ZECs are not unbundled from or "independent of other

'attributes'" of the eligible generators because the generators receive ZECs based on their

inability to remain profitable from wholesale market sales, Opp. 31.  *See also* Compl. ¶¶ 50-51.

For these reasons, Plaintiffs claim that "the REC is different and is not subject to the same

issues."  Tr. 21:6-7; *see also* Tr. 31:4-5 ("You don't have that tie for the RECs").

Although there are factual differences between ZECs and RECs, none is legally

significant.  As discussed above, the fact that the ZEC price is calculated using a forecast of

wholesale prices does not mean that the ZEC program is preempted.  Nothing in *WSPP*

considered the REC pricing mechanism to be constitutionally significant; indeed, *WSPP* did not

even explicitly address how RECs were priced.[18]  That RECs are available to any energy

producer that uses renewable sources, whereas ZECs are available only to energy producers that

satisfy certain other requirements does not pose a preemption concern.[19]  Plaintiffs cite no cases

---

[18]     WSPP Inc. proposed two structures for the purchase and sale transactions of RECs: (1) RECs that were transferred independently (or unbundled) from energy and (2) RECs that were bundled with energy in the sale transaction.  *WSPP*'s only discussion of REC prices considered whether, in the context of RECs bundled with energy, to allocate the contract price between the RECs and energy or to impose a single price, subject to a cap, for both.  *WSPP* ¶¶ 7, 15.  *WSPP*, however, nowhere discussed how RECs themselves were to be priced, and *WSPP* did not address the price of RECs in transactions where, as here, the sales of RECs were unbundled from the sales of wholesale energy.

[19]     ZECs are available only to energy producers that have historically contributed to clean energy resources in New York, produce zero-emissions electricity, and satisfy other standards.  Compl. ¶¶ 67-68; CES Order at 124.

supporting their theory that subsidizing only a few generators is problematic from a preemption

perspective.  Plaintiffs' creative rephrasing of "unbundled" as "independent of other 'attributes'"

also is unavailing.  *WSPP* held that the "unbundled REC transaction" was not preempted because

it was "independent of a *wholesale electric energy transaction*."  *WSPP* ¶ 24 (emphasis added).

*WSPP* nowhere said that that RECs were not preempted because they were independent of other

attributes.

Like a REC, a ZEC is a certification of an energy *attribute* that is separate from a

wholesale charge or rate.  Like a REC, the purchase or sale of a ZEC is the purchase or sale of

this attribute, rather than the purchase or sale of wholesale energy.  Like a REC, the purchase or

sale of a ZEC is independent of the purchase or sale of wholesale energy.  Like a REC, payment

for a ZEC is not conditioned on the generator's participation in the wholesale auction; rather,

RECs and ZECs are given in exchange for the renewable energy or zero-emissions *production* of

energy by generators.  Compl. ¶ 64 ("payment of ZEC subsidies occurs if, and only if, the

nuclear generator 'produces' electricity"); CES Order, App'x E at 1.  Because of these

similarities between ZECs and RECs, the effect of ZECs on the wholesale auction is legally

indistinguishable from the effect of RECs on the wholesale auction.[20]  FERC has clearly held

that RECs are not preempted.   The Court cannot find any principled basis to hold that the ZEC

program is preempted even though its sibling REC program is not.

---

[20]     Plaintiffs assert that "[u]nlike New York's REC program, which is not tethered to the wholesale markets
(and which Plaintiffs do not challenge), the ZEC program directly affects wholesale rates."  Opp. 30.  Plaintiffs'
distinction between ZECs and RECs hinges on their legal conclusion that ZECs, and not RECs, are "tethered to the
wholesale markets."  The Court rejects Plaintiffs' purported "tether" for the reasons discussed *supra*.

3. <u>Plaintiffs' Attempt to Analogize to Other Preempted State Measures Is Unpersuasive</u>

Plaintiffs argue that the ZEC program's effect on wholesale prices is "far greater" than the effects of programs held preempted in *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988), *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988), *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986), and *Northern Natural Gas Company v. State Corporation Commission of Kansas*, 372 U.S. 84 (1963).  The Court disagrees. Those cases all involved obvious state intrusions into the federal government's area of responsibility that are absent from the ZEC program.  In *Oneok*, the Supreme Court made clear that the *Schneidewind* program was preempted because the state law was "*directed at . . . the control of rates and facilities of natural gas companies . . . precisely the things over which FERC has comprehensive authority.*"  *Oneok*, 135 S. Ct. at 1600 (quoting *Schneidewind*, 488 U.S. at 1600).  The Court found that the *Schneidewind* program "was designed to keep a natural gas company from raising its equity levels above a certain point in order to keep the company's revenue requirement low, thereby ensuring lower *wholesale* rates."  *Id.* (citing *Schneidewind*, 488 U.S. at 307-08).  As discussed *supra*, and unlike in *Schneidewind*, the ZEC program is not directed at and does not directly affect wholesale rates.

*Mississippi Power* and *Nantahala* also do not help Plaintiffs' case.  In *Mississippi Power*, which is a conflict (not field) preemption case, the State barred the utility from recovering costs that the utility was required to pay under a FERC order mandating a certain allocation of power. *Mississippi Power*, 487 U.S. at 373-74.  The Supreme Court concluded that "Mississippi's inquiry into the reasonableness of FERC-approved purchases" was preempted by FERC.  *Oneok*, 135 S. Ct. at 1601-02 (discussing *Mississippi Power*).  Similarly, in *Nantahala*, which also is a conflict preemption case and a case on which *Mississippi Power* relied, a State commission

28

prevented the utility from recovering the costs incurred in paying the wholesale rate for a FERC-mandated allocation of power. *Mississippi Power*, 487 U.S. at 370-71 (discussing *Nantahala*). As in *Nantahala*, the Supreme Court held that the State commission's action was preempted. *Id.* at 370-73 (discussing *Nantahala*). Here, the ZEC program does not challenge or seek to re-determine the reasonableness of the wholesale rate. Rather, ZECs are payments for the environmental attributes of zero-emission energy. Unlike the challenged state laws in *Mississippi Power* and *Nantahala,* and despite Plaintiffs' protestations otherwise, the ZEC program is simply not tethered to the wholesale rate.

Lastly, *Northern Natural Gas* is simply inapposite. In that case, Kansas required the ratable purchase of gas from a particular gas field. *N. Nat. Gas*, 372 U.S. at 85-86. The Supreme Court held that Kansas' orders were preempted because they were "unambiguously directed at purchasers who take gas in Kansas for resale after transportation in interstate commerce" and thereby invaded federal jurisdiction "over the sale and transportation of natural gas in interstate commerce for resale." *Id.* at 90-92 (Kansas orders "directly affect[ed] the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation, which was an objective of the Natural Gas Act."). Unlike in *Northern Natural Gas*, the ZEC program does not order utilities to make any purchases of energy or capacity, let alone from any particular electricity source.

In sum, the Court concludes that the ZEC program is not field preempted. By establishing a program that does not condition or tether ZEC payments to wholesale auction participation, New York has successfully threaded the needle left by *Hughes* that allows States to adopt innovative programs to encourage the production of clean energy. *See Hughes*, 136 S. Ct.

29

at 1299.  For the foregoing reasons, the Complaint does not state a plausible claim of field

preemption.

### B.  Conflict Preemption

Conflict preemption "exists where compliance with both state and federal law is

impossible, or where the state law stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress."  *Oneok*, 135 S. Ct. at 1595 (quotation marks and

citation omitted).  "State regulation of production may be pre-empted as conflicting with FERC's

authority over interstate transportation and rates if it is impossible to comply with both state and

federal law; if state regulation prevents attainment of FERC's goals; or if a state regulation's

impact on matters within federal control is not an incident of efforts to achieve a proper state

purpose."  *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 515-16

(1989).  Where, as here, conflict preemption is alleged based on the obstacle presented by state

law to the federal purpose and objective, "[w]hat constitutes a sufficient obstacle is a matter of

judgment, to be informed by examining the federal statute as a whole and identifying its purpose

and intended effects."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d

65, 101 (2d Cir. 2013) (internal quotation marks and citation omitted); *see also PPL EnergyPlus,

LLC v. Nazarian*, 753 F.3d 467, 478 (4th Cir. 2014) (same).

In "a system of 'interlocking' [state and federal] jurisdiction" like the FPA, *Nazarian*,

753 F.3d at 478; *see also Hughes*, 136 S. Ct. at 1300 (Sotomayor, J., concurring), "conflict pre-

emption analysis must be applied sensitively . . . so as to prevent the diminution of the role

Congress reserved to the States while at the same time preserving the federal role," *Nw. Cent.

Pipeline*, 489 U.S. at 515.  When state law has an impact on matters within FERC's control, "the

State's purpose must be to regulate production or other subjects of state jurisdiction, and the

means chosen must at least plausibly be related to matters of legitimate state concern." *Nw. Cent. Pipeline*, 489 U.S. at 518. A state law "creates a conflict rather than demands an accommodation" when the State is attempting to regulate a matter of federal concern in the guise of regulating a matter of state concern. *Id.* But when the State is legitimately regulating a matter of state concern, "FERC's exercise of its authority must accommodate" that state regulation "[u]nless clear damage to federal goals would result." *Id.* at 522.

Plaintiffs argue that the ZEC program is conflict preempted because it causes "clear damage" to and "interferes with FERC's regulatory objective" of maintaining competitive energy markets. Opp. 32-33. Plaintiffs allege that the ZEC program "disrupt[s] market signals" and "interferes with FERC's decision to structure the wholesale markets . . . on market-based principles" to encourage the maintenance of efficient generators. Compl. ¶¶ 88-89. Plaintiffs further argue that conflict preemption presents a factual issue inappropriate for resolution on a motion to dismiss. Opp. 34.

Defendants and Intervenors respond that the ZEC program is consistent with FERC's policy statements and that NYISO, which administers FERC's markets in New York, has endorsed the ZEC program. Defs. Mem. 8-9; Intervenors Mem. 19-20. Intervenors further note that if the ZEC program were interfering with federal objectives, "FERC has abundant steps it could take but has chosen to take none of them," Tr. 15:21-22. To the contrary, as Intervenors note, FERC has concluded that state programs that incentivize clean energy generation are consistent with FERC's policy objectives. Intervenors Mem. 19 (collecting FERC decisions).

Accepting the Complaint's factual allegations as true, as the Court must at this stage, the Complaint does not state a plausible claim of conflict preemption. The ZEC program is plainly related to a matter of legitimate state concern: the production of clean energy and the reduction

of carbon emissions from the production of other energy.  Thus, in the interlocking jurisdictional scheme provided by the FPA, there is no conflict preemption "[u]nless clear damage to federal goals would result."  *Nw. Cent. Pipeline*, 489 U.S. at 522.

Plaintiffs allege that the ZEC program "interferes with FERC's decision to structure the wholesale markets . . . on market-based principles" to encourage efficient generators. Compl. ¶ 89.  Accepting as true that one of FERC's goals is to promote market efficiency through energy auctions, there is no conflict.  The ZEC program does not run afoul of the goal of having an efficient energy market.  Instead, by incentivizing clean energy production, it seeks to minimize the environmental damage that is done by generating electricity through the use of gas and fossil fuels.  CES Order at 19.  Far from objecting to state programs that encourage energy production with certain desirable environmental attributes, FERC has approved state programs with "renewable portfolio mandates and greenhouse reduction goals."  *See, e.g.*, *Pac. Gas & Elec. Co.*, 123 FERC P 61067, 2008 WL 1780603, ¶ 34 (FERC Apr. 21, 2008).  The ZEC program does not thwart the goal of an efficient energy market; rather, it encourages through financial incentives the production of clean energy.

Plaintiffs' only remaining allegations relative to their conflict preemption claim are that ZECs "will disrupt market signals" within the auction, Compl. ¶ 88, and that "the ZECs will have market-distorting ripple effects throughout the national market and beyond New York's borders," Compl. ¶ 90.  Accepting these factual allegations as true, Plaintiffs have not stated a plausible claim of conflict preemption.

Plaintiffs' core complaint is that the ZEC program will permit certain nuclear generators to continue to participate in the energy market when they otherwise would have gone out of

business.[21]  Compl. ¶ 58.  But, as discussed *supra*, *Allco* concluded that the fact that the

Connecticut program would "increase the supply of electricity," thereby affecting wholesale

prices, did not mean that the Connecticut program was preempted.  *Allco*, 861 F.3d at 101 ("This

incidental effect on wholesale prices does not . . . amount to a regulation of the interstate

wholesale electricity market that infringes on FERC's jurisdiction.").[22]  Here, too, any effects

exerted by ZECs on the market auctions are indirect and incidental; those effects do not cause the

sort of "clear damage to federal goals," *Nw. Cent.* 489 U.S. at 522, that would give rise to a

claim of conflict preemption.  *See Nazarian*, 751 F.3d at 479-80 ("Obviously, not every state

regulation that incidentally affects federal markets is preempted.  Such an outcome 'would

thoroughly undermine precisely the division of the regulatory field that Congress went to so

much trouble to establish . . . , and would render Congress' specific grant of power to the States

to regulate production virtually meaningless.'" (quoting *Nw. Cent. Pipeline*, 489 U.S. at 515)).

As discussed *supra*, other forms of state incentives give the incentive recipient this same sort of

leg up in the market.  If those incentives, including RECs, are not conflict preempted—and

Plaintiffs do not argue that they are—then the Court fails to see how ZECs are.

   Plaintiffs argue that the issue of conflict preemption is not appropriately decided on a

motion to dismiss, pointing out that other district courts decided the conflict preemption question

---

[21]  The Court notes that Plaintiffs' alleged economic harm is that other generators were awarded ZECs while they were not and that Plaintiffs must compete against the generators receiving ZECs.  *See* Compl. ¶ 74.  But that harm exists because Plaintiffs do not produce energy with the environmental attributes encouraged by the ZEC program.  That is, Plaintiffs fail to qualify for the ZEC program because of their business decisions about how they generate electricity.

[22]  Although the Second Circuit did not explicitly discuss whether its discussion of the contracts' effects on wholesale prices was relevant to the field or conflict preemption question, the Second Circuit cited *Hughes* throughout that discussion, which was a field preemption case.  Nevertheless, *Allco* concluded, as a matter of law, that the kind of effect alleged by Allco was an "incidental effect on wholesale prices."  *Allco*, 861 F.3d at 101.  The Court finds no basis to find that an effect that is "incidental" when contemplating field preemption loses its "incidental" nature when contemplating conflict preemption.

after considering factual and expert evidence in the case.  *See PPL EnergyPlus, LLC v. Nazarian* (hereafter, "*Nazarian II*"), 974 F. Supp. 2d 790 (D. Md. 2013); *PPL EnergyPlus, LLC v. Hanna*, 977 F. Supp. 2d 372 (D.N.J. 2013).  *Nazarian II* and *Hanna*, however, presented plausible claims of conflict preemption.  In those cases, the programs guaranteed a fixed price that displaced the wholesale auction price; that displacement resulted in clear damage to FERC's goal of setting wholesale prices at auction.  *See* Mem. and Order re: Mot. to Dismiss at 11, ECF 71, *Nazarian II*, No. MJG-12-1286 (D. Md. Aug. 3, 2012) (Plaintiffs asserted a plausible claim of conflict preemption based on their allegation that the generator benefitting from the Maryland program was "guaranteed receipt of the PSC fixed price" through a contract for difference and was therefore "not appropriately market-based.");[23] *see also* Mem. and Order at 9, ECF 69, *PPL EnergyPlus, LLC v. Solomon* ("*Hanna*"), No. 11-745 (D.N.J. Oct. 19, 2011) (Conflict preemption claim survived the motion to dismiss because the New Jersey program, which "impermissibly guarantee[d] a wholesale capacity price," thereby "impede[d] FERC's policy of establishing a market-based approach to setting wholesale energy rates in the mid-Atlantic market." (citing allegations that New Jersey's utilities are required to procure power at a fixed price approved by the State)).  Put differently, the *Nazarian II* and *Hanna* programs stood as an obstacle to FERC's policy of using market principles to set wholesale prices because those programs guaranteed a predetermined, state-approved price, rather than the market auction price, for the wholesale sale of energy or capacity.

No such obstacle exists for the ZEC program.  Unlike *Nazarian II* and *Hanna*, the ZEC program does not guarantee a certain wholesale price that displaces the market-determined price.

---

[23]      *Nazarian II* concerned the Maryland program that was struck down in *Hughes*.  The district court denied the motion to dismiss in *Nazarian II* but later concluded after a bench trial that the Maryland program was field preempted, a decision affirmed by the Fourth Circuit, *PPL Energyplus, LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014), and the Supreme Court, *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016).

Recognizing FERC's goal to set wholesale prices through a market-based approach, the Court fails to see how the ZEC program causes clear damage to that goal.  As discussed above, the nuclear generators receiving ZECs will receive for their energy whatever the market-clearing price is.  Separately, they will be compensated for their ZECs, which are awarded based on the positive attributes of the energy they generate.  Any price-distorting effects exerted by the ZECs on the market signals at the wholesale auctions are, at best, indirect and do not present the sort of "clear damage" required for a plausible conflict preemption claim.  To hold otherwise would call into question RECs and all state subsidies, such as tax incentives and land grants; such subsidies, too, exert price-distorting effects on market signals and allow some generators to clear the auction when they otherwise would be priced out.

Plaintiffs cite *International Paper Co. v. Oullette*, 479 U.S. 481 (1987), to argue that state programs with the potential to undermine a federal regulatory structure are conflict preempted because States "cannot 'do indirectly what they could not do directly.'"  Opp. 32 (quoting *Oullette*, 479 U.S. at 495).  *Oullette* is inapposite.  In *Oullette*, the Court considered whether a Vermont nuisance law was preempted by the Clean Water Act, which established a federal permit program regulating the discharge of pollutants and assigned different state regulatory roles based on whether the State was the source of the discharge.  479 U.S. at 489-91.  Because application of the Vermont law could "effectively override the permit requirements and the policy choices made by the source State," the Court concluded that the Vermont law effectively circumvented and upset the balance of interests contemplated by the Clean Water Act.  *Id.* at 494-95.  Accordingly, the Court held that the Vermont law was conflict preempted.  *Id.* at 487, 493-97.

Nothing about the ZEC program "effectively override[s]," *id*. at 495, the FPA. ZECs do not circumvent the FERC auction—at the risk of being redundant, ZECs, like RECs, are payments for environmental attributes that are unbundled from and involve separate transactions than those for the wholesale sales of energy or capacity. If the ZEC program were aimed at wholesale market participation or wholesale prices for sales of energy or capacity, then this would be a stronger case for conflict preemption. Unlike the Vermont law at issue in *Oullette*, which did present a clear conflict between the state law and the federal regulatory scheme, the ZEC program does not "stand[] as an obstacle," *Oneok*, 135 S. Ct. at 1595 (internal quotation marks and citation omitted), to the FERC auction or the FPA.

Plaintiffs' proposed discovery highlights the implausibility of their conflict preemption claim. The only two topics of discovery proposed by Plaintiffs relevant to the conflict preemption claim are: (1) fact discovery supporting Plaintiffs' allegation that "the nuclear energy is not being sold directly to any customers at retail; it's going into the auction process"; and (2) fact and expert discovery to demonstrate that the ZEC program "will, in fact, have a substantial impact on the wholesale rate." Status Conference Tr. 29:25-30:9-10, Dkt. 90 (Dec. 16, 2016). Again, even if all of the nuclear generators' electricity is sold into the auction and the ZECs have an impact on the wholesale rate by affecting market signals, Plaintiffs will not have stated a plausible claim of conflict preemption. No factual discovery into these topics will surmount the core problem with Plaintiffs' claim: the ZECs are not tethered to wholesale sales in a way that causes clear damage to federal goals.

Therefore, the Court concludes that the Complaint does not state a plausible claim of conflict preemption.[24]

---

[24]     It is difficult to fathom how the ZEC program could cause "clear damage" to FERC goals inasmuch as FERC has taken no steps to oppose the ZEC program, despite having had several months to do so, and has approved

III.    DORMANT COMMERCE CLAUSE

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the

several States."  U.S. CONST. art. I, § 8, cl. 3.  "The negative or dormant implication of the

Commerce Clause prohibits state. . . regulation . . . that discriminates against or unduly burdens

interstate commerce and thereby impedes free private trade in the national marketplace." *Gen.*

*Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (internal citations and quotation marks

omitted).  But "there is a residuum of power in the state to make laws governing matters of local

concern which nevertheless in some measure affect interstate commerce or even, to some extent,

regulate it."  *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 669 (1981) (internal

quotation marks and citation omitted).  Therefore, a state law or regulation violates the dormant

Commerce Clause "only if it (1) 'clearly discriminates against interstate commerce in favor of

intrastate commerce,' (2) 'imposes a burden on interstate commerce incommensurate with the

local benefits secured,' or (3) 'has the practical effect of "extraterritorial" control of commerce

occurring entirely outside the boundaries of the state in question.'"  *Selevan v. N.Y. Thruway*

*Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quoting *Freedom Holdings Inc. v. Spitzer,* 357 F.3d 205,

216 (2d Cir. 2004)).

Only the first two means of violating the dormant Commerce Clause are at issue here.

Plaintiffs allege that the ZEC program violates the dormant Commerce Clause because: (1) the

ZEC program facially discriminates against out-of-state energy producers, including nuclear and

other carbon-free energy producers, by selecting only New York nuclear power plants to receive

---

REC programs, which have an identical impact on the market.  *See WSPP*, 139 FERC P 61061, 2012 WL 1395532. The fact that FERC has convened a technical conference "to understand the potential for sustainable wholesale market designs that both preserve the benefits of regional markets and respect state policies" that encourage particular resource attributes would seem to indicate that FERC concurs with the Court's conclusion that there is not a conflict between federal goals regarding wholesale market auctions and state policies that incentivize the production of energy with positive environmental attributes.  *See* Notice of Technical Conference at 2, Dkt. 121-1 (FERC Mar. 3, 2017).

ZECs, Compl. ¶ 98; and (2) the ZEC program imposes an undue burden on interstate commerce by distorting market pricing and incentives, which will cause energy generators, including out-of-state energy providers, to leave the market or discourage their entry into the market, Compl. ¶ 99.  Plaintiffs have no cause of action under either theory and have, in any event, failed to allege a dormant Commerce Clause claim.

### A.  <u>Cause of Action</u>

Intervenors argue that Plaintiffs lack prudential standing to bring a dormant Commerce Clause claim because they do not allege a nexus between their injury and any discriminatory aspect of the ZEC program.  Intervenors Mem. 22; Intervenors Reply 15.  In other words, Intervenors argue that Plaintiffs lack prudential standing because Plaintiffs' injury does not fall within the dormant Commerce Clause's zone of interests.  Courts have consistently applied the zone of interests test to dormant Commerce Clause claims to determine whether plaintiffs have prudential standing.  *See, e.g.*, *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977); *Selevan*, 584 F.3d at 91-92; *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474-76 (5th Cir.2013); *Fla. Transp. Services, Inc. v. Miami-Dade Cty.*, 703 F.3d 1230, 1255-56 (11th Cir. 2012), *cert. denied*, 134 S. Ct. 116 (2013); *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 932-33 (9th Cir. 2011); *Freeman v. Corzine*, 629 F.3d 146, 156-57 (3d Cir. 2010); *Nat'l Solid Wastes Mgmt. Ass'n v. Daviess Cty.*, 434 F.3d 898, 901-02 (6th Cir. 2006), *vacated and remanded on other grounds*, 127 S. Ct. 2294 (2007).

The Supreme Court recently held that the zone of interests test does not fall under the prudential standing rubric; instead, whether a plaintiff's injury falls within a law's zone of interests goes to whether the plaintiff has a cause of action.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014).  The Supreme Court in *Lexmark* addressed the

zone of interests inquiry only as it applies to statutory claims; it did not address constitutional

claims, such as Plaintiffs' dormant Commerce Clause claim.  *Id.*  To the Court's knowledge,

only the Third Circuit has addressed whether *Lexmark* applies to constitutional claims.  In *Maher*

*Terminals*, the Third Circuit applied the zone of interests test to determine whether the plaintiff

had stated a Tonnage Clause[25] claim, while clarifying that post-*Lexmark* this was not a prudential

standing issue.[26]  *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 105, 110 (3d

Cir. 2015).  This Court sees no reason not to apply *Lexmark* to constitutional claims.  Just as "a

rose by any other name would smell as sweet,"[27] so, too, does the zone of interests test apply

whether labeled a prudential standing issue or a cause of action issue.  The Supreme Court's

reasoning that the zone of interests test is more logically a cause of action question applies

equally to statutory and constitutional claims, and *Lexmark* did not reject the zone of interests

test—it merely reclassified it.  Accordingly, and in light of the numerous cases that have applied

the zone of interests test to dormant Commerce Clause claims, the Court applies the zone of

interests test to determine whether Plaintiffs have alleged a cause of action.[28]

---

[25]     The Tonnage Clause of the Constitution prohibit states from imposing taxes on cargo shipments without the consent of Congress.  U.S. CONST. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, lay any Duty of Tonnage . . . .").

[26]     The District Court for the Northern District of California has also addressed whether *Lexmark* applies to constitutional claims.  In *HomeAway Inc. v. City & Cty. of San Francisco*, the district court held that *Lexmark* did not address the prudential doctrine of third-party standing as applied to constitutional claims and declined to extend *Lexmark* as invalidating that strand of prudential standing doctrine.  No. 14-CV-04859-JCS, 2015 WL 367121, at *6-7 (N.D. Cal. Jan. 27, 2015).  Because third-party interests are not at issue here, the decision in *HomeAway* is not relevant.

[27]     William Shakespeare, *Romeo and Juliet*, act 2, sc. 2.

[28]     In their opposition brief, Plaintiffs did not address Intervenors' argument that Plaintiffs' dormant Commerce Clause claim should be dismissed because Plaintiffs lack prudential standing, although Plaintiffs did attempt to address the issue in response to the Court's question during oral argument, *see* Tr. 35:4-39:15.  "[F]ailure to adequately brief an argument constitutes waiver of that argument at [the] motion to dismiss stage."  *Guzman v. Macy's Retail Holdings, Inc.*, No. 09 CIV. 4472 (PGG), 2010 WL 1222044, at *8 (S.D.N.Y. Mar. 29, 2010) (quotation marks and citation omitted).  Nevertheless, the Court will consider the merits of the prudential standing issue, albeit reframed as a cause of action issue.

The zone of interests protected by the dormant Commerce Clause is the economic interests of out-of-state entities. *Allocco Recycling, Ltd. v. Doherty*, 378 F. Supp. 2d 348, 358 (S.D.N.Y. 2005); *see also Yakima Valley Mem'l Hosp.*, 654 F.3d at 932 ("Any alleged injury 'must somehow be tied to a barrier imposed on interstate commerce.'" (quoting *City of Los Angeles v. Cty. of Kern*, 581 F.3d 841, 848 (9th Cir. 2009))). In other words, Plaintiffs must "allege an injury stemming from the application of the [ZEC program] in a manner discriminatory to out-of-state interests," *L.A.M. Recovery, Inc. v. Dep't of Consumer Affairs*, 184 F. App'x 85, 88-89 (2d Cir. 2006) (summary order) (citing *Boston Stock Exch.*, 429 U.S. at 321), whether due to facial discrimination against or an undue burden on out-of-state economic interests.

Plaintiffs entirely fail to allege any injury arising from discrimination against or an undue burden on out-of-state economic interests. As to their claim that the ZEC program facially discriminates against out-of-state nuclear power providers by awarding ZECs only to New York nuclear power plants, Plaintiffs do not allege that they own or represent an out-of-state nuclear power plant.[29] In addition, Plaintiffs allege that the ZEC program is "directly discriminatory" because it "is not even-handed with respect to other technologies that could produce carbon-free electricity," Compl. ¶ 98, and that various Plaintiffs own or have members that own in- and out-of-state power suppliers (without specifying whether the power suppliers are nuclear), Compl. ¶¶ 10-15. That those Plaintiffs may be discriminated against because the ZEC program

---

[29] At oral argument, counsel for Plaintiffs represented to the Court that Plaintiff Electric Power Supply Association includes at least one member that is an out-of-state nuclear power plant. Tr. 35:17-25. But, "[o]n a motion to dismiss, the Court must only examine the allegations in the complaint to determine whether Plaintiff has met the [zone of interests test]." *Allocco Recycling, Ltd.*, 378 F. Supp. 2d at 357 (citing *Nash v. Califano*, 613 F.2d 10, 14 (2d Cir. 1980)). Because the Court holds that even if Plaintiffs had a cause of action, their dormant Commerce Clause claims would fail, it would be futile for Plaintiffs to amend their Complaint to include allegations that they own or represent out-of-state nuclear facilities.

is available only to nuclear power plants—as opposed to other kinds of power plants that produce few or no greenhouse gas emissions—does not constitute a cause of action under the dormant Commerce Clause.  That alleged injury does not fall within the zone of interests protected by the dormant Commerce Clause—namely the protection of *out-of-state* economic interests.  The dormant Commerce Clause does not protect the economic interests of non-nuclear power plants, regardless of where they are located or whether they are carbon-free.  *See Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 500 (5th Cir. 2004) (plaintiffs did not have prudential standing to bring dormant Commerce Clause claim on a facial discrimination theory because the plaintiffs' injury was "not related to any out-of-state characteristic of their business").

Plaintiffs also lack a cause of action to bring a dormant Commerce Clause claim on their undue burden theory.  According to that theory, Plaintiffs will be injured by the ZEC program because the otherwise unprofitable nuclear power plants receiving ZECs will drive down the auction prices received by all power plants, including Plaintiffs' power plants, and will thus cause them to leave or discourage them from entering the market.  Compl. ¶¶ 47, 74.  But this alleged injury also falls outside the zone of interests protected by the dormant Commerce Clause.  Under Plaintiffs' theory, the same price-distorting effects and the same alleged injury would occur (probably to a more significant degree) if ZECs were extended to nuclear power plants nationwide.[30]  Thus, because Plaintiffs would be allegedly injured by the ZEC program's market distortion effect even if New York provided ZECs to in- and out-of-state nuclear power plants,

---

[30]     The District Court for the Northern District of Illinois made a similar point with respect to a dormant Commerce Clause challenge in *Vill. of Old Mill Creek*, 2017 WL 3008289, at *7, but did so in the context of holding the complaining plaintiffs lacked Article III standing to challenge Illinois' ZEC program.  That district court wrote: "If the procurement process were non-discriminatory, the out-of-state, non-nuclear plaintiffs would still be injured.  Similarly, the general market-distorting effects on non-nuclear plants outside of Illinois would still be felt if the ZEC procurement process subsidized nuclear plants without favoring in-state interests."  *Id.*

Plaintiffs are not harmed because of an alleged undue burden on out-of-state economic interests.[31]

Although "the zone of interests test is not a rigorous one," *Nat'l Weather Serv. Employees Org., Branch 1–18 v. Brown*, 18 F.3d 986, 989 (2d Cir. 1994), the interest sought to be protected must be at least *arguably* within the zone of interests to be protected by the dormant Commerce Clause, *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).  Because Plaintiffs' interests are, at best, "marginally related" to the protection of out-of-state economic interests, Plaintiffs lack a cause of action.[32]  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

## B.  Market Participant Exception and Subsidies

Even if Plaintiffs had a cause of action, their dormant Commerce Clause claim would fail because New York was acting as a market participant, not as a regulator, when it created ZECs. The dormant Commerce Clause "does not prohibit a state from participating in the free market if it acts like a private enterprise."  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255 (2d Cir. 2001).  "'[A] state regulates when it exercises governmental powers that are unavailable to private parties,' such as the imposition of civil or criminal penalties to compel behavior."  *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d

---

[31]     In evaluating whether the plaintiffs had a cause of action under the Copyright Act, the Supreme Court in *Lexmark* analyzed the zone of interests and proximate cause requirements separately.  134 S. Ct. at 1388-91.  The proximate cause analysis is similar to the zone of interests analysis and concerns "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Id.* at 1390.  In other words, "the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct."  *Id.* For the same reasons that Plaintiffs' undue burden claim is not within the dormant Commerce Clause's zone of interests, it also fails to satisfy the proximate cause requirement.

[32]     Moreover, the Supreme Court has suggested that a less generous approach may be appropriate outside of the Administrative Procedure Act ("APA") context.  *Lexmark Int'l, Inc.*, 134 S. Ct. at 1389 ("[T]he breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes." (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997))).

200, 208 (2d Cir. 2003) (quoting *United Haulers Ass'n, Inc.*, 261 F.3d at 255).  But, "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976).

In *Alexandria Scrap*, in order to ameliorate the aesthetic and environmental problem associated with abandoned automobiles, Maryland created a bounty payable to any licensed processor that destroyed any vehicle formerly titled in Maryland. *Id.* at 797.  Maryland imposed a more burdensome title documentation requirement on out-of-state processors than in-state processors in order to receive the bounty. *Id.* at 801.  An out-of-state processor claimed that the Maryland law violated the dormant Commerce Clause because it gave Maryland processors an unfair advantage in the market for bounty-eligible hulks. *Id.* at 802.  The Supreme Court disagreed.  It held that the Maryland law did not violate the dormant Commerce Clause because Maryland did not seek to prohibit the flow of hulks or regulate that flow but instead "entered into the market itself to bid up their price" for the legitimate purpose of protecting Maryland's environment. *Id.* at 806, 809.  The Court acknowledged that the effect of the law was that Maryland hulks would be primarily destroyed by in-state processors and that in-state processors would primarily receive the bounties, but the Court held that "no trade barrier of the type forbidden by the Commerce Clause" restricted the movement of Maryland hulks out-of-state. *Id.* at 810.  Instead, the hulks remained in Maryland "in response to market forces, including that exerted by money from the State." *Id.*

Building on *Alexandria Scrap*, in a case involving facts and allegations much closer to those at issue here, the District Court for the District of Connecticut dismissed the plaintiff's dormant Commerce Clause claim, reasoning that Connecticut was acting as a market participant

when it created a market for RECs that subsidized clean energy generation.  *Allco Fin. Ltd. v. Klee*, Nos. 3:15-cv-608 (CSH), 3:16-cv-508 (CSH), 2016 WL 4414774, at *23-25 (D. Conn. Aug. 18, 2016), *aff'd*, 861 F.3d 82 (2d Cir. 2017).  In *Allco*, the Plaintiff generated RECs in Georgia through one of its solar power facilities, but those RECs did not satisfy Connecticut's requirements, which required that RECs be generated from power plants within the Northeast. *Id.* at *21.  The district court concluded that, just as Maryland had incentivized market participants to destroy hulks by financially rewarding them to do so, Connecticut was merely making it "more lucrative for generators to produce and distribute clean energy in Connecticut" by creating a secondary REC market.  *Id.* at *24.  Connecticut is "not obligated to spread the benefit of that market to states that do not also bear the burden of the cost of the subsidy, which is ultimately paid by Connecticut ratepayers."  *Id.*  The district court held that Connecticut was not acting as a regulator because it was "not preventing the flow of clean energy or regulating the conditions on which it may occur."[33]  *Id.*

This case follows in the footsteps of *Alexandria Scrap* and the district court's decision in *Allco*.  New York's ZEC program does not create a trade barrier or prevent or regulate the flow of energy—renewable, nuclear, or otherwise.  New York gives financially eligible nuclear generators that have historically contributed power into the New York market credit for the zero-emission attributes of each MWh of electricity they produce.  Compl. ¶ 67.  NYSERDA then

---

[33]      The Second Circuit affirmed the district court's dormant Commerce Clause ruling on a different ground without commenting on the district court's analytical approach.  The Second Circuit applied *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), to conclude that the Connecticut REC program did not violate the dormant Commerce Clause because a REC that satisfies Connecticut's REC program can be produced only in the Northeast and is thus a different product that does not compete against a REC produced in Georgia.  *Allco*, 861 F.3d at 103-08. The district court's analytical approach is more applicable here than the Second Circuit's approach given that the dormant Commerce Clause claim is not that New York is discriminating against a competing product from out-of-state but that New York (1) is not giving ZECs to out-of-state energy producers, and (2) is creating an undue burden on interstate commerce because ZECs distort market pricing and incentives.

buys the ZECs from the nuclear generators at an administratively determined price, and the cost

is ultimately passed on to New York ratepayers.  Compl. ¶¶ 69, 73.  Just like Maryland in

*Alexandria Scrap* and Connecticut in *Allco*, by distributing subsidies through the ZEC program

to otherwise financially struggling nuclear power plants, New York is participating in the energy

market and exercising its right to favor its own citizens.[34]  Moreover, just as Maryland and

Connecticut were not required to subsidize out-of-state businesses when in-state residents were

paying for the subsidies, neither is New York required to provide financial assistance in the form

of ZECs to out-of-state power plants when the ZECs are ultimately paid for by New York

ratepayers.

Plaintiffs argue that this case is distinguishable because New York, and not the free

market, sets the price of the ZECs and because ZECs are distributed on the basis of financial

need.  Opp. 40.  Plaintiffs have not articulated why those distinctions are relevant to the dormant

Commerce Clause analysis, and the Court does not find them to be relevant.  New York is

paying the nuclear power plants a set dollar amount for each MWh of electricity they produce in

recognition of the zero-emission attributes of their electricity.  This is no different than Maryland

paying a set bounty to hulk processors.  Whether the subsidy amount is at a government-set rate,

as it is here and as it was in *Alexandria Scrap*, 496 U.S. at 797 n.5, or set by market forces, as it

was in *Allco*, 2016 WL 4414774, at *20, has no impact on the market participant analysis.  Nor

does the fact that ZECs are distributed based on financial need.  The dormant Commerce Clause

does not restrict which in-state businesses a State may subsidize when it is expending its own

---

[34]     New York is favoring its own citizens in the ZEC program as it is currently applied because only three
power plants currently receive ZECs, and they are all in New York.  The parties dispute whether the ZEC program,
by requiring nuclear power plants to have been historical providers of energy to New York, effectively limits
eligibility to New York nuclear power plants.  *Compare* Defs. Mem. 23, *and* Intervenors Mem. 23, *and* Defs. Reply
13-14, *with* Opp. 37.

funds to do so, so long as the State does not also impose "taxes and regulatory measures impeding free private trade in the national marketplace," *Reeves, Inc. v. Stake*, 447 U.S. 429, 436-37 (1980).

Indeed, regardless of the market participant exception, although the Supreme Court has "never squarely confronted the constitutionality of subsidies," *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 589 (1997) (quotation marks and citation omitted), "[a] pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business," *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199 (1994); *see also New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988) ("Direct subsidization of domestic industry does not ordinarily run afoul of [the dormant Commerce Clause] . . . .").[35]  The Supreme Court has, however, struck down a state subsidy; it did so when a subsidy to in-state producers was coupled with a tax on in-state and out-of-state producers and thus functioned like a discriminatory tax on out-of-state producers.  *West Lynn Creamery, Inc.*, 512 U.S. at 214-15. But the subsidy at issue here is not linked to a tax on out-of-state electricity generators—it is "a pure subsidy" for the environmental attributes of nuclear energy and is paid for by New York retail energy consumers.  *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 394 (1994) (noting that instead of instituting an unconstitutional flow control ordinance to make a waste disposal facility commercially viable, the town could have subsidized the facility through general taxes or municipal bonds); *see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 368 (2007) (same).  Accordingly, the ZEC program is a

---

[35]     Courts often apply the market participant exception to dormant Commerce Clause cases concerning subsidies, but because some cases have analyzed whether subsidies violate the dormant Commerce Clause independent of—and without mention of—the market participant exception, this Court also addresses whether ZECs are a permissible subsidy pursuant to those cases, independent of the market participant exception doctrine.

permissible subsidy, and the market participant exception to the dormant Commerce Clause applies.  For these additional reasons, the Complaint does not state a plausible dormant Commerce Clause claim.[36]

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' and Intervenors' motions to dismiss.  The American Wind Energy Association's motion for leave to file an *amicus* brief is GRANTED.  The Clerk of Court is respectfully directed to terminate Docket Entry Nos. 54, 76 and 150 and to close this case.


**SO ORDERED.**

**Date:  July 25, 2017**              **VALERIE CAPRONI**
**         New York, New York**              **United States District Judge**

---

[36]      Because Plaintiffs lack a cause of action, the market participant exception applies, and the ZEC program is a permissible subsidy, the Court need not reach the parties' arguments regarding whether the ZEC program is facially discriminatory or poses an undue burden.  Nevertheless, the Court is skeptical that the ZEC program poses a disparate, undue burden on out-of-state economic interests on the theory, as alleged by Plaintiffs, that ZECs artificially reduce market prices.  That alleged harm is not disparate—it affects in-state and out-of-state power plants equally.